**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) MDL No. <br> ) 2:18-mn-2873-RMG |

| | |
|---|---|
| CITY OF CAMDEN, CITY OF BROCKTON, CITY OF SIOUX FALLS, CALIFORNIA WATER SERVICE COMPANY, CITY OF DELRAY BEACH, CORAOPOLIS WATER & SEWER AUTHORITY, TOWNSHIP OF VERONA, DUTCHESS COUNTY WATER AND WASTEWATER AUTHORITY AND DALTON FARMS WATER SYSTEM, CITY OF SOUTH SHORE, CITY OF FREEPORT, MARTINSBURG MUNICIPAL AUTHORITY, SEAMAN COTTAGES, VILLAGE OF BRIDGEPORT, CITY OF BENWOOD, NIAGARA COUNTY, CITY OF PINEVILLE, AND CITY OF IUKA, individually and on behalf of all others similarly situated, <br><br> *Plaintiffs,* <br><br> -*vs*- <br><br> E. I. DUPONT DE NEMOURS AND COMPANY (n/k/a EIDP, Inc.), DUPONT DE NEMOURS INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and CORTEVA, INC., <br><br> *Defendants.* | 2:23-cv-03230-RMG <br><br> **CLASS ACTION COMPLAINT** <br><br> **Jury Trial Demanded** |

Plaintiffs CITY OF CAMDEN, CITY OF BROCKTON, CITY OF SIOUX FALLS, CALIFORNIA WATER SERVICE COMPANY, CITY OF DELRAY BEACH, CORAOPOLIS WATER & SEWER AUTHORITY, TOWNSHIP OF VERONA, DUTCHESS COUNTY WATER AND WASTEWATER AUTHORITY AND DALTON FARMS WATER SYSTEM,

CITY OF SOUTH SHORE, CITY OF FREEPORT, MARTINSBURG MUNICIPAL AUTHORITY, SEAMAN COTTAGES, VILLAGE OF BRIDGEPORT, CITY OF BENWOOD, NIAGARA COUNTY, CITY OF PINEVILLE, AND CITY OF IUKA (collectively "Proposed Class Representatives"), by and through their attorneys Baron & Budd P.C., Douglas & London P.C., Napoli Shkolnik, and Fegan Scott LLC (collectively "Proposed Class Counsel"), for their Class Action Complaint against Defendants E. I. DUPONT DE NEMOURS AND COMPANY (n/k/a EIDP, Inc.), DUPONT DE NEMOURS INC., THE CHEMOURS COMPANY, THE CHEMOURS COMPANY FC, LLC, and CORTEVA, INC., (collectively "Defendants") allege on behalf of themselves and others similarly situated as follows:

## **INTRODUCTION AND BACKGROUND**

1.     The Proposed Class Representatives are public water entities and/or private companies that provide drinking water to the public ("Public Water Systems"), and they bring this class action lawsuit on behalf of themselves and other similarly situated Public Water Systems (the "Class members") arising from the widespread contamination of water intended for distribution to consumers and users with per- and polyfluoroalkyl substances ("PFAS"), a family of chemical compounds that includes perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonic acid ("PFOS").

2.     Collectively, the Proposed Class Representatives and Class members supply drinking water to tens of millions of individuals nationwide. The Proposed Class Representatives own and/or operate drinking water wells and/or public water supply systems that allow them to supply water to residences, schools, and businesses. These drinking water wells and/or water supplies have been contaminated with PFAS and/or are required to be tested for it under applicable law.  The Proposed Class Representatives seek to represent all similarly situated owners and/or

operators of drinking water wells and water supplies that have likewise been contaminated with PFAS or are currently required to test for it under UCMR 5 or applicable state or federal law.

3.     At various times from the 1950s through today, Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in end products that contain PFAS as an active ingredient, byproduct or degradation product (collectively referred to as "Defendants' PFAS"). These end products include aqueous film-forming foam ("AFFF"), Teflon, Scotchguard, waterproofing compounds, stainproofing compounds, paper and cloth coatings, waxes, and various other products.

4.     Defendants' PFAS are manufactured compounds that are toxic, bioaccumulative and persistent in the environment, do not biodegrade, move readily through soil and groundwater, and pose a significant risk to human health and safety.

5.     Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS with the knowledge that these toxic compounds would be released into the environment when used as directed, instructed and/or intended.

6.     Defendants were also aware that Defendants' PFAS would be and have been used, released, stored, and/or disposed of at, near or within the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members, and that they would enter the environment, migrating through the soil, sediment, stormwater, surface water, and groundwater and thereby contaminating or threatening to contaminate the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

7.      Nevertheless, Defendants elected to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendants' PFAS, thereby placing profits over human health and the environment.

8.      At all relevant times, beginning decades ago and continuing to this date, Defendants' PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied, used and/or disposed of in the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

9.      During these activities, and at all relevant times, Defendants' PFAS were being applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, which allowed PFAS to enter the environment. When applied, used and/or disposed of as directed, instructed and/or intended by the manufacturers, these compounds migrated through the soil and into the groundwater, thereby contaminating the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

10.     One end product containing Defendants' PFAS is AFFF, which is a firefighting agent used for training and to control and extinguish Class B fuel fires, that was distributed, and/or sold at military and civilian airports throughout the United States.

11.     Regarding AFFF specifically, Defendants developed, manufactured, formulated, distributed, and/or sold Defendants' PFAS for use by its customers in AFFF with the knowledge that toxic compounds would be released into the environment during fire protection, training, and response activities even when the AFFF was used as directed, instructed and/or intended by the manufacturers.

12.     Further, regarding AFFF specifically, Defendants developed, manufactured, formulated, distributed, and/or sold Defendants' PFAS with the knowledge that large quantities of

PFAS would be stored, used, and/or maintained in a manner such that these toxic chemicals would be released into the environment and contaminate the air, soil, and groundwater.

13.     At all relevant times, beginning decades ago and continuing to this date, AFFF containing PFAS has been used and stored at fire training facilities, airports, and military bases for fire protection, training, and response activities. During these activities, AFFF was used as directed, instructed and intended by the manufacturers, which allowed PFAS to enter the environment and leach into the air, soil, and groundwater, thereby contaminating the drinking water wells and water supplies of the Proposed Class Representatives and Class members.

14.     As a result of their exposure to Defendants' PFAS that were applied, used and/or disposed of as directed, instructed and/or intended, the Class members have either detected discrete PFAS compounds in their respective drinking water wells and water supplies and/or are threatened with such detection.

15.     The Proposed Class Representatives bring this action, individually and on  behalf of all others similarly situated, against Defendants to recover any and all relief with respect to the installation, maintenance and operation of, and cost associated with, any kind of treatment, filtration, remediation, testing, or monitoring of the ongoing contamination of their surface water, groundwater, soil, and sediment caused and/or created by Defendants' PFAS, as well as any and all punitive damages available as a result of the actions and/or inactions of Defendants, and to ensure that Defendants, as the responsible parties, bear such expense, rather than the Proposed Class Representatives and Class members.

16.     The Proposed Class Representatives seek to recover by this action the substantial costs necessary to protect the public and restore the damaged drinking water supply of their own surface water supplies and groundwater wells, as well as those of other similarly situated Public

Water Systems. These costs include, but are not limited to, the costs of testing and monitoring water supplies for PFAS contamination, the costs of designing, constructing, installing, operating and maintaining the treatment facilities and equipment required to comply with state and federal safe drinking water laws and to remove PFAS from the drinking water supplied to the public, and/or for the costs of securing alternative sources of water as a result of PFAS contamination.

## JURISDICTION AND VENUE

17.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332 (d) because there is minimal diversity of citizenship among the parties, there are more than one hundred members of the proposed Class, and the amount in controversy exceeds the sum or value of $5,000,000.00 exclusive of interest and costs.

18.    Venue is appropriate in this District pursuant to the Order of the Judicial Panel on Multidistrict Litigation which transferred and centralized all related action in this Court for coordinated or consolidated pretrial proceedings pursuant to 28 U.S.C § 1407.

19.    Case Management Order No. 4 authorizes direct filing of the claim to this judicial district.

## PARTIES

A.    **Proposed Class Representatives for the Proposed Class**

20.    **Plaintiff City of Camden ("Camden")** is located in Southeast New Jersey, in Camden County, with a population of approximately 72,000. Camden provides drinking water to all residents of the City of Camden, comprising approximately 13,666 metered accounts.

21.    Camden's system consists of 19 wells that draw from the lower Potomac Raritan-Magothy (PRM) Aquifer. The system has a total max pumping rate of 27,600 gallons per minute. The 19 wells are spread across 4 wellfields in the City of Camden.  As of May 2023, 17 of the 19 wells were active and, of these 17 active wells, 10 have been taken out of service due to PFAS

contamination, which is believed to have resulted from firefighting training activities by the City of Camden's fire department.

22.     Camden's system utilizes two treatment plants, which treat groundwater for iron and manganese removal by oxidation, settling and filtration. Volatile organic chemicals are removed via packed tower aeration. All treated water is disinfected with chlorine to maintain water quality in the distribution system.  Fifteen (15) of the groundwater wells are treated at the Morris-Delair Water Treatment Plant and two (2) wells are treated at the Parkside Water Treatment Plant. Aside from PFAS, no other regulated contaminants have been detected in the City of Camden's drinking water supply at levels above the relevant MCLs.

23.     PFAS were first detected in the City of Camden's water supply in January 2018. The highest level of PFOA detected was 163.9 ppt and the highest level of PFOS detected was 75.2 ppt.

24.     In January 2020, the City of Camden removed six (6) wells with significantly elevated levels of PFAS from service. Continued PFAS testing in 2020 revealed additional contamination and four (4) other wells were taken off-line.

25.     With these wells off-line, it was necessary to supplement the City's water supply for the next several years until adequate treatment could be installed to treat the water from Morris and Delair wellfields for PFAS. The City of Camden therefore entered into a 10-year Commodity Demand Water Supply Agreement ("CDWSA") with New Jersey-American Water to meet these needs. The City of Camden purchased 3.0 million gallons per day ("MGD") in 2021 and 2.5 MGD in 2022.  The City of Camden is paying approximately $300,000 per month for the purchased water.

26.     The City of Camden has installed a granulated activated carbon ("GAC") filtration system to remove PFAS at the Parkside Treatment Plant and is in the planning phase for the implementation of PFAS treatment at the Morris-Delair Plant.

27.     **Plaintiff City of Brockton ("City of Brockton")** is located in Plymouth County, Massachusetts, and is the owner and operator of the Brockton Water Department ("BWD").  The BWD is a Public Water System currently serving approximately 23,000 active water service accounts, over 3,000 hydrants and over 5,500 valves in the City of Brockton, Towns of Avon, Hanson, Halifax, Pembroke, and Whitman.

28.     The BWD obtains water from Silver Lake and the Brockton Reservoir.  Silver Lake is the primary supply (88.25% of total) and is located approximately 15 miles southeast of the center of Brockton. Over 50% of the watersheds are either owned by the City of Brockton or in conservation protection.  Water from the lake is treated at the Silver Lake Water Treatment Plant ("SLWTP") and is transmitted through two 24-inch diameter mains to Brown's Crossing Pumping Station.  After Brown's Crossing, the water is pumped through one 36-inch diameter and two 24-inch diameter transmission mains to the Brockton service system.  The Brockton Reservoir is a supplemental supply (5.51% of total) to Silver Lake and is blended into the system at Woodland Avenue.[1]

29.     Beginning in 2020, the City of Brockton started testing the water for PFAS under the Massachusetts Department of Environmental Protection's guidance.  Testing at that time showed PFAS6[2] levels from a water sample taken at the Brockton Reservoir totaling 28 ppt.

---

[1] The BWD purchased the remaining 6.24% of its water from Aquaria.

[2] The six PFAS are: PFOS, PFOA, PFHxS, PFNA, PFHpA, and PFDA.  MassDEP abbreviates this set of six PFAS as the "PFAS6" and has used them to set a drinking water standard meant to be protective against adverse health effects for all people consuming the water.  *See*

Subsequent testing performed at the Brockton Reservoir also reported high levels of PFAS6 at 28 ppt.  The City of Brockton also performed water testing on November 18, 2021, showing PFAS6 levels of 35.63 ppt in finished water and 40.33 ppt in raw water at the Brockton Reservoir and the Woodland Avenue Water Treatment Plant.

30.    The City of Brockton took the Brockton Reservoir out of service and is currently purchasing water from the Aquaria Desalination Plant to comply with their water supply demands. While removed from service, upgrades were completed at the Woodland Avenue Water Treatment Plant.  Upgrades included replacing both filter carbons with new granular activated carbon which are designed to reduce PFAS6 in the water.  The City of Brockton is following the guidance and testing requirements of the Massachusetts Department of Environmental Protection as it pertains to PFAS.

31.    **Plaintiff City of Sioux Falls ("Sioux Falls")** is a municipal corporation and public water provider, existing under the laws of the State of South Dakota, with its primary address at 231 N. Dakota Avenue, Sioux Falls, South Dakota, 57104.  Sioux Falls supplies drinking water to customers in Minnehaha and Lincoln Counties and in the City of Sioux Falls. The drinking water is obtained in part from groundwater wells that draw from the Big Sioux Aquifer. Sioux Falls has a property interest in the water it appropriates, treats, stores, and distributes to the public as well as in its wells, piping, distribution system, and water treatment facilities.

32.    At least 20 of Sioux Fall's wells are contaminated with PFOS and PFOA, which is believed to have resulted from firefighting training, protection and response activities by the Sioux Fall's fire department.

_____

https://www.mass.gov/info-details/per-and-polyfluoroalkyl-substances-pfas#:~:text=Drinking%20Water%20Standards%20and%20Health%20Information,-Massachusetts%20PFAS%20Standard&text=The%20six%20PFAS%20are%3A%20PFOS,all%20people%20consuming%20the%20water (Last accessed on June 7, 2023).

33.    **Plaintiff California Water Service Company ("Cal Water")** is a California public utility water corporation incorporated under the laws of the State of California with its principal place of business in San Jose, California.

34.    Cal Water owns and operates public drinking water systems that provide potable drinking water to residents and businesses in various locations throughout California, including but not limited to Bakersfield, Bakersfield-North Garden, Marysville, Salinas, Selma, South San Francisco, Stockton, Tulco and Visalia. Each of these systems is subject to the rules and regulations of the California Public Utilities Commission, and with respect to each such system, Cal Water has a certificate of convenience and necessity pursuant to which Cal Water has a duty to provide water service.

35.    Each of these water systems includes, among other elements, drinking water production wells that draw from groundwater aquifers and associated pumping, storage, treatment and distribution facilities and equipment.    Among other things, Cal Water has the right to appropriate and use groundwater for drinking water supplies from such wells.

36.    Cal Water's water supply is contaminated with PFAS.

37.    **Plaintiff City of Delray Beach ("City of Delray Beach")** is located in Florida and is the owner and operator of a Public Water System serving approximately 68,000 residents with 22,000 service connections. The City of Delray Beach withdraws water from a shallow underground source called the east coast surficial aquifer, a 75- to 195-feet deep underground aquifer. There are 30 raw water wells located throughout the City of Delray Beach from which water is drawn and piped to the water treatment plant. The surficial aquifer system in Florida includes any otherwise undefined aquifers that are present at land surface. It is made up of mostly unconsolidated sand, shelly sand, and shell. The aquifer thickness is typically less than 50 feet but

can range up to 400 feet in Indian River and St. Lucie Counties. The City of Delray Beach is currently operating under a water use permit issued by the South Florida Water Management District. The water use permit allows for the withdrawal of up to 19.1 million gallons per day.

38.     In August 2020, the City of Delray Beach voluntarily started testing for PFAS in its water system. This testing showed PFAS in all their wells. PFAS levels ranged between 25.3 ppt to 92 ppt. Since 2020, the City of Delray Beach has been committed to test regularly for PFAS and continues to provide transparency of the process to its customers. Their most recent PFAS testing from June 13, 2022 continues to show PFAS contamination.

39.     The City of Delray Beach has paid an excess of $25,000 for PFAS testing. They are currently working on a project to construct a new water treatment plant. The new water treatment plant is meant to replace or complement the existing aged conventional lime softening plant and it will have a Nanofiltration system to remove PFAS. It will also be designed and constructed to meet all the latest regulatory requirements of the Environmental Protection Agency; the Florida Department of Environmental Protection and the Florida Department of Health. The new water treatment plant is projected to be online in late 2026 and has an approximate cost of $100 million.

40.     **Plaintiff Coraopolis Water & Sewer Authority** ("Coraopolis") is a municipal corporation organized pursuant to laws of the Commonwealth of Pennsylvania.

41.     Coraopolis operates a Public Water System that draws drinking water from eight groundwater wells located near the Ohio River, and serves 2,574 metered residential, commercial, industrial and municipal accounts in the Borough of Coraopolis and small portion of Moon Township in western Pennsylvania.

11

42.    Coraopolis has detected PFAS compounds in sampling from all four of its groundwater wells.

43.    **Plaintiff Township of Verona ("Verona")** is located in Northern New Jersey in Essex County and provides drinking water to a population of approximately 15,000 with approximately 4,179 residential and commercial customer connections.

44.    Verona provides drinking water from two wells, both of which have been taken out of service because of PFAS contamination. Prior to the PFAS contamination, Verona provided most of its water from its own wells and supplemented its supply with water purchased from the Passaic Valley Water Commission. Since the wells were shut down, however, one hundred percent of Verona's drinking water is purchased from the Passaic Valley Water Commission.

45.    PFAS were first detected in Verona's wells in December 2020. The highest level of PFOA detected was 23.3 ppt and the highest level of PFOS detected was 9.11 ppt.

46.    **Plaintiff Dutchess County Water and Wastewater Authority ("DCWWA")** currently owns and operates 13 water systems, 6 sewer systems, and one water transmission system located within 10 different municipalities, collectively serving over 5,500 residential and commercial customers. One of these 13 water systems is the **Dalton Farms Water System ("DFWS")**.

47.    The DFWS serves 2,055 residents through 603 service connections. The DFWS operates its own water system that contains four drilled wells on the northerly side of Recreation Road. The DCWWA tested the DFWS wells and results indicated that well #5A has detectable amounts of PFOS that range from ND-8.51 ppt and PFOA that range from 1.8 ppt to 30.5 ppt. These wells are located 1.5 miles from the Beekman Fire House ("BFH").

48.    **Plaintiff City of South Shore ("South Shore")** is located in Northeastern Kentucky in Greenup County and provides drinking water to a population of approximately 6,800 with approximately 2,069 residential and commercial customer connections.

49.    South Shore's drinking water system is comprised of eleven wells. South Shore also purchases water from nearby public water suppliers to augment its groundwater well supply. The system has a total annal flow of 96,008,000 and the average gallons used per month is 8,000,000.

50.    PFAS were first detected in South Shore's wells in February 2020. The highest level of PFOA detected was 72.10 ppt and the highest level of PFOS detected was 248 ppt. All of the South Shore's wells were shut down due to PFAS contamination and South Shore now purchases one hundred percent of its drinking water from Portsmouth, Ohio via a temporary water line that is laid across a bridge. South Shore is currently in the design process to make this line permanent by burying it under the Ohio River.

51.    **Plaintiff City of Freeport ("Freeport")** is the owner and operator of a water system serving approximately 25,000 residents located in and around the City of Freeport, Illinois. Currently, Freeport's system draws the drinking water it provides to customers from four groundwater wells. Two other wells that used to produce 75% of the city's water have been abandoned due to PFAS contamination.

52.    **Plaintiff Martinsburg Municipal Authority ("Martinsburg")** is a municipal corporation organized pursuant to the Pennsylvania Municipality Authorities Act, 53 Pa C.S.A. §5601 et seq. Martinsburg operates four groundwater wells to supply drinking water to the community. Martinsburg has detected PFAS compounds in samples from all four groundwater wells.

53. **Plaintiff Seaman Cottages ("Seaman Cottages")** is the owner and operator of a water system (a "Transient Non-Community System") serving ten cottages in their property. The main source of the water system is the Cape Cod Aquifer, located at Eastham Massachusetts. The wells are located four feet apart, with well 2 at 25' depth and well 3 at 35' depth and approximately 200' from the mean high tide mark. In September 2020, Seaman Cottages tested for PFAS in one well at a cottage sink and results showed a level of 18.18 ppt PFAS6. As a result, they tested both wells in October 2020 and results showed levels of 14.04 ppt PFAS6 and 14. 28 ppt PFAS6.

54. **Plaintiff Village of Bridgeport ("Bridgeport")** is located in the state of Ohio and has a population of approximately 1,500 residents. Bridgeport serves 1,150 metered accounts and produces drinking water through groundwater wells. Bridgeport historically utilized five groundwater wells. However, in recent years, findings of a variety of PFAS chemicals in four of its five wells have resulted in the closure of all five wells forcing Bridgeport to purchase all of its drinking water from City of Martin's Ferry.

55. The Village first became aware of PFAS contamination through testing performed by the State of Ohio in 2020. PFAS findings were revealed in four of those wells (Wells 1-4) with Well 5 yielding no findings. However, well 5 is too small to rely upon for consistent production of drinking water.

56. **Plaintiff City of Benwood ("Benwood")** is located in Marshall County, West Virginia and has a population of approximately 1,245 residents. Benwood's water system provides water services to a population of approximately 1,510. Benwood's water supply comes from two groundwater wells. The source wells are located in the Alluvial Valleys Area of West Virginia. Total raw water production is approximately 175,000 GPD.

57.     Benwood first became aware of PFAS contamination through testing conducted by the United States Geological Survey (USGS) between 2019 and 2021. Further testing was conducted by the State of West Virginia in 2022. Over the course of testing, PFAS, including PFOS, PFOA, PFHxS, and PFBS, were detected in Benwood's water system.  PFOS results ranged from 8.56 to 14 ppt and PFOA was 5.3 ppt.

58.     **Plaintiff Niagara County Water District ("NCWD")** is a Public Water System located in New York and serves a population of 150,000 people through 108 service connections to Towns and Villages located in Niagara, Erie, and Orleans Counties. NCWD's drinking water is supplied from surface water drawn from the west branch of the Niagara River.

59.     The daily average volume of water treated and pumped into the distributions system in 2021 was 15,433,614 gallons per day and the total amount of water delivered to customers in 2021 was 5,617,835,384 gallons.

60.     The NCWD has not yet had their water system tested for PFAS, but is legally required to monitor for PFAS. The NCWD is subject to the monitoring rules of UCMR 5.

61.     Plaintiff City of **Pineville ("Pineville"**) is located in the state of Louisiana and has a population of approximately 14,394 residents (according to the 2020 census).  Pineville serves 7,400 metered accounts.  Pineville produces drinking water through nine groundwater wells.  The city currently treats its water with chlorine prior to serving the same. It also operates a wastewater facility.

62.     Pineville underwent PFAS testing through UCMR 3 and results for all nine chemicals tested therein were below the detection limit. However, Pineville is legally required to monitor for PFAS.  Pineville is currently awaiting the scheduling of UCMR 5 testing.

63.     **Plaintiff City of Iuka, Mississippi ("Iuka")** is a Public Water System located in Mississippi and serves a population of 7,223 people through 2,736 service connections in Iuka, Mississippi. Iuka's drinking water is supplied from four groundwater wells.

64.     Iuka has not yet had their water system tested for PFAS and is subject to the monitoring rules of UCMR 5.

**B.     Party Defendants**

65.     **Defendant E.I. du Pont de Nemours & Company ("DuPont")** is a corporation organized under the laws of the State of Delaware, with its principal place of business located at 974 Centre Road, Wilmington, Delaware 19805.  Defendant DuPont does and/or has done business throughout the United States.

66.     **Defendant DuPont de Nemours, Inc. (f/k/a DowDuPont, Inc.)** is a Delaware corporation with its principal place of business located at 974 Centre Road, Building 730, Wilmington, Delaware 19805.  DowDuPont, Inc. was formed in 2017 as a result of the merger of Dow Chemical and Defendant DuPont.  DowDuPont, Inc. was subsequently divided into three publicly traded companies, and on June 1, 2019, DowDuPont, Inc. changed its registered name to DuPont de Nemours, Inc. ("New DuPont").  Defendant New DuPont does and/or has done business throughout the United States.

67.     **Defendant Corteva, Inc. ("Corteva")** is a corporation organized and existing under the laws of Delaware, with its principal place of business at 974 Centre Rd., Wilmington, Delaware 19805. Defendant Corteva is one of the aforementioned spin-off companies from DowDuPont, Inc., and assumed some of the PFAS liabilities of the former DuPont.  Defendant Corteva was originally formed in February 2018.  From that time until June 1, 2019, Corteva was a wholly-owned subsidiary of New Dupont (then known as DowDuPont, Inc.).  Defendant Corteva does and/or has done business throughout the United States.

16

68.    **Defendant The Chemours Company ("Chemours")** is a corporation under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.  Defendant Chemours does and/or has done business throughout the United States.

69.    **Defendant The Chemours Company FC, LLC ("Chemours FC")** is a limited liability company organized under the laws of the State of Delaware.  Defendant Chemours FC has only one member which is Defendant Chemours, a corporation also organized under the laws of the State of Delaware, with its principal place of business located at 1007 Market Street, P.O. Box 2047, Wilmington, Delaware, 19899.   Defendant Chemours FC is the successor in interest to DuPont Chemical Solutions Enterprise. Defendant Chemours FC does and/or has done business throughout the United States.

70.    In 2015, Defendant DuPont spun off its "Performance Chemicals" business to Defendant Chemours, along with vast environmental liabilities which Defendant Chemours assumed, including those related to Defendant DuPont's PFAS, which included PFOA. At the time of the transfer of its Performance Chemicals business to Defendant Chemours, Defendant DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Defendant DuPont's liability for damages and injuries arising from its development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

71.    Defendant Chemours was incorporated as a subsidiary of Defendant DuPont as of April 30, 2015.  From that time until July 2015, Defendant Chemours was a wholly-owned subsidiary of Defendant DuPont.

72.    In July 2015, Defendant DuPont distributed shares of Defendant Chemours' stock to Defendant DuPont stockholders, and Defendant Chemours has since been an independent, publicly-traded company.

73.    On June 1, 2019, Defendant New Dupont (then known as DowDuPont, Inc.) separated its agriculture business through the spin-off of Defendant Corteva.  In so doing, and through a series of stock transfers/distributions, Defendant Corteva became the direct parent of Defendant DuPont, and also holds certain assets and liabilities of Defendant New Dupont, including its agriculture and nutritional businesses.

74.    On June 1, 2019, Defendant New Dupont (then known as DowDuPont, Inc.), the surviving entity after the spin-off of Defendant Corteva and of another entity known as Dow, Inc., changed its name to DuPont de Nemours, Inc. ("New DuPont"). Defendant New DuPont retained assets in the specialty products business lines following the above-described spin-offs, as well as the balance of the financial assets and liabilities of Defendant DuPont not assumed by Defendant Corteva.

75.    At various times from the 1950s through today, Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS.  Defendants' PFAS were later stored, handled, used, discharged, and/or disposed of at sites in the vicinity of the drinking water wells and water supplies of the Proposed Class Representatives and Class members.

76.    The Proposed Class Representatives, individually and on behalf of similarly situated Public Water Systems seek damages against Defendants as set forth herein relating to their exposure to Defendants' PFAS.

## GENERAL FACTUAL ALLEGATIONS

### A.    THE CONTAMINANT: PFOA

77.    Defendants' PFAS is a family of chemical compounds that include PFOA and many other compounds.

78.    As relevant to this action, PFOA is one of two chemicals (the other being perfluorooctane sulfonic acid ("PFOS")) within a class known as perfluoroalkyl acids ("PFAAs"). PFAAs are part of a larger chemical family known as PFAS.

79.    PFAAs are composed of a chain of carbon atoms in which all but one of the carbon atoms are bonded to fluorine atoms, and the last carbon atom is attached to a functional group. The carbon-fluorine bond is one of the strongest chemical bonds that occur in nature which is why these molecules are so persistent and bioaccumulate.

80.    PFAAs are sometimes described as long-chain and short-chain, depending on the number of carbon atoms contained in the carbon chain. PFOA is considered a long-chain PFAA because it has eight carbon atoms in its chain.

81.    PFOA does not occur in nature. Rather, it is a stable, man-made chemical. It is highly water soluble, persistent in the environment and resistant to biologic, environmental, or photochemical degradation. Because this compound is water soluble and does not readily adsorb to sediments or soil, it tends to stay in the water column and can be transported long distances.

82.    PFOA is readily absorbed in animal and human tissues after oral exposure and accumulates in the serum, kidney, and liver. It has been found globally in water, soil, and air as well as in human food supplies, breast milk, umbilical cord blood, and human blood serum.[3]

---

[3] *See* Agency for Toxic Substances and Disease Registry, Per- and Polyfluoroalkyl Substances and Your Health, available at https://www.atsdr.cdc.gov/pfas/index.html (Last Accessed June 7, 2023)

83.    PFOA is persistent in the human body and resistant to metabolic degradation. A short-term exposure can result in a body burden that persists for years and can increase with additional exposures.[4]

84.    PFOA is relatively stable once ingested, so it bioaccumulates in individual organisms for significant periods of time.  Because of this stability, any newly ingested PFOA will be added to any PFOA already present. In humans, PFOA remains in the body for years.

85.    Additionally, PFOA biomagnifies up the food chain. This occurs, for example, when humans eat fish that have ingested PFOA.

86.    Since it was first produced, information has emerged showing negative health effects caused by exposure to PFOA, including but not limited to:

    a.  Altered growth, learning and behavior of infants and older children;

    b.  Lowering a woman's chance of getting pregnant;

    c.  Interference with the body's natural hormones;

    d.  Increased cholesterol levels;

    e.  Modulation of the immune system;

    f.  Increased risk of certain cancers; and

    g.  Increased risk of ulcerative colitis

---

[4] *See* EPA, Drinking Water Health Advisory for Perfluorooctanoic Acid (PFOA), EPA Document Number: 822-R16-005 (May 2016) at 55; Drinking Water Health Advisory for Perfluorooctane Sulfonate (PFOS), EPA Document Number: 822-R-16-004 (May 2016) at 55, both available at https://www.epa.gov; Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

87.    The EPA has warned that there is suggestive evidence of the carcinogenic potential for PFAS in humans.[5]

88.    The EPA has noted that "drinking water can be an additional source [of PFOA in the body] in the small percentage of communities where these chemicals have contaminated water supplies." In communities with contaminated water supplies, "such contamination is typically localized and associated with a specific facility, for example […] an airfield at which [PFOA] were used for firefighting."[6]

89.    No federal or state agency has approved PFAS as additives to drinking water. No federal or state agency has approved releasing or discharging PFAS into groundwater.

90.    The EPA has announced its intent to regulate PFAS chemicals by issuing a primary drinking water standard (also known as a maximum contaminant level or "MCL").[7]

91.    Certain states have established concentration levels for drinking water.  For example, the California Department of Drinking Water ("DDW") has established "Notification Levels" at concentrations of 5.1 parts per trillion ("ppt") for PFOA. A Notification Level is a health-based advisory level established for chemicals in drinking water that do not have established maximum contaminant levels. When a Notification Level is exceeded, the water supplier must

---

[5] *See* Proposed PFAS National Primary Drinking Water Regulation FAQs for Drinking Water Primacy Agencies (March 14, 2023) ("EPA determined that PFOA and PFOS are likely carcinogens (i.e., cancer causing) and that there is no level of these contaminants that is without a risk of adverse health effects."), available at https://www.epa.gov/system/files/documents/2023-03/FAQs_PFAS_States_NPDWR_Final_3.14.23_0.pdf. (Last Accessed June 7, 2023)

[6] See "Fact Sheet PFOA & PFOS Drinking Water Health Advisories," EPA Document Number: 800-F-16-003, available at https://www.epa.gov/sites/default/files/2016-06/documents/drinkingwaterhealthadvisories_pfoa_pfos_updated_5.31.16.pdf (Last Accessed June 7, 2023)

[7] See PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638 (Mar. 29, 2023).

provide notice to its customers about the presence of the chemical and the health effects associated with it. DDW has also established a single "Response Level" of 70 ppt combined for both PFOA and PFOS. When possible, DDW recommends removing the source from service or providing treatment when the concentration exceeds the Response Level.

92.    At all relevant times, Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

93.    At all relevant times, Defendants' PFAS were used to make a variety of consumer and industrial goods sold, supplied, used, and disposed of throughout the United States. Defendants' PFAS were used, for example, in nonstick cookware, waterproofing waxes, stain-preventing coatings, and AFFF used for firefighting.

94.    When applied, used and/or disposed of as directed, instructed and/or intended, Defendants' PFAS, including PFOS, entered into the environment.

95.    Once Defendants' PFAS were free in the environment, they did not hydrolyze, photolyze, or biodegrade under typical environmental conditions. Instead, they were and still are extremely persistent in the environment. As a result of their persistence, they are widely distributed throughout soil, air, and groundwater.

96.    The application, use and/or disposal of Defendants' PFAS as directed, instructed and/or intended by the manufacturers allowed PFOA to enter into and onto the respective properties of the Proposed Class Representatives and Class members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damage to the respective properties of the Proposed Class Representatives and Class members.

97.     Due to the persistent nature of Defendants' PFAS, among other things, they have caused, and continue to cause, injury and damage to the respective properties of the Proposed Class Representatives and Class members.

98.     One end product containing Defendants' PFAS is AFFF.  AFFF is a water-based foam that was first developed in the 1960s to extinguish flammable liquid fuel fires at airports, among other places.  AFFF is typically sprayed directly onto a fire, where it then works by coating the ignited fuel source, preventing its contact with oxygen, and suppressing combustion.

99.     The vast majority of AFFF was used in training, which was an activity promoted by Defendants' customers who used Defendants' PFAS in their end AFFF products. Defendants developed, manufactured, formulated, distributed, sold and/or transported Defendants' PFAS that were used in AFFF.  When used as directed, instructed and/or intended, AFFF containing Defendants' PFAS released PFOA into the environment.

100.    AFFF containing Defendants' PFAS has been used for its intended purpose in the process of fire protection, training, and response activities for many years. During these activities, AFFF containing Defendants' PFAS were used as directed, instructed and/or intended by the manufacturers, which allowed PFOA to enter into and onto the respective properties of the Proposed Class Representatives and Class members where these compounds migrated through the subsurface and into the groundwater, thereby contaminating the surface, soil, sediment and groundwater, as well as causing other extensive and ongoing damages.

101.    AFFF can be made without PFOA and/or PFOS.  Despite knowledge of this fact as well as knowledge of the toxic nature of AFFF made with Defendants' PFAS, Defendants continued to develop, manufacture, formulate, distribute, sell and/or transport Defendants' PFAS

to be used in AFFF which led to the ongoing contamination and damages the respective properties of the Proposed Class Representatives and Class members.

102.    Due to the chemicals' persistent nature, among other things, these chemicals have, and continue to, cause injury and damage to respective properties of the Proposed Class Representatives and Class members.

103.    At all relevant times, Defendants were sophisticated and knowledgeable in the art and science of developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendants' PFAS.  Defendants understood far more about the properties of Defendants' PFAS—including the potential hazards they posed to human health and the environment—than any of their customers as well as the Proposed Class Representatives and Class members.  Nevertheless, Defendants declined to use their sophistication and knowledge to design safer products and/or warn their customers, the Proposed Class Representatives and Class members of the dangers associated with Defendants' PFAS.

104.    As a direct and proximate result of Defendants' acts and omissions, as alleged in this Class Action Complaint, the respective drinking water wells and water supplies of the Proposed Class Representatives and Class members have been contaminated and will continue to be contaminated with PFOA, thereby creating an environmental and public health hazard.  Such contamination caused by Defendants needs to be remediated.

105.    As a direct and proximate result of Defendants' acts and omissions, the Proposed Class Representatives and Class members must assess, evaluate, investigate, monitor, remove, clean up, correct, and remediate PFOA contamination on their respective drinking water wells and water supplies at significant expense, loss and damage.

106.    Defendants had and breached their duty to evaluate and test Defendants' PFAS adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they sold such products. They also had and breached their duty to minimize the environmental harm caused by Defendants' PFAS. Moreover, Defendants failed to warn the Proposed Class Representatives and Class members of the known risks for environmental and health hazards arising from the application, use and/or disposal of Defendants' PFAS when such products were being applied, used and/or disposed of as instructed, directed and/or intended.

## B.    DEFENDANT DUPONT'S KNOWLEDGE OF THE DANGERS OF PFOA

107.    In 1951, Defendant DuPont began purchasing PFOA for use in manufacturing a non-stick coating called Teflon, commonly known for its uses as a coating for non-stick cookware.

108.    In 1964, a group of Defendant DuPont employees working in Teflon manufacturing became sick after their department was moved to a more enclosed workspace.[8] They experienced chills, fever, difficulty breathing, and a tightness in the chest—symptoms referred to variously as "polymer-fume fever," "Teflon flu," or simply, "the shakes." Polymer-fume fever was first reported in medical literature in 1951.

109.    By at least the end of the 1960s, additional research and testing performed by Defendant DuPont and 3M Company ("3M"), a manufacturer of products containing PFAS, including either and/or both PFOA and PFOS, with whom Defendants had various contractual relationships relating to PFAS products, indicated that fluorosurfactants, including at least PFOA,

---

[8] Charles E. Lewis and Gerald R. Kerby, *An Epidemic of Polymer-Fume Fever*, 191 JAMA 375 (February 1, 1965).

because of their unique chemical structure, were resistant to environmental degradation and would persist in the environment essentially unaltered if allowed to enter the environment.

110. Also, in a 1965 study sponsored by Defendant DuPont where rats were fed a PFAS compound over a ninety-day period, the rats had liver damage and showed an increased size in the spleen.

111. At all relevant times, Defendant DuPont knew, or reasonably should have known, among other things, that: (a) Defendants' PFAS were/is toxic; and (b) when allowed to escape into the open environment per the directions and/or instructions given by the manufacturer, PFOA migrates through the subsurface, mixes easily with groundwater, resists natural degradation, renders drinking water unsafe and/or non-potable, and can be removed from public drinking water wells and water supplies only at substantial expense.

112. At all times pertinent herein, Defendants also knew or should have known that Defendants' PFAS presented/presents a risk to human health and could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that Defendants' PFAS were/are known carcinogens that cause genetic damage.

113. In 1979, Defendant DuPont and 3M discussed 3M's discovery of high levels of PFOS in the blood of its workers. Both companies came to the same conclusion that there: was "no reason" to notify the EPA of the finding.[9]

---

[9] Memorandum from R.A. Prokop to J.D. Lazerte re: Disclosure of Information on Levels of Fluorochemicals in Blood, July 26, 1979, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX2723.pdf. (Last Accessed June 7, 2023)

114.    In 1980, 3M published data in peer reviewed literature showing that humans retain PFOS in their bodies for years. Based on that data, 3M estimated that it could take a person up to 1.5 years to clear just half of the accumulated PFOS from their body after all exposures had ceased.[10] Upon information and belief, Defendant DuPont was aware or should have been aware of these studies.

115.    By the early 1980s, the industry suspected a correlation between PFAS exposure and human health effects. Specifically, manufacturers observed bioaccumulation of PFOS in workers' bodies and birth defects in children of workers.  Upon information and belief, Defendants were aware or should have been aware of this information.

116.    In 1981, Defendant DuPont tested for and found PFOA in the blood of female plant workers at its Washington Works plant in Parkersburg, West Virginia, where it had been using PFOA to manufacture Teflon since 1951.  DuPont observed and documented pregnancy outcomes in exposed workers, finding two of seven children born to female plant workers between 1979 and 1981 had birth defects—one an "unconfirmed" eye and tear duct defect, and one a nostril and eye defect.[11]

117.    Beginning in 1983, 3M documented a trend of increasing levels of PFOS in the bodies of 3M workers. In an internal memo, 3M's medical officer warned, "we must view this present trend with serious concern. It is certainly possible that [...] exposure opportunities are

---

[10] See Letter from 3M to Office of Pollution Prevention and Toxics, EPA titled "TSCA 8e Supplemental Submission, Docket Nos. 8EHQ-0373/0374 New Data on Half Life of Perfluorochemicals in Serum," available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades. (Last Accessed June 7, 2023)
[11] C-8 Blood Sampling Results, *available at* available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades. (Last Accessed June 7, 2023)

providing a potential uptake of fluorochemicals that exceeds excretion capabilities of the body."[12]

Upon information and belief, Defendant DuPont was aware or should have been aware of this documented trend.

118.    In 1983, 3M researchers concluded that concerns about PFAS "give rise to concern for environmental safety," including "legitimate questions about the persistence, accumulation potential, and ecotoxicity of fluorochemicals in the environment."[13]    That same year, 3M completed a study finding that PFOS caused the growth of cancerous tumors in rats.[14]  This finding was later shared with Defendant DuPont and led them to consider whether "they may be obliged under their policy to call FC-143 a carcinogen in animals."[15]

119.    In 1984, Defendant DuPont tested drinking water near its Washington Works plant and found elevated PFOA levels in the water, but, after deciding that limiting PFOA discharge from the plant would not be "economically attractive," it did nothing to reduce contamination from the plant.

120.    By at least the end of the 1980s, additional research and testing performed by Defendant DuPont and 3M indicated that elevated incidence of certain cancers and other adverse health effects, including elevated liver enzymes and birth defects, had been observed among

---

[12] See Memorandum "Organic Fluorine Levels," August 31, 1984, available at available at http://www.ewg.org/research/dupont-hid-teflon-pollution-decades. (Last Accessed June 7, 2023)
[13] 3M Environmental Laboratory (EE & PC), Fate of Fluorochemicals - Phase II, May 20, 1983, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1284.pdf.

[14] Two Year Oral (Diet) Toxicity/Carcinogenicity Study of Fluorochemical FC-143 in Rats, Volume 1 of 4, Aug. 29, 1987, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1337.pdf.

[15] Memorandum from R.G. Perkins to F.D. Griffith re: Summary of the Review of the FC-143 Two-Year Feeder Study Report to be presented at the January 7, 1988 meeting with DuPont, January 5, 1988, *available at* https://www.ag.state.mn.us/Office/Cases/3M/docs/PTX/PTX1343.pdf.

workers exposed to such materials, including at least PFOA, but such data was not published, provided to governmental entities as required by law, or otherwise publicly disclosed at the time.

121.    Notwithstanding their respective knowledge of the dangers of PFAS, including PFOA, Defendants negligently and carelessly: (1) developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS; (2) failed to warn users of Defendants' PFAS about the presence of, and emission PFOA from their products; (3) failed to direct and/or instruct users of Defendants' PFAS on the proper use of and/or disposal of Defendants' PFAS, thus, improperly permitting PFOA to contaminate the soil and groundwater; (4) failed to recall and/or warn users of Defendants' PFAS of the dangers of soil and groundwater contamination as a result of the standard use and disposal of their products; (5) designed products containing or degrading into PFOA; and (6) failed and refused to issue the appropriate warnings and/or recalls to the users of Defendants' PFAS.

122.    By 2000, Defendant DuPont's in-house counsel was particularly concerned about the threat of punitive damages resulting from Defendant DuPont's releases of Defendants' PFAS at its Washington Works facility in West Virginia.

123.    Defendant DuPont's own Epidemiology Review Board repeatedly raised concerns about Defendant DuPont's statement to the public that there were no adverse health effects associated with human exposure to Defendants' PFAS.

124.    For example, in February 2006, the Epidemiology Review Board "strongly advise[d] against any public statements asserting that PFOA does not pose any risk to health" and questioned "the evidential basis of [Defendant DuPont's] public expression asserting, with what appears to be great confidence, that PFOA does not pose a risk to health."

125.    In 2004, the EPA filed an action against Defendant DuPont based on its failure to disclose toxicity and exposure information for PFOA, in violation of federal environmental laws.

126.    In December 2005, the EPA announced it was imposing the "Largest Environmental Administrative Penalty in Agency History" against Defendant DuPont based on evidence that it violated the Toxic Substances Control Act ("TSCA") by concealing the environmental and health effects of PFOA.

127.    Also, in 2005, a final court order was entered approving Defendant DuPont's 2004 settlement in the class action lawsuit styled *Leach et al v. E.I. du Pont de Nemours & Co,*, Civil Action No. 01-C-608 (Wood Cty. W.Va. Cir. Ct)(the "Leach Action") filed on behalf of approximately 700,000 individuals with PFOA-contaminated drinking water wells and/or water supplies in Ohio and West Virginia for benefits valued at over $300 million.

128.    Under the terms of the final class action settlement, Defendant DuPont agreed to fund a panel of independent scientists (the "C-8 Science Panel") to conduct whatever studies were necessary to confirm which diseases were linked to *Leach* class member PFOA exposure, to remove PFOA from the contaminated water sources, and to pay up to $235 million for medical monitoring of class members with respect to any diseases linked by the C-8 Science Panel to their PFOA exposure.   "C-8", a term used internally by employees of Defendant DuPont, is an alternative name for PFOA.

129.    After seven years of study and analyses, the C-8 Science Panel confirmed that PFOA exposures among class members were linked to six serious human diseases, including two types of cancer.

130.    More than 3,500 personal injury claims were filed against Defendant DuPont in Ohio and West Virginia following the final settlement in the *Leach* action and the findings of the C-8 Science Panel.

131.    These claims were consolidated in the federal multidistrict litigation styled *In Re: E.I. du Pont de Nemours & Company C-8 Personal Injury Litigation* (MDL No. 2433) in the United States District Court for the Southern District of Ohio (the "C-8 MDL").

132.    Between 2015 and 2016, juries in three bellwether trials in the C-8 MDL returned multi-million-dollar verdicts against Defendant DuPont, awarding compensatory damages and, in two cases, punitive damages to plaintiffs who claimed PFOA exposure caused their cancers.

133.    As discussed below, Defendant DuPont required that Defendant Chemours both directly assume its historical PFAS liabilities and indemnify Defendant DuPont from those liabilities. Defendant Chemours explained in its November 2016 SEC filing, "[s]ignificant unfavorable outcomes in a number of cases in the [C-8] MDL could have a material adverse effect on Chemours' consolidated financial position, results of operations or liquidity."

134.    On February 13, 2017, Defendant DuPont and Defendant Chemours agreed to pay $670.7 million to resolve the approximately 3,500 then-pending cases in the C-8 MDL.

**C.    DEFENDANT DUPONT'S MULTI-STEP FRAUDULENT SCHEME TO ISOLATE ITS VALUABLE TANGIBLE ASSETS FROM ITS PFAS LIABILITIES AND HINDER CREDITORS**

135.    By 2013, Defendant DuPont knew that it faced substantial environmental and other liabilities arising from its use of PFOA at Washington Works alone, as well as liability related to PFAS contamination at other sites and areas throughout the country, and its sale of products containing PFAS, and that its liability was likely billions of dollars.

136.    These liabilities include clean-up costs, remediation obligations, tort damages, natural resource damages and, most importantly, likely massive and potentially crippling punitive damages arising from Defendant DuPont's intentional misconduct.

137.    In light of this significant exposure, by 2013 Defendant DuPont's management began to consider restructuring the company to, among other things, avoid responsibility for the widespread environmental harm and personal injuries that Defendant DuPont's PFAS and associated conduct caused, and to shield billions of dollars in assets from these substantial liabilities. Defendant DuPont referred to this initiative internally as "Project Beta."

138.    Defendant DuPont contemplated various restructuring opportunities, including potential merger structures. In or about 2013, Defendant DuPont and The Dow Chemical Company ("Old Dow") began discussions about a possible "merger of equals."

139.    Defendant DuPont recognized that neither Old Dow, nor any other rational merger partner, would agree to a transaction that would result in exposing Old Dow, or any other merger partner, to the substantial PFAS liabilities that Defendant DuPont faced.

140.    Accordingly, Defendant DuPont's management decided to pursue a corporate restructuring strategy specifically designed to isolate Defendant DuPont's massive legacy liabilities from its valuable tangible assets in order to shield those assets from creditors and entice Old Dow to pursue the proposed merger.

141.    Defendant DuPont engaged in a three-part restructuring plan, further explained below.

142.    The first step in Defendant DuPont's plan was to transfer its Performance Chemicals business (which included Teflon® and other products, the manufacture of which involved the use of PFOA and other PFAS) into its wholly owned subsidiary, Chemours. And

then, in July 2015, Defendant DuPont "spun-off" Defendant Chemours as a separate publicly traded entity and saddled Defendant Chemours with Defendant DuPont's massive legacy liabilities (the "Chemours Spinoff").

143.    Defendant DuPont knew that Defendant Chemours was undercapitalized and could not satisfy the massive liabilities that it caused Defendant Chemours to assume. Defendant DuPont also knew that the Chemours Spinoff alone would not isolate its own assets from its PFAS liabilities, and that Defendant DuPont still faced direct liability for its own conduct.

144.    Accordingly, Defendant DuPont moved on to the next step of its plan, designed to further distance itself from the exposure it had created over its decades of illicit conduct with regard to PFAS.

145.    The second step involved Defendant DuPont and Old Dow entering into an "Agreement and Plan of Merger" in December 2015, pursuant to which Defendant DuPont and Old Dow merged with subsidiaries of a newly formed holding company, DowDuPont, Inc. ("DowDuPont"), which was created for the sole purpose of effectuating the merger. Defendant DuPont and Old Dow became subsidiaries of DowDuPont.

146.    Then, through a series of subsequent agreements, DowDuPont engaged in numerous business segment and product line "realignments" and "divestitures."

147.    The net effect of these transactions was to transfer, either directly or indirectly, a substantial portion of Defendant DuPont's assets to DowDuPont.

148.    The third step involved DowDuPont spinning off two, new, publicly traded companies: (i) Defendant Corteva, which currently holds Defendant DuPont as a subsidiary, and (ii) Dow, Inc. ("New Dow") which currently holds Old Dow as a subsidiary. DowDuPont was then renamed New DuPont.

149. As a result of these transactions, between December 2014 (pre-Chemours Spinoff) and December 2019 (post-Dow merger), the value of Defendant DuPont's tangible assets decreased by $20.85 billion.

150. New DuPont and New Dow now hold the vast majority of the tangible assets that Defendant DuPont formerly owned.

151. Many of the details about these transactions are hidden from the public in confidential schedules and exhibits to the various restructuring agreements. Upon information and belief, Defendant DuPont, New DuPont, New Dow, and Corteva have intentionally buried these details in an attempt to hide from creditors, like the Proposed Class Representatives, where Defendant DuPont's valuable assets went and to hide the inadequate consideration that Defendant DuPont received in return.

**STEP 1: THE CHEMOURS SPINOFF**

152. In February 2014, Defendant DuPont formed Defendant Chemours as a wholly owned subsidiary. Defendant Chemours was originally incorporated on February 18, 2014, under the name "Performance Operations, LLC."

153. On or about April 15, 2014, the company was renamed "The Chemours Company, LLC," and on April 30, 2015, it was converted from a limited liability company to a corporation named "The Chemours Company."

154. Prior to July 1, 2015, Defendant Chemours was a wholly owned subsidiary of Defendant DuPont. On July 1, 2015, Defendant DuPont completed the spinoff of its Performance Chemicals Business, consisting of Defendant DuPont's Titanium Technologies, Chemical Solutions, and Fluoroproducts segments, and Defendant Chemours became a separate, publicly traded entity.

155. The Performance Chemicals Business included fluorochemical products and the business segment that had manufactured, used, and discharged PFOA into the environment.

156. Prior to the Chemours Spinoff, Defendant Chemours was a wholly owned subsidiary of Defendant DuPont, and its Board of Directors had three members, all of whom were Defendant DuPont employees.

157. On June 19, 2015, a fourth member of the Board was appointed, and upon information and belief, this fourth member had served as a member of Defendant DuPont's Board of Directors from 1998 to 2015.

158. On July 1, 2015, effective immediately prior to the Chemours Spinoff, the size of the Chemours Board of Directors was expanded to eight members. The three initial Defendant DuPont employees resigned from the Board, and to fill the vacancies created thereby, seven new members were appointed.

159. To effectuate the Chemours Spinoff, Defendant DuPont and Defendant Chemours entered into the June 26, 2015 Separation Agreement (the "Chemours Separation Agreement").

160. Pursuant to the Chemours Separation Agreement, Defendant DuPont agreed to transfer to Defendant Chemours all businesses and assets related to the Performance Chemicals Business, including 37 active chemical plants.

161. Defendant DuPont completed a significant internal reorganization prior to the Chemours Spinoff, such that all the assets that Defendant DuPont deemed to be part of the Performance Chemicals Business would be transferred to Defendant Chemours.

162. At the same time, Defendant Chemours accepted a broad assumption of liabilities for Defendant DuPont's historical use, manufacture, and discharge of PFAS, although the specific

details regarding the nature, probable maximum loss value, and anticipated timing of the liabilities that Defendant Chemours assumed are not publicly available.

163.    Notwithstanding the billions of dollars in PFAS liabilities that Defendant Chemours would face, on July 1, 2015, Defendant Chemours transferred to Defendant DuPont approximately $3.4 billion as a cash dividend, along with a "distribution in kind" of promissory notes with an aggregate principal amount of $507 million.

164.    Thus, in total, Defendant Chemours distributed $3.9 billion to Defendant DuPont. Defendant Chemours funded these distributions by entering into approximately $3.995 billion of financing transactions, including senior secured term loans and senior unsecured notes, on May 12, 2015. Also, Defendant Chemours distributed approximately $3.0 billion in common stock to Defendant DuPont shareholders on July 1, 2015 (181 million shares at $16.51 per share price).

165.    Accordingly, most of the valuable assets that Defendant Chemours may have had at the time of the Chemours Spinoff were unavailable to creditors with current or future PFAS claims, and Defendant DuPont stripped Defendant Chemours's value for itself and its shareholders. In total, Defendant Chemours transferred almost $7 billion in stock, cash, and notes to Defendant DuPont and its shareholders. Defendant DuPont, however, only transferred $4.1 billion in net assets to Chemours. And, Defendant Chemours assumed billions of dollars of Defendant DuPont's PFAS and other liabilities.

166.    In addition to the assumption of such liabilities, the Chemours Separation Agreement required Defendant Chemours to provide broad indemnification to Defendant DuPont in connection with these liabilities, which is uncapped and does not have a survival period.

167.    The Chemours Separation Agreement requires Defendant Chemours to indemnify Defendant DuPont against, and assume for itself, all "Chemours Liabilities," which is defined

broadly to include, among other things, "any and all Liabilities relating . . . primarily to, arising primarily out of or resulting primarily from, the operation or conduct of the Chemours Business, as conducted at any time prior to, at or after the Effective Date . . . including . . . any and all Chemours Assumed Environmental Liabilities . . . ," which includes Defendant DuPont's historic liabilities relating to and arising from its decades of emitting PFOA into the environment from Washington Works and elsewhere.

168.    The Chemours Separation Agreement also requires Defendant Chemours to indemnify Defendant DuPont against, and assume for itself, the Chemours Liabilities regardless of (i) when or where such liabilities arose; (ii) whether the facts upon which they are based occurred prior to, on, or subsequent to the effective date of the spinoff; (iii) where or against whom such liabilities are asserted or determined; (iv) whether arising from or alleged to arise from negligence, gross negligence, recklessness, violation of law, fraud or misrepresentation by any member of the Defendant DuPont group or the Chemours group; (v) the accuracy of the maximum probable loss values assigned to such liabilities; and (vi) which entity is named in any action associated with any liability.

169.    The Chemours Separation Agreement also requires Defendant Chemours to indemnify Defendant DuPont from, and assume all, environmental liabilities that arose prior to the spinoff if they were "primarily associated" with the Performance Chemicals Business.

170.    Defendant Chemours also agreed to use its best efforts to be fully substituted for Defendant DuPont with respect to "any order, decree, judgment, agreement or Action with respect to Chemours Assumed Environmental Liabilities [.]"

171.    Notably, Defendant Chemours sued Defendant DuPont in Delaware state court in 2019, alleging, among other things, that if (i) the full value of Defendant DuPont's PFAS liabilities

were properly estimated and (ii) the court does not limit Defendant Chemours' liability that the Chemours Separation Agreement imposes, then Defendant Chemours would have been insolvent at the time of the Chemours Spinoff.

172.    There was no meaningful, arms-length negotiation of the Separation Agreement.

173.    In its Delaware lawsuit, Defendant Chemours alleges that Defendant DuPont refused to allow any procedural protections for Defendant Chemours in the negotiations, and Defendant DuPont and its outside counsel prepared all the documents to effectuate the Chemours Spinoff.    Indeed, during the period in which the terms of commercial agreements between Defendant Chemours and Defendant DuPont were negotiated, Defendant Chemours did not have an independent board of directors or management independent of Defendant DuPont.

174.    Although Defendant Chemours had a separate board of directors, Defendant DuPont's employees controlled Defendant Chemours' board. Indeed, when the Chemours Separation Agreement was signed, Defendant Chemours was a wholly owned subsidiary of Defendant DuPont, and the Defendant Chemours board consisted of three Defendant DuPont employees and one former, long-standing member of the Defendant DuPont board.

175.    Defendant Chemours' independent board of directors, newly appointed on July 1, 2015, immediately prior to the Chemours Spinoff, did not participate in the negotiations of the terms of the separation.

176.    It is apparent that Defendant DuPont's goal with respect to the Chemours Spinoff was to segregate a large portion of Defendant DuPont's legacy environmental liabilities, including liabilities related to its PFAS chemicals and products, and in so doing, shield Defendant DuPont's assets from any financial exposure associated therewith.

177.    Not surprisingly, given Defendant DuPont's extraction of nearly $4 billion from Defendant Chemours immediately prior to the Chemours Spinoff, Defendant Chemours was thinly capitalized and unable to satisfy the substantial liabilities that it assumed from Defendant DuPont. Indeed, Defendant Chemours disclosed in public SEC filings that its "significant indebtedness" arising from its separation from Defendant DuPont restricted its current and future operations.

178.    Shortly after the Chemours Spinoff, market analysts described Defendant Chemours as "a bankruptcy waiting to happen" and a company "purposely designed for bankruptcy."

179.    At the end of December 2014, Defendant Chemours reported it had total assets of $5.959 billion and total liabilities of $2.286 billion. At the end of 2015, following the Chemours Spinoff, Defendant Chemours reported that it had total assets of $6.298 billion and total liabilities of $6.168 billion as of December 31, 2015, yielding total net worth of $130 million.

180.    Removing Defendant Chemours' goodwill and other intangibles of $176 million yields tangible net worth of negative $46 million (that is, Defendant Chemours' liabilities were greater than its tangible assets). According to unaudited pro forma financial statements, as of March 31, 2015 (but giving effect to all of the transactions contemplated in the Chemours Spinoff), Defendant Chemours had total assets of $6.4 billion and total liabilities of $6.3 billion.

181.    Defendant Chemours also reported that these liabilities included $454 million in "other accrued liabilities," which in turn included $11 million for accrued litigation and $68 million for environmental remediation. Defendant Chemours also had $553 million in "other liabilities," which included $223 million for environmental remediation and $58 million for accrued litigation.

182.    Defendant Chemours significantly underestimated its liabilities, including the liabilities that it had assumed from Defendant DuPont with respect to PFAS, and which Defendant DuPont and Defendant Chemours knew or should have known would be tens of billions of dollars.

183.    Had Defendant Chemours taken the full extent of Defendant DuPont's legacy liabilities into account, as it should have done, it would have had negative equity (that is, total liabilities that are greater than total assets), not only on a tangible basis, but also on a total equity basis, and, Defendant Chemours would have been rendered insolvent at the time of the Chemours Spinoff.

**STEP 2: THE OLD DOW/DEFENDANT DUPONT "MERGER"**

184.    After the Chemours Spinoff, Defendant DuPont took the untenable position that it was somehow no longer responsible for the widespread PFAS contamination that it had caused over several decades. Defendant DuPont publicly claimed that the PFAS liabilities associated with the Performance Chemicals business that Defendant DuPont had transferred to Defendant Chemours rested solely with Defendant Chemours, and not with Defendant DuPont.

185.    Of course, Defendant DuPont could not contractually discharge all of its historical liabilities through the Chemours Spinoff, and Defendant DuPont remained liable for the liabilities it had caused, and that Defendant Chemours had assumed.

186.    Defendant DuPont knew that it could not escape liability and would still face exposure for PFAS liabilities, including for potentially massive punitive damages. So Defendant DuPont moved to the next phase of its fraudulent scheme.

187.    On December 11, 2015, less than six months following the Chemours Spinoff, Defendant DuPont and Old Dow announced that their respective boards had approved an agreement "under which the companies [would] combine in an all-stock merger of equals" and

that the combined company would be named DowDuPont, Inc. ("Dow-DuPont Merger"). The companies disclosed that they intended to subsequently separate the combined companies' businesses into three publicly traded companies through further spinoffs, each of which would occur 18 to 24 months following the closing of the merger.

188.    To effectuate the transaction, Defendant DuPont and Old Dow entered into an Agreement and Plan of Merger (the "Dow-DuPont Merger Agreement") that provided for (i) the formation of a new holding company – Diamond-Orion HoldCo, Inc., later named DowDuPont, and then renamed DuPont de Nemours, Inc., (*i.e.*, New DuPont) and (ii) the creation of two new merger subsidiaries into which Old Dow and Defendant DuPont each would merge.

189.    Upon the closing of the DowDuPont Merger, Old Dow merged into one merger subsidiary, and Defendant DuPont merged into the other merger subsidiary. Thus, as a result of the merger, and in accordance with the DowDuPont Merger Agreement, Old Dow and Defendant DuPont each became wholly owned subsidiaries of DowDuPont.

190.    Although Defendant DuPont and Old Dow referred to the transaction as a "merger of equals," the two companies did not actually merge at all, because doing so would have infected Old Dow with all of Defendant DuPont's historical PFAS liabilities. Rather, Defendant DuPont and Old Dow became affiliated sister companies that were each owned by the newly formed DowDuPont (*i.e.*, New DuPont).

191.    The below image reflects the corporate organization following the "merger":



**STEP 3: THE SHUFFLING, REORGANIZATION, AND TRANSFER OF VALUABLE ASSETS AWAY FROM DEFENDANT DUPONT AND SEPARATION OF DEFENDANT CORTEVA AND DEFENDANT NEW DOW**

192.   Following the Dow-DuPont Merger, DowDuPont (*i.e.*, New DuPont) underwent a significant internal reorganization, and engaged in numerous business segment and product line "realignments" and "divestitures." The net effect of these transactions has been the transfer, either directly or indirectly, of a substantial portion of Defendant DuPont's assets out of the company.

193.   While, again, the details of these transactions remain hidden from the Proposed Class Representatives and other creditors, it is apparent that the transactions were intended to frustrate and hinder creditors with claims against Defendant DuPont, including with respect to its substantial PFAS liabilities. The significant internal reorganization instituted by DowDuPont (*i.e.*, New DuPont) was in preparation for the conglomerate being split into three, separate, publicly traded companies.

194.   Defendant DuPont's assets, including its remaining business segments and product lines, were transferred either directly or indirectly to DowDuPont (*i.e.*, New DuPont), which reshuffled the assets and combined them with the assets of Old Dow, and then reorganized the

combined assets into three distinct divisions: (i) the "Agriculture Business"; (ii) the "Specialty Products Business"; and (iii) the "Material Sciences Business."

195.    While the precise composition of these divisions, including many details of the specific transactions, the transfer of business segments, and the divestiture of product lines during this time, are not publicly available, it is apparent that Defendant DuPont transferred a substantial portion of its valuable assets to DowDuPont (*i.e.*, New DuPont), for far less than the assets were worth.

196.    Once the assets of Defendant DuPont and Old Dow were combined and reorganized, DowDuPont (*i.e.*, New DuPont) incorporated two new companies to hold two of the three newly formed business lines: (i) Defendant Corteva, which became the parent holding company of Defendant DuPont, which in turn holds the Agriculture Business; and (ii) New Dow, which became the parent holding company of Old Dow, and which holds the Materials Science Business. DowDuPont (*i.e.*, New DuPont) retained the Specialty Products Business, and prepared to spin off Defendant Corteva and New Dow into separate, publicly traded companies.

197.    The below graph depicts the structure of DowDuPont after the internal reorganization and realignment:



198.    The mechanics of the separations are governed by the April 1, 2019 Separation and Distribution Agreement among Defendant Corteva, New Dow, and DowDuPont (*i.e.*, New DuPont) (the "DowDuPont Separation Agreement").

199.    The Dow DuPont Separation Agreement generally allocates the assets primarily related to the respective business divisions to Defendant Corteva (Agriculture Business), New Dow (Materials Science Business) and Defendant New DuPont (Specialty Products Business), respectively. Defendant New DuPont also retained several "non-core" business segments and product lines that once belonged to Defendant DuPont.

200.    Similarly, Defendant Corteva, New Dow, and Defendant New DuPont each retained the liabilities primarily related to the business divisions that they retained, *i.e.*, (i) Defendant Corteva retained and assumed the liabilities related to the Agriculture Business; (ii) New DuPont retained and assumed the liabilities related to the Specialty Products Business; and

(iii) Defendant New Dow retained and assumed the liabilities related to the Materials Science Business.

201.    Defendants Corteva and New DuPont also assumed direct financial liability of Defendant DuPont that was not related to the Agriculture, Material Science or Specialty Products Businesses, including, upon information and belief, the PFAS liabilities. These assumed PFAS liabilities are allocated on a pro rata basis between Defendants Corteva and New DuPont pursuant to the DowDuPont Separation Agreement, such that, after both companies have satisfied certain conditions, future liabilities are allocated 71% to Defendant New DuPont and 29% to Defendant Corteva.

202.    This "allocation" applies to Defendant DuPont's legacy liabilities for PFAS contamination and its former Performance Chemicals business, including the claims of the Class members in this case.

203.    While Defendants New DuPont and Corteva have buried the details in non-public schedules, upon information and belief, Defendants New DuPont and Corteva each assumed these liabilities under the DowDuPont Separation Agreement, along with other liabilities related to Defendant DuPont's discontinued and divested businesses. The Proposed Class Representatives can therefore bring claims against Defendants New DuPont and Corteva directly for Defendant DuPont's contamination of their drinking water wells and/or water supplies.

204.    The separation of New Dow was completed on or about April 1, 2019, when DowDuPont (*i.e.*, New DuPont) distributed all of New Dow's common stock to DowDuPont stockholders as a pro rata dividend. New Dow now trades on the New York Stock Exchange ("NYSE") under Old Dow's stock ticker "DOW."

205. On or about May 2, 2019, DowDuPont (*i.e.*, New DuPont) consolidated the Agricultural Business line into Defendant DuPont, and then, on or about May 31, 2019, it "contributed" Defendant DuPont to Defendant Corteva. The following day, on June 1, 2019, DowDuPont (i.e., New DuPont) spun off Defendant Corteva as an independent public company.

206. Defendant Corteva now holds 100% of the outstanding common stock of Defendant DuPont. Defendant Corteva now also trades on the NYSE under the stock ticker "CTVA."

207. The separation of Defendant Corteva was completed on or about June 1, 2019, when DowDuPont distributed all of Corteva's common stock to DowDuPont (*i.e.*, New DuPont) stockholders as a pro rata dividend.

208. The corporate structures of New Dow and Old Dow, and Defendant Corteva and Defendant DuPont, respectively, following the separations are depicted below:



209. Also, on or about June 1, 2019, DowDuPont changed its registered name to Du Pont de Nemours Inc. (*i.e.*, New DuPont).

**THE EFFECT OF THE YEARS-LONG SCHEME TO DEFRAUD**
**THE PROPOSED CLASS REPRESENTATIVES AND OTHER CREDITORS AND**
**AVOID FINANCIAL RESPONSIBILITY FOR LEGACY LIABILITIES**

210.    The net result of these transactions was to strip away valuable tangible assets from Defendant DuPont and transfer those assets to Defendants New DuPont and Corteva for far less than the assets are worth.

211.    Defendant DuPont estimated that the Dow-DuPont Merger created "goodwill" worth billions of dollars. When the Defendant Corteva separation was complete, a portion of this "goodwill" was assigned to Defendant DuPont in order to prop up its balance sheet. But, in reality, Defendant DuPont was left with substantially fewer tangible assets than it had prior to the restructuring.

212.    In addition, Defendant DuPont owes a debt to Defendant Corteva of approximately $4 billion. Recent SEC filings demonstrate the substantial deterioration of Defendant DuPont's finances and the drastic change in its financial condition before and after the above transactions.

213.    For example, for the fiscal year ended 2014, prior to the Chemours Spinoff, Defendant DuPont reported $3.6 billion in net income and $3.7 billion in cash provided by operating activities. For the fiscal year ended 2019, just months after the Defendant Corteva separation, however, Defendant DuPont reported a net loss of negative $1 billion and only $996 million in cash provided by operating activities. That is a decrease of 128% in net income and a decrease of 73% in annual operating cash flow.

214.    Additionally, Defendant DuPont reported a significant decrease in Income From Continuing Operations Before Income Taxes ("EBT"). Defendant DuPont reported $4.9 billion in EBT for the period ending December 31, 2014. For the period ending December 31, 2019, Defendant DuPont reported EBT of negative $422 million.

215.    The value of Defendant DuPont's tangible assets further underscores Defendant DuPont's precarious financial situation. For the fiscal year ended 2014, prior to the Chemours Spinoff, Defendant DuPont owned nearly $41 billion in tangible assets. For the fiscal year ended 2019, Defendant DuPont owned just under $21 billion in tangible assets.

216.    That means in the five-year period over which the restructuring occurred, when Defendant DuPont knew that it faced billions of dollars in PFAS liabilities, Defendant DuPont transferred or divested approximately half of its tangible assets—totaling $20 billion.

217.    As of September 2019, just after the Defendant Corteva spinoff, Defendant DuPont reported $43.251 billion in assets. But almost $21.835 billion of these assets were comprised of intangible assets, including "goodwill" from its successive restructuring activities.

218.    At the same time, Defendant DuPont reported liabilities totaling $22.060 billion. Thus, when the Defendant Corteva spinoff was complete, Defendant DuPont's tangible net worth (excluding its intangible assets) was negative $644 million.

219.    Defendant DuPont's financial condition has continued to deteriorate. By end of fiscal year 2019, Defendant DuPont reported $42.397 billion in total assets, half of which (or $21.653 billion) are intangible assets. Defendant DuPont's reported liabilities for the same period totaled $21.869 billion.

220.    Defendant DuPont's tangible net worth between September 30, 2019 and December 31, 2019 declined even further, whereby Defendant DuPont ended fiscal year 2019 with tangible net worth of negative $1.125 billion.

221.    In addition, the Proposed Class Representatives cannot take comfort in the "allocation" of liabilities to Defendants New DuPont and Corteva. Neither of those Defendants

has publicly conceded that they assumed Defendant DuPont's historical PFAS liabilities. And it is far from clear that either entity will be able to satisfy any judgment in this case.

222.    Indeed, Defendant New DuPont—to which 71% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—is in the process of divesting numerous business segments and product lines, including tangible assets that it received from Defendant DuPont, and for which Defendant DuPont has received less than reasonably equivalent value.

223.    Defendant New DuPont has received or will receive significant proceeds on the sales of Defendant DuPont's former business segments and product lines.

224.    In September 2019, Defendant New DuPont sold the Sustainable Solutions business for $28 million to Gyrus Capital.

225.    On or about December 15, 2019, Defendant New DuPont agreed to sell the Nutrition and Biosciences business to International Flavors & Fragrances for $26.2 billion.

226.    In March 2020, Defendant New DuPont completed the sale of Compound Semiconductor Solutions for $450 million to SK Siltron.

227.    In addition, Defendant New DuPont has issued Notices of Intent to Sell relating to six non-core segments (estimated by market analysts at approximately $4.5 billion), as well as the Transportation and Industrial Chemicals business, which had reported net sales revenue in 2019 of $4.95 billion and estimated annual operating earnings before interest, taxes, depreciation, and amortization of $1.3 billion.

228.    Defendant DuPont's parent holding company, Defendant Corteva—to which 29% of PFAS liabilities are "allocated" under the DowDuPont Separation Agreement once certain conditions are satisfied—holds as its primary tangible asset the intercompany debt owed to it by

its wholly owned subsidiary, Defendant DuPont. But Defendant DuPont does not have sufficient tangible assets to satisfy this debt obligation.

**D.    FEDERAL, STATE, AND INTERNATIONAL GOVERNMENT AGENCIES CALL FOR MONITORING AND CLEANUP OF PFAS CONTAMINATION**

229.    On May 2, 2012, the EPA published its Third Unregulated Contaminant Monitoring Rule ("UCMR 3"), requiring Public Water Systems nationwide to monitor for thirty contaminants of concern between 2013 and 2015, including PFOS and PFOA.[16]

230.    In the May 2015 "Madrid Statement on Poly- and Perfluoroalkyl Substances (PFAS's)," scientists and other professionals from a variety of disciplines, concerned about the production and release into the environment of PFOA, called for greater regulation, restrictions, limits on the manufacture and handling of any PFOA containing product, and to develop safe non-fluorinated alternatives to these products to avoid long-term harm to human health and the environment.[17]

231.    On May 25, 2016, the EPA released a lifetime health advisory level (HAL) for drinking water and health effects support documents for PFOS and PFOA.[18] The EPA developed the HAL to assist governmental officials in protecting public health when PFOS and PFOA are present in drinking water. The EPA HAL identified the concentration of PFOS and PFOA in drinking water at or below which adverse health effects are not anticipated to occur over a lifetime

---

[16] *Revisions to the Unregulated Contaminant Monitoring Regulation (UCMR 3) for Public Water Systems*, 77 Fed. Reg: 26072 (May 2, 2012).

[17] Blum A, Balan SA, Scheringer M, Trier X, Goldenman G, Cousins IT, Diamond M, Fletcher T, Higgins C, Lindeman AE, Peaslee G, de Voogt P, Wang Z, Weber R. 2015. The Madrid statement on poly- and perfluoroalkyl substances (PFASs). Environ Health Perspect 123:A107–A111; http://dx.doi.org/10.1289/ehp.1509934.

[18] *See* Fed. Register, Vol. 81, No. 101, May 25, 2016, Lifetime Health Advisories and Health Effects Support Documents for Perfluorooctanoic Acid and Perfluorooctane Sulfonate.

of exposure at 0.07 ppb or 70 ppt. The HAL was based on peer-reviewed studies of the effects of PFOS and PFOA on laboratory animals (rats and mice) and was also informed by epidemiological studies of human populations exposed to PFOS. These studies indicated that exposure to PFOS and PFOA over the HAL could result in adverse health effects.

232.    In 2016, the National Toxicology Program of the United States Department of Health and Human Services ("NTP") and the International Agency for Research on Cancer ("IARC") both released extensive analyses of the expanding body of research regarding the adverse effects of fluorochemicals. The NTP concluded that both PFOA and PFOS are "presumed to be an immune hazard to humans" based on a "consistent pattern of findings" of adverse immune effects in human (epidemiology) studies and "high confidence" that PFOA and PFOS exposure was associated with suppression of immune responses in animal (toxicology) studies.[19]

233.    IARC similarly concluded that there is "evidence" of "the carcinogenicity of . . . PFOA" in humans and in experimental animals, meaning that "[a] positive association has been observed between exposure to the agent and cancer for which a causal interpretation is . . . credible."[20]

---

[19] *See* U.S. Dep't of Health and Human Services, Nat'l Toxicology Program, *NTP Monograph: Immunotoxicity Associated with Exposure to Perfluorooctanoic Acid or Perfluorooctane Sulfonate* (Sept. 2016), at 1, 17, 19, *available at* https://ntp.niehs.nih.gov/ntp/ohat/pfoa_pfos/pfoa_pfosmonograph_508.pdf

[20] *See* Int'l Agency for Research on Cancer, IARC Monographs: *Some Chemicals Used as Solvents and in Polymer Manufacture* (Dec. 2016), at 27, 97, *available at* http://monographs.iarc.fr/ENG/Monographs/vol110/mono110.pdf.

234.    California has listed PFOA and PFOS to its Proposition 65 list as a chemical known to cause reproductive toxicity under the Safe Drinking Water and Toxic Enforcement Act of 1986.[21]

235.    The United States Senate and House of Representatives passed the National Defense Authorization Act in November 2017, which included $42 million to remediate fluorochemical contamination from military bases, as well as devoting $7 million toward the Investing in Testing Act, which authorizes the Center for Disease Control and Prevention ("CDC") to conduct a study into the long-term health effects of PFOA and PFOS exposure.[22]  The legislation also required that the Department of Defense submit a report on the status of developing a new military specification for AFFF that did not contain PFOS or PFOA.[23]

236.    In June 2018, the Agency for Toxic Substances and Disease Registry ("ATSDR") and EPA released a draft toxicological profile for PFOS and PFOA and recommended the drinking water advisory levels be lowered to 11 ppt for PFOA and 7 ppt for PFOS.[24]

237.    In December 2019, the United States Senate and House of Representatives passed the National Defense Authorization Act for Fiscal Year 2020 ("FY 2020 NDAA"), which

---

[21] California Office of Environmental Health Hazard Assessment, *Chemicals Listed Effective Nov. 10, 2017 as Known to the State of California to Cause Reproductive Toxicity: Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS)*, Nov. 9, 2017, *available at* https://oehha.ca.gov/proposition-65/crnr/chemicals-listed-effective-november-10-2017-known-state-california-cause.

[22] National Defense Authorization Act for Fiscal Year 2018, H.R. 2810, 115th Congress (2017), *available at* https://www.congress.gov/115/plaws/publ91/PLAW-115publ91.pdf.

[23] *Id.*; *see also* U.S. Department of Defense, *Alternatives to Aqueous Film Forming Foam Report to Congress*, June 2018, *available at* https://www.denix.osd.mil/derp/home/documents/alternatives-to-aqueous-film-forming-foam-report-to-congress/.

[24] ATSDR, *Toxicological Profile for Perfluoroalkyls: Draft for Public Comment* (June 2018), *available at* https://www.atsdr.cdc.gov/toxprofiles/tp200.pdf.

introduced new prohibitions on the use of PFAS-containing AFFF for land-based applications.[25] Section 322 of the Act introduced a timeline for the phasing out of AFFF use by the military, including by requiring the Secretary of the Navy to publish a new military specification for a fluorine-free fire-fighting agent for use at all military installations by January 31, 2023. Section 322(b) and (c) then provide that Department of Defense organizations will no longer be authorized to purchase AFFF containing more than 1 part per billion of PFAS after October 1, 2023, and that after October 1, 2024, this prohibition will extend to the use of any PFAS-containing AFFF at any military installation.

238.    On February 20, 2020, the EPA announced a proposed decision to regulate PFOA and PFOS under the Safe Drinking Water Act, which the agency characterized as a "key milestone" in its efforts to "help communities address per- and polyfluoroalkyl substances (PFAS) nationwide."[26]

239.    On December 27, 2021 the EPA published its Fifth Unregulated Contaminant Monitoring Rule ("UCMR 5") requiring all Public Water Systems nationwide that serve populations 3,300 or more persons, as well as a representative sampling of Public Water Systems serving 25 to 3,2999 persons, to test for 29 PFAS with sample collection beginning on January 1, 2023 and ending on December 31, 2025.  See 86 Fed. Reg. 73131.

240.    On June 15, 2022, the EPA released new drinking water health advisory levels (HALs) for four PFAS, including new interim HALs for PFOS and PFOA that departed

---

[25] National Defense Authorization Act for Fiscal Year 2020, S. 1790, 116th Congress (2019), *available at* https://www.govinfo.gov/content/pkg/BILLS-116s1790enr/pdf/BILLS-116s1790enr.pdf.

[26] Press Release, *EPA Announces Proposed Decision to Regulate PFOA and PFOS in Drinking Water*, Feb. 20, 2020, *available at* https://www.epa.gov/newsreleases/epa-announces-proposed-decision-regulate-pfoa-and-pfos-drinking-water.

significantly from the 2016 EPA HAL they replaced.[27] Specifically, EPA issued HALs of 0.004 ppt for PFOA and 0.02 ppt for PFOS,[28] which collectively accounted for only a small fraction of the combined 70 ppt HAL that preceded them.  Importantly, EPA set these interim HALs at levels below which PFOS and PFOA can be measured using current analytic methods, meaning that the mere detection of PFOS or PFOA in a water provider's system would be sufficient on its own to exceed the new levels.

241.    As support for its decision, EPA explained that the science had evolved since 2016 and that the new interim HALs for PFOS and PFOA were "based on human studies" that "found associations between PFOA and/or PFOS exposure and effects on the immune system, the cardiovascular system, human development (e.g., decreased birth weight), and cancer."[29] Specifically, EPA had performed updated health effects analyses for PFOS and PFOA to provide support for the drinking water regulations the agency planned to adopt for the two chemicals under the SDWA. Based on these analyses, EPA concluded that "the levels at which negative health effects could occur are much lower than previously understood when EPA issued the 2016 health advisories for PFOA and PFOS – including near zero for certain health effects."[30]  For this reason, the agency determined there was a "pressing need to provide updated information on the current

---

[27] *See* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[28] *Id.* Fed. Register, Vol. 87, No. 36848, June 21, 2022, Lifetime Drinking Water Health Advisories for Four Perfluoroalkyl Substances.

[29] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Communities* at 1-2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-communities.pdf..

[30] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

best available science to public health officials prior to finalization of the health effects assessment."[31]

242.   Because the referenced health analyses were still undergoing final review by EPA's Science Advisory Board, the agency at that time stated that the new interim HALs for PFOS and PFOA were subject to change. EPA indicated, however, that it did not anticipate any changes resulting in revised HALs for PFOS and PFOA that are greater than the 4 ppt minimum reporting level[32] that applies to Public Water Systems.[33]

243.   On September 6, 2022, EPA published a notice of proposed rulemaking seeking public comment on its plan to designate PFOS and PFOA as hazardous substances under CERCLA.[34]   Pursuant to that notice, all comments from the public were to be submitted by November 7, 2022.

244.   On January 6, 2023, the Defense Logistics Agency within the Department of Defense published a new Military Specification for "Fire Extinguishing Agent, Fluorine-Free

---

[31] EPA Office of Water, EPA Doc. No. 822-R-22-003, *INTERIM Drinking Water Health Advisory: Perfluorooctanoic Acid (PFOA) CASRN 335-67-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfoa-2022.pdf; EPA Office of Water, EPA Doc. No. 822-R-22-004, *INTERIM Drinking Water Health Advisory: CASRN 1763-23-1* at 18 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/interim-pfos-2022.pdf.

[32] As EPA's website explains, the Minimum Reporting Level ("MRL") for Unregulated Contaminant Monitoring Rule (UCMR) 5 is the minimum quantitation level that, with 95 percent confidence, can be achieved by capable analysts at 75 percent or more of the laboratories using a specified analytical method. The MRLs in EPA's chart are based on the UCMR 5 requirement to use EPA Method 533.

[33] EPA, *Drinking Water Health Advisories for PFAS Fact Sheet for Public Water Systems* at 2 (June 2022), *available at* https://www.epa.gov/system/files/documents/2022-06/drinking-water-ha-pfas-factsheet-water-system.pdf.

[34] *See* Designation of Perfluorooctanoic Acid (PFOA) and Perfluorooctanesulfonic Acid (PFOS) as CERCLA Hazardous Substances, 87 Fed. Reg. 54415 (Sep. 6, 2022).

Foam (F3) Liquid Concentrate, for Land-Based, Fresh Water Application," MIL-PRF-32725 ("F3 MilSpec") in accordance with § 332(a)(1) of the FY 2020 NDAA.[35] This new specification will govern fire extinguishing foams used by all Department of Defense organizations and will require such foams to test "non-detect" for PFAS.  The specification further requires manufacturers to "certify in writing that PFAS has not intentionally been added to the concentrate."

245.    On March 29, 2023, EPA published a notice of proposed rulemaking seeking public comment on its plan to set maximum contaminant levels ("MCLs")—legally mandated regulatory standards under the Safe Water Drinking Act—for six PFAS chemicals.[36]  The proposed rule would set an MCL of 4.0 ppt for PFOA and PFOS, set a hazard index for the remaining four PFAS chemicals, and require Public Water Systems to monitor for these PFAS, notify the public of the levels of these PFAS, and reduce the levels of these PFAS in drinking water if they exceed the proposed standards.  Coincident to the proposed rule-making, EPA announced final findings that PFAS were carcinogenic and dangerous to human health.

E.    **THE IMPACT OF DEFENDANTS' PFAS ON THE DRINKING WATER WELLS AND WATER SUPPLIES OF THE PROPOSED CLASS REPRESENTATIVES AND THE PROPOSED CLASS**

246.    The drinking water wells and water supplies of the Proposed Class Representatives have been contaminated and/or threatened to be contaminated with Defendants' PFAS, such that Defendants' PFAS has traveled via surface water, stormwater, groundwater, etc. to contaminate or threaten to contaminate the water wells and water supplies of the Proposed Class Representatives.

---

[35] Available on the Defense Logistics Agency's website, https://quicksearch.dla.mil/qsDocDetails.aspx?ident_number=285047.
[36] *See* PFAS National Primary Drinking Water Regulation Rulemaking, 88 Fed. Reg. 18,638 (Mar. 29, 2023).

247.    Upon information and belief, the drinking water wells and water supplies of the Class members have been contaminated and/or threatened to be contaminated with Defendants' PFAS, such that Defendants' PFAS has traveled via surface water, stormwater, groundwater, etc. to contaminate or threaten to contaminate the drinking water wells and water supplies of the Class members.

248.    The Proposed Class Representatives contend that any contamination and/or threat of contamination of Defendants' PFAS to their drinking water wells and water supplies as well as those of the Class members requires investigation, remediation and monitoring.

249.    The detection and/or presence of Defendants' PFAS and the threat of further detection and/or presence of PFOA in the drinking water wells and water supplies of the Proposed Class Representatives and Class members has resulted, and will continue to result, in significant injuries and damage to the Proposed Class Representatives and the Proposed Class.

250.    Upon information and belief, the invasion of the respective properties of the Proposed Class Representatives and Class members with PFOA is recurring—new contamination flows regularly and constantly through the groundwater and into the property each day, resulting in new harm to the property of the Proposed Class Representatives and Class members on each occasion.

251.    Because of the risks that Defendants' PFAS poses to human health, in June 2022, the federal EPA issued new interim lifetime drinking water health advisories of 0.0004 parts per trillion ("ppt") for PFOA and 0.02 ppt for PFOS in drinking water.

252.    The injuries to the Proposed Class Representatives and Class members caused by Defendants' conduct constitute an unreasonable interference with, and damage to, their respective properties for which they are entitled to any and all damages provided by law.

## CLASS ACTION ALLEGATIONS

253.    Defendants' unlawful conduct, as set forth herein, caused Defendants' PFAS to enter into groundwater and surface water sources, ultimately resulting in the contamination, or risk of contamination, of the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members with Defendants' PFAS.

254.    The Proposed Class Representatives and Class members have suffered, and will continue to suffer, property damage as a result of the presence, and ongoing risk, of Defendants' PFAS in their drinking water wells and/or water supplies.

255.    The Proposed Class Representatives bring this class action on behalf of themselves and all other similarly situated Public Water Systems.

256.    The proposed Class is defined as:

>    All Public Water Systems in the United States of America that draw or otherwise collect from any Water Source that, on or before June 30, 2023, was tested or otherwise analyzed for PFAS and found to contain any PFAS at any level; and

>    All Public Water Systems in the United States of America that, as of June 30, 2023, are (i) subject to the monitoring rules set forth in UCMR 5 (*i.e.*, "large" systems serving more than 10,000 people and "small" systems serving between 3,300 and 10,000 people), or (ii) required under applicable federal or state law to test or otherwise analyze any of their Water Sources or the water they provide for PFAS before the UCMR 5 Deadline.[37]

257.    The following are specifically excluded as members of the proposed Class:

>    a.    Any Public Water System that is located in Bladen, Brunswick, Columbus, Cumberland, New Hanover, Pender, or Robeson counties in North Carolina;

---

[37] "UCMR 5" is the U.S. EPA's fifth Unregulated Contaminant Monitoring Rule, published at 86 Fed. Reg. 73131, which requires certain Public Water Systems to test for PFAS compounds.  The "UCMR 5 Deadline" means (i) December 31, 2025, or (ii) such later date to which the deadline for completion of sample collection under UCMR 5 may be extended by the U.S. EPA.

      b.     Any Public Water System that is owned and operated by a State government and cannot sue or be sued in its own name;

      c.     Any Public Water System that is owned and operated by the federal government and cannot sue or be sued in its own name; and

      d.     Any privately owned well or surface water system that is not owned by, used by, or otherwise part of, and does not draw water from a Public Water System within the Class;

258.    As used in Paragraphs 257 and 258, "Public Water System" means a system for the provision of water to the public for human consumption through pipes or other constructed conveyances, if such system has at least fifteen (15) service connections or regularly serves at least twenty-five (25) individuals.  As used in Paragraphs 257 and 258, a "Public Water System" shall include the owner and/or operator of that system and any public entity that is legally responsible for funding (by statute, regulation, other law, or contract), other than a State or the federal government, a Public Water System described in such Paragraph or has authority to bring a claim on behalf of such a Public Water System.

259.    This action satisfies the ascertainably, numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of Federal Rule of Civil Procedure 23.

260.    <u>Ascertainability</u>. The members of the Proposed Class are readily ascertainable without extensive and individualized fact-finding and have been identified as putative Class members by reference to publicly available information.  Each public water provider in the United States is a permitted entity that is regulated by the Environmental Protection Agency ("EPA").  The EPA assigns a unique identification number called a "PWSID" to each public water provider and maintains a centralized database that contains an inventory of all Public Water Systems in America.  This database, called the Safe Drinking Water Information System ("SDWIS"), is regularly updated with classifying information about all Public Water Systems as well as administrative contact information.  Thus, all Public Water Systems can be readily ascertained

based on their registration and respective, system-specific information in the Federal SDWIS database. Class notice will be delivered to all Public Water Systems via direct and publication notice. Public Water Systems may also identify themselves as Class members by submitting a Claims Form and providing additional information including testing data showing PFAS detections.

261.    Numerosity. The members of the Class are so numerous that their individual joinder is impracticable. Over 10,000 Public Water Systems are estimated to fall within the Class definition. The Class members are geographically located across the United States, making their joinder even more impracticable.

262.    Existence and Predominance of Common Questions of Law and Fact. Common questions of law and fact exist as to all Class members that predominate over any questions affecting individual Class members. All Class members have been subject to the same unlawful conduct of the Defendants and have suffered the same resulting injuries – contamination of their drinking water wells and/or water supplies. Questions of law or fact which are common to the Class members, as set forth in this Complaint, predominate over questions affecting individual members because the Class members are similarly situated victims of Defendants' common course of unlawful conduct. Defendants' conduct similarly harmed all Class members because Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product that infiltrated the Class members' drinking water wells and water supplies. In addition, Defendants have no defenses specific to individual Class members, and their defenses, if any, apply equally to all Class members. The common legal and factual questions include, but are not limited to, the following:

a.  When the Defendants designed, manufactured, and sold Defendants' PFAS;

b.  Whether Defendants owed a duty to the Class members to refrain from the conduct that led to the contamination of their drinking water wells and water supplies with Defendants' PFAS;

c.  Whether there is sufficient evidence that Defendants' PFAS posed/poses a risk of harm to the environment and human health;

d.  Whether Defendants knew and/or should have known that Defendants' PFAS posed/poses a risk of harm to the environment and human health;

e.  The extent to which Defendants became aware that Defendants' PFAS posed a risk of harm to the environment and human health;

f.  Whether Defendants provided adequate warnings about the potential harms associated with Defendants' PFAS;

g.  Whether Defendants provided adequate instructions for the use of Defendants' PFAS;

h.  Whether Defendants provided adequate instructions for the disposal of waste generated by Defendants' PFAS;

i.  Whether Defendants made misleading representations or omissions with respect to the environmental and health effects of Defendants' PFAS;

j.  Whether Defendants' PFAS were defectively and/or negligently designed;

k.  Whether Defendants owed the Class members duties, including a duty to warn about the propensity of Defendants' PFAS to contaminate surface water and groundwater used by Public Water Systems;

l.  Whether Defendants failed to warn about the environmental and health risks posed by Defendants' PFAS;

m.  Whether Defendants, through their actions and omissions, breached their duties to the Class members;

n.  whether Defendants, through their actions and omissions, directly and proximately caused the Class members' injuries and damages;

o.  whether Defendants' conduct supports an award of statutory, exemplary and/or punitive damages; and

p. whether the Proposed Class Representatives and Class members are entitled to damages.

263.    The injuries sustained by the Proposed Class Representatives and Class members flow, in each instance, from a common nucleus of operative facts – Defendants' misconduct relating to Defendants' PFAS.

264.    These questions of law and fact that are common to the Proposed Class Representatives and Class predominate over any questions affecting them individually.

265.    <u>Typicality</u>. The claims of the Proposed Class Representatives are typical of the claims of the Class members in that the Proposed Class Representatives, like the Class members, own and/or operate Public Water Systems that have been and/or are contaminated with Defendants' PFAS and/or are legally required to monitor for PFAS, and have incurred costs or will incur costs to test for and/or remove Defendants' PFAS from their respective drinking water wells and water supplies.

266.    <u>Adequacy of Representation</u>. The Proposed Class Representatives will fairly and adequately protect the interests of the Class. The Proposed Class Representatives have retained Proposed Class Counsel all of whom are experienced in highly complex litigation, including litigation involving public entities, widescale environmental damage, class actions and mass torts. Neither the Proposed Class Representatives nor Proposed Class Counsel have any adverse or antagonistic interests to those of the Class members, and they will fairly and adequately protect the interests of the Class members.  Proposed Class Counsel are unaware of any interests adverse or antagonistic to those of the Proposed Class Representatives and the Class members.

267.    <u>Superiority</u>. A class action is superior to any other theoretically available method for the fair and efficient adjudication of this controversy.  Significant economies of time, effort, and expense will inure to the benefit of the Court and the parties in litigation of essentially identical

issues on a class-wide rather than a repetitive individual basis. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the judicial system and the issues raised by this action. The class action device presents far fewer management difficulties, and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court. No unusual difficulties are likely to be encountered in the management of this class action, and concentrating the litigation in this centrally located forum is particularly convenient to the parties.

**FIRST CAUSE OF ACTION**
**PUBLIC NUISANCE**

268. The Proposed Class Representatives reaffirm each and every allegation set forth in all preceding paragraphs as if fully restated in this count.

269. Defendants developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS in a manner that created or participated in creating a public nuisance that is harmful to health and obstructs the use of the drinking water from the water wells and/or water supplies of the Proposed Class Representatives and Class members.

270. The presence of Defendants' PFAS interferes with the use of the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

271. The presence of Defendants' PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members caused and/or continues to cause significant costs, inconvenience and annoyance to the Proposed Class Representatives and the Class members, who are all charged with supplying potable drinking water to residents and businesses in various locations throughout the United States.

272.    The presence of Defendants' PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members affects a substantial number of people nationwide who rely upon the water wells and water supplies of the Proposed Class Representatives and Class members for commercial and recreational purposes, and it interferes with the rights of the public at large to clean and safe drinking water resources and environment.

273.    An ordinary person would be reasonably annoyed and/or disturbed by the presence in public drinking water of Defendants' toxic PFAS that endangers human health and degrades water quality.

274.    The seriousness of the environmental and human health risk of Defendants' PFAS in the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members far outweighs the social utility, if any, of Defendants' conduct in developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendants' PFAS and concealing the dangers posed to human health and the environment.

275.    The Proposed Class Representatives and Class members have suffered and will continue to suffer this particularized harm which is different from the type of harm suffered by the general public at large, as the Proposed Class Representatives and Class members have incurred substantial costs to remove PFAS from its water supply.

276.    The Proposed Class Representatives and Class members did not consent to the conduct that resulted in the contamination of their respective drinking water wells and water supplies.

277.    Defendants' conduct was a substantial factor in causing the harm to the Proposed Class Representatives and Class members.

278.    Defendants knew or, in the exercise of reasonable care, should have known that the manufacture and sale of Defendants' PFAS were causing the type of contamination now found in and around the respective drinking water wells and water supplies of the Proposed Class Representatives and Class members.

279.    At all relevant times, Defendants knew or should have known that Defendants' PFAS would contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendants, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water wells and water supplies.

280.    As a direct and proximate result of Defendants' creation of a public nuisance, the Proposed Class Representatives and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

281.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## SECOND CAUSE OF ACTION
## PRIVATE NUISANCE

282.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

283.    The respective drinking water wells and water supplies of the Proposed Class Representatives and Class members have been contaminated by Defendants' PFAS as a direct and proximate result of the unreasonable acts and omissions of Defendants as set forth herein.

284. PFAS contamination caused by Defendants' unreasonable acts and/or omissions has substantially damaged the respective drinking water wells and water supplies of the Proposed Class Representatives and Class members, and interfered with the ordinary safety, use, benefit, and enjoyment of their respective drinking water wells and water supplies.

285. At all relevant times, Defendants knew or should have known that Defendants' PFAS would substantially contaminate water supplies and were/are associated with serious illnesses and cancers in humans. Defendants, thus, knew or should have known that PFAS contamination would seriously and unreasonably interfere with the ordinary comfort, use, and enjoyment of public drinking water wells and water supplies.

286. As a direct and proximate result of Defendants' creation of a private nuisance, the Proposed Class Representatives and Class members have suffered, and continue to suffer, monetary damages to be proven at trial.

287. Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**THIRD CAUSE OF ACTION**
**STRICT LIABILITY- DESIGN DEFECT**
**CONSUMER EXPECTATION TEST**

288. The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

289. The Proposed Class Representatives and Class members were harmed by Defendants' PFAS which were developed, manufactured, formulated, distributed, sold,

transported, stored, loaded, mixed, applied and/or used by Defendants, and which were dangerous to an extent beyond that contemplated by the ordinary consumer, defectively designed, did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

290. The design of Defendants' PFAS were defective because Defendants' PFAS did not perform as safely as an ordinary consumer would have expected them to perform.

291. Defendants' PFAS did not perform as safely as an ordinary consumer would have expected it to perform when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

292. The drinking water wells and water supplies of the Proposed Class Representatives and Class members were, are and will continue to be harmed by Defendants' PFAS.

293. The failure of Defendants' PFAS to perform safely was a substantial factor in causing harm to the drinking water wells and water supplies of the Proposed Class Representatives and Class members.

294. Defendants had actual knowledge that Defendants' PFAS were causing the type of harm suffered by the Proposed Class Representatives and Class members.

295. Defendants also knew or should have known that Defendants' PFAS caused harm even when used as intended, instructed, and normally expected and that no third-party could prevent such harm.

296. Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

297. Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed,

manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

**FOURTH CAUSE OF ACTION**
**STRICT LIABILITY - DESIGN DEFECT**
**RISK-BENEFIT TEST**

298.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

299.    The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendants, and which were defectively designed in that their safety risks outweighed their benefits, if any.

300.    The design of Defendants' PFAS were a substantial factor in causing harm to the Proposed Class Representatives and Class members.

301.    The gravity of the huge environmental harm resulting from the use of Defendants' PFAS were, is, and will be enormous because PFAS contamination is widespread, persistent, and toxic.

302.    The likelihood of this harm was, is, and will continue to be very high because Defendants' PFAS were toxic, cannot be contained, and do not readily degrade in the environment.

303.    Defendants knew and/or should have known that Defendants' PFAS were toxic, could not be contained, and do not readily degrade in the environment.

304.    At the time of manufacture, there were alternative safer designs that were feasible, cost effective, and advantageous to Defendants.  For example, Defendants could have developed,

manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used products not containing fluorine for use in AFFF.

306.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and thus Defendants were grossly negligent.

306.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, and that these dangers significantly outweighed any benefits of Defendants' PFAS.

**FIFTH CAUSE OF ACTION**
**NEGLIGENCE - DESIGN DEFECT**

307.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

308.    The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendants, and which were defectively designed in that they were dangerous to an extent beyond that contemplated by the ordinary consumer, and their safety risks outweighed their benefits, if any, and they did not include sufficient instructions, and did not include sufficient warning of potential safety hazards.

309.    At all relevant times, Defendants, as commercial developers, manufacturers, formulators, distributors, sellers, transporters, storers, loaders, mixers, appliers sand/or user of Defendants' PFAS, had a duty not to place a defective product into the stream of commerce

meaning that Defendants had a duty not to place into the stream of commerce any product that was unreasonably dangerous.

310.    Defendants breached that duty by developing, manufacturing, formulating, distributing, selling, transporting, storing, loading, mixing, applying and/or using Defendants' PFAS which, at all relevant times, was unreasonably dangerous.

311.    Defendants' PFAS, that were used in the vicinity of the drinking water wells and/or water supplies of the Proposed Class Representatives and/or Class members, were defective in design and unreasonably dangerous because, among other things:

    a.  Defendants' PFAS caused and/or would continue to cause extensive and persistent contamination of groundwater when used in its foreseeable and intended manner;

    b.  Contamination with Defendants' PFAS in drinking water poses significant risks to public health and welfare; and

    c.  Defendants failed to conduct and/or disclose adequate scientific studies to evaluate the impact of Defendants' PFAS contamination on the environment and human health.

312.    At all relevant times, Defendants' PFAS were dangerous to an extent beyond that contemplated by the ordinary consumer and posed a foreseeable risk of harm that outweighed the cost to Defendants of measures designed to mitigate that risk.

313.    Defendants knew or should have known that third parties would purchase Defendants' PFAS and use them without knowledge of their defects and hazardous consequences.

314.    Defendants knew or should have known that at the time of manufacture, that Defendants' PFAS would result in contamination of a chemical that was not biodegradable and bioaccumulated in fish, wildlife, and humans.

315.    Defendants' PFAS were purchased by third parties who used them in a reasonably foreseeable manner and without substantial change in their condition.

316.    Defendants knew or should have known that the use of Defendants' PFAS by these third parties would result in the spillage, discharge, disposal, or release of Defendants' PFAS onto land or into groundwater supplies.

317.    Defendants knew or should have known about safer, feasible alternatives to Defendants' PFAS that could be used in certain end products, such as AFFF, and the omission of those alternative designs rendered Defendants' PFAS defective.

318.    As a direct and proximate result of Defendants' negligence, the Proposed Class Representatives and Class members were, are and/or will be harmed by the contamination of their respective drinking water wells and/or water supplies with Defendants' PFAS.

319.    Upon information and belief, Defendants knew and/or should have known that Defendants' PFAS would result in injury to the Proposed Class Representatives and Class members.

320.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

321.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## SIXTH CAUSE OF ACTION
## STRICT LIABILITY- FAILURE TO WARN

322. The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

323. The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendants, and which were designed, manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

324. Defendants' PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

325. The potential environmental hazard and toxicity risks of Defendants' PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about Defendants' PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

326. The potential environmental hazard and toxicity risks presented a substantial danger when Defendants' PFAS were applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way. Ordinary consumers and third parties would not have recognized the potential risks.

327. Defendants had strict duties not to develop, manufacture, formulate, distribute, sell, transport, store, load, mix, apply and/or use Defendants' PFAS without adequate warnings of the

potential risks associated with Defendants' PFAS, which they knew or should have known resulted from the foreseeable application, use, storage and/or disposal of Defendants' PFAS.

328.    Defendants breached these duties by failing to adequately warn or instruct of the potential risks associated with the application, use and disposal of Defendants' PFAS and the dangers to drinking water wells and water supplies that were contaminated with Defendants' PFAS.

329.    The lack of sufficient instructions or warnings was a direct, proximate and/or substantial factor in causing harm to the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

330.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

331.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

<u>SEVENTH CAUSE OF ACTION</u>
<u>NEGLIGENCE - FAILURE TO WARN</u>

332.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

333.    The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendants, and which were designed,

manufactured, sold, and distributed without adequate warning of toxicity, potential human health risks, and environmental hazards.

334.    Defendants' PFAS were designed, manufactured, sold, and distributed without instructions to prevent contamination of soil and water and the resulting potential human health risks and environmental hazards.

335.    The potential environmental hazard and toxicity risks of Defendants' PFAS were known and/or knowable in light of the scientific and medical knowledge that was generally accepted in the scientific community and/or in light of Defendants' superior knowledge about Defendants' PFAS at the time of their development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use.

336.    Defendants had a duty to the Proposed Class Representatives and Class members to warn about the potential environmental hazard and toxicity risks associated with Defendants' PFAS.

337.    Defendants breached this duty by failing to adequately warn or instruct of the potential risks associated with Defendants' PFAS.

338.    Defendants had a duty to the Proposed Class Representatives and Class members to provide sufficient instructions or warnings relating to Defendants' PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

339.    Defendants breached this duty by failing to provide sufficient instructions or warnings relating to Defendants' PFAS so as to avoid contamination of drinking water wells and water supplies throughout the United States.

340.    Defendants' breaches were a substantial factor in causing harm to the drinking water wells and/or water supplies of the Proposed Class Representatives and Class members.

341.    Defendants knew or reasonably should have known that users and third parties would not realize the dangers associated with Defendants' PFAS.

342.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

343.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## EIGHTH CAUSE OF ACTION
## NEGLIGENCE - FAILURE TO RECALL

344.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

345.    Defendants' PFAS were developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used by Defendants, without adequate warning of toxicity, potential human health risks, and environmental hazards.

346.    Defendants had a duty to use reasonable care to warn or instruct about the risks associated with Defendants' PFAS.

347.    Defendants breached the duty to use reasonable care by failing to warn or instruct about the risks associated with Defendants' PFAS.

348.    Defendants had a duty to recall Defendants' PFAS when it knew or should have known about the risks associated with Defendants' PFAS.

349.    Defendants breached the duty to recall by failing to recall Defendants' PFAS when it first learned or should have learned about the risks associated with Defendants' PFAS.

350.    Defendants knew or reasonably should have known that Defendants' PFAS were dangerous or likely to be dangerous when applied, used and/or disposed of as directed, instructed and/or intended and/or when misused in a reasonably foreseeable way.

351.    At all relevant times, Defendants knew or reasonably should have known that users and third parties would not realize the danger associated with Defendants' PFAS.

352.    At all relevant times, Defendants knew or reasonably should have known of the human health risks and environmental dangers presented by Defendants' PFAS.

353.    A reasonable developer, manufacturer, formulator, distributor, seller, transporter, storer, loader, mixer, applier and/or user of chemical products under the same or similar circumstances would have recalled Defendants' PFAS.

354.    The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which have contaminated their drinking water wells and/or water supplies.

355.    Defendants' failure to warn and/or recall Defendants' PFAS were a substantial factor in causing the harm suffered by the Proposed Class Representatives and Class members.

356.    Defendants' conduct lacked any care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent. 132.

357.    Defendants' conduct was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or

used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries, without warning and/or instruction of these dangers.

## NINTH CAUSE OF ACTION
### TRESPASS

358.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

359.    The Proposed Class Representatives and Class members own and/or operate drinking water wells and/or water supplies that draw their water various Water Sources, including groundwater, aquifers and associated pumping, storage, treatment and distribution facilities.

360.    The Proposed Class Representatives and Class members have significant property interests in the waters they appropriate and use, and they also have significant property interests in the groundwaters that supply their drinking water wells and/or water supplies.

361.    Defendants intentionally, recklessly, and/or negligently caused Defendants' PFAS to enter into the groundwaters, aquifers, and drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Class members.

362.    The Proposed Class Representatives and Class members did not give permission for the entry of Defendants' PFAS on to their respective properties.

363.    The Proposed Class Representatives and Class members were, are and/or will be harmed by Defendants' PFAS which have contaminated their drinking water wells and/or water supplies.

364.    Defendants' unlawful conduct was a substantial factor in causing the harm that the Proposed Class Representatives and Class members have suffered and/or continue to suffer.

365.    Defendants' conduct relating to Defendants' PFAS lacked any reasonable care and was an extreme departure from what a reasonably careful company would do in the same situation to prevent harm to others and the environment, and, thus, Defendants were grossly negligent.

366.    Defendants' conduct in trespassing on the property of the Proposed Class Representatives and Class members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

## TENTH CAUSE OF ACTION
## CIVIL CONSPIRACY

367.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

368.    At all times relevant to this lawsuit, Defendants actually knew of the hazards that Defendants' PFAS posed to the environment, including the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Class members.

369.    Beginning in the 1950s and, upon information and belief, continuing through the date of the filing of this Complaint, Defendants agreed to engage in unlawful and wrongful acts with each other and with other manufacturers that caused damage to the Proposed Class Representatives and Class members.

370.    Each Defendant performed at least one overt act in furtherance of this conspiracy.

371.    Specifically, Defendants colluded with one another and with other manufacturers for the avowed purpose of providing false and/or misleading information about Defendants' PFAS to the public and the government, including the EPA.

372.    One way they did this was through the formation of an industry alliance with other telomer manufacturers called the FireFighting Foam Coalition ("FFFC"), which was created for the express purpose of, inter alia, communicating with regulatory authorities, including EPA, the Department of Defense, and the general public.

373.    Over the years, Defendants, through the FFFC gave various presentations, issued press releases, and promulgated other communications repeatedly reassuring all interested parties that telomer-based AFFFs are safe and do not contain PFOS, PFOA, and/or their precursors.  In one notable 2001 presentation to EPA, as the spokesperson for the Telomer Defendants, the FFFC specifically stated that telomer-based AFFFs do not contain any PFOA-based products, knowingly omitting that the telomer-based AFFFs degrade to PFOA in the environment.

374.    Following a 2003 meeting between the FFFC and the EPA, Tom Cortina, the president of the FFFC, boasted about the "major victory for FFFC and the telomer based AFFF industry" in convincing EPA that "telomer based fire fighting foams are not likely to be a source of PFOA in the environment," noting that "everyone in the room including EPA agreed."

375.    The FFFC conspiracy between Defendants and the other telomer manufacturers was effective as they convinced the government of the safety of their AFFFs, and that they did not contain or degrade to PFOA, which, in turn caused the government to continue to use AFFF.

376.    The misrepresentations and omissions made by Defendants with one another and with others interfered with the government's understanding of the dangers posed by Defendants' PFAS.

377.    The purpose of Defendants' collusion with one another and with others was unlawful because their purpose was to: (a) intentionally misrepresent to the public and the government, including the EPA, that Defendants' PFAS were safe and did not pose a risk to human

health and the environment; (b) to conceal the dangers of Defendants' PFAS, including the products' characteristics and their propensity to contaminate soil and groundwater, from the public and the government, including the EPA by, among other means, repeatedly misrepresenting how that Defendants' PFAS were being disposed of; and (c) to conceal the dangers of Defendants' PFAS from the public, including the Proposed Class Representatives and Class members.

378.    Defendants used their considerable resources to fight legislation concerning PFOA and PFOS.

379.    As a direct and proximate result of Defendants' conspiracy with one another and with others, such as 3M:

(a) Defendants' PFAS posed and continue to pose a threat to the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Class members;

(b) Defendants' PFAS contaminated and will continue to contaminate the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Class members;

(c) Defendants' PFAS contaminated and will continue to contaminate the soil, surface and groundwater on and/or within the vicinity of the drinking water wells and/or water supplies owned and/or operated by the Proposed Class Representatives and Class members;

(d) the Proposed Class Representatives and Class members required and will continue to require testing and monitoring of their drinking water wells and/or water supplies for contamination with Defendants' PFAS;

(e)  the Proposed Class Representatives and Class members required or will require remediation of contamination of Defendants' PFAS or, where remediation is impracticable or insufficient, removal and disposal of the contamination;

(f) Defendants diminished the confidence of the Proposed Class Representatives and Class members in their drinking water wells and/or water supplies as well as their use and enjoyment of same;

(g) Defendants diminished the value of the drinking water wells and/or water supplies owned and/or operated by the Proposed Class

Representatives and Class members due to actual, impending, and/or threatened contamination with Defendants' PFAS; and

(h) Defendants caused and/or will cause the Proposed Class Representatives and Class members to sustain substantially increased damages and expenses resulting from the loss of the safety, use, benefit and/or enjoyment of their drinking water wells and/or water supplies.

380.    Defendants' conduct in unlawfully conspiring with each other and with others, such as 3M, to defraud and/or mislead the Proposed Class Representatives and Class members was malicious, oppressive, wanton, willful, intentional, and shocks the conscience, warranting punitive and exemplary damages, because they developed, manufactured, formulated, distributed, sold, transported, stored, loaded, mixed, applied and/or used Defendants' PFAS knowing that toxic PFAS would be released, could not be contained, and would last for centuries.

### ELEVENTH CAUSE OF ACTION
### ACTUAL FRAUDULENT TRANSFER UNDER THE
### UNIFORM FRAUDULENT TRANSFER ACT

381.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

382.    The Proposed Class Representatives seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UFTA") against Defendants.

383.    Defendant DuPont formed Defendant Chemours as a wholly-owned subsidiary, and used it to spin off Defendant DuPont's "Performance Chemicals" business line in July 2015.

384.    At the time of the spinoff, Defendant DuPont's Performance Chemicals division contained Defendants' PFAS and/or AFFF business segments.

385.    In addition to the transfer of the Performance Chemicals division, Defendant Chemours accepted broad assumption of liabilities for Defendant DuPont's historical

development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of Defendants' PFAS.

386.    At the time of the transfer of Defendant DuPont's Performance Chemicals business to Defendant Chemours, Defendant DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Defendant DuPont's liability for damages and injuries arising from its development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

387.    As a result of the transfer of assets and liabilities described in this Complaint, Defendant DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from its development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

388.    In creating, developing and participating in the aforementioned fraudulent transactions, Defendants have acted with intent to hinder, delay and defraud parties, including the Proposed Class Representatives and Class members, without receiving a reasonably equivalent value in exchange for the transfers or obligations.

389.    In creating, developing and participating in the aforementioned unlawful and fraudulent transactions, Defendants: (a) were engaged or were about to engage in a business for which the remaining assets of the spinoff company, Defendant Chemours, were unreasonably small in relation to the business; and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond its ability to pay as they became due.

390.    Upon information and belief, Defendants engaged in acts in furtherance of a scheme to transfer Defendant DuPont's assets out of the reach of parties, such as the Proposed Class Representatives and the Class members, that have been damaged as a result of Defendants' actions as described in this Complaint.

391.    Upon information and belief, Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations between Defendant DuPont and the remaining Defendants.

392.    Under Del. Code. Tit. 6 Sc. 1301 to 1312, and/or any other comparable state law, the Proposed Class Representatives, on behalf of themselves and the Class members, seek to avoid the transfer of Defendant DuPont's liabilities for the claims brought in this Complaint and to hold Defendant DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

393.    Under Del. Code. Tit. 6 Sc. 1301 to 1312, and/or any other comparable state law, the Proposed Class Representatives, on behalf of themselves and the Class members, further reserve such other rights and remedies that may be available to them as may be necessary to fully compensate the Proposed Class Representatives and the Class members for the damages and injuries they have suffered as alleged in this Complaint.

## TWELFTH CAUSE OF ACTION
## CONSTRUCTIVE FRAUDULENT TRANSFER UNDER THE
## UNIFORM FRAUDULENT TRANSFER ACT

394.    The Proposed Class Representatives reallege and reaffirm all allegations set forth in Paragraphs 1 to 268.

395.    The Proposed Class Representatives seek equitable and other relief pursuant to the Uniform Fraudulent Transfer Act ("UFTA") against Defendants.

396.    Defendant DuPont formed Defendant Chemours as a wholly-owned subsidiary, and used it to spin off Defendant DuPont's "Performance Chemicals" business line in July 2015.

397.    At the time of the spinoff, Defendant DuPont's Performance Chemicals division contained Defendants' PFAS and/or AFFF business segments.

398.    In addition to the transfer of the Performance Chemicals division, Defendant Chemours accepted the broad assumption of liabilities for Defendant DuPont's historical development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of Defendants' PFAS.

399.    At the time of the transfer of Defendant DuPont's Performance Chemicals business to Defendant Chemours, Defendant DuPont had been sued, threatened with suit and/or had knowledge of the likelihood of litigation to be filed regarding Defendant DuPont's liability for damages and injuries arising from its development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

400.    As a result of the transfer of assets and liabilities described in this Complaint, Defendant DuPont limited the availability of assets to cover judgements for all of the liability for damages and injuries from its development, manufacture, formulation, distribution, sale, transportation, storage, loading, mixing, application and/or use of PFAS alone or in products that contain PFAS as an active ingredient, byproduct or degradation product.

401.    In creating, developing and participating in the aforementioned fraudulent transactions, Defendants intended to incur, or believed or reasonably should have believed that Defendant DuPont would incur debts beyond its ability to pay as they became due.

402.    The aforementioned fraudulent transactions were made to or for the benefit of the Defendants.

403.    In creating, developing and participating in the aforementioned unlawful and fraudulent transactions, Defendants: (a) were engaged or were about to engage in a business for which the remaining assets of the spinoff company, Defendant Chemours, were unreasonably small in relation to the business; and/or (b) intended to incur, or believed or reasonably should have believed that they would incur, debts beyond its ability to pay as they became due.

404.    Upon information and belief, Defendants engaged in acts in furtherance of a scheme to transfer Defendant DuPont's assets out of the reach of parties, such as the Proposed Class Representatives and the Class members, that have been damaged as a result of Defendants' actions as described in this Complaint.

405.    Defendants acted without receiving a reasonably equivalent value in exchange for the transfer of obligations between Defendant DuPont and the remaining Defendants.

406.    Under Del. Code. Tit. 6 Sc. 1301 to 1312, and/or any other comparable state law, the Proposed Class Representatives, on behalf of themselves and the Class members, seek to avoid the transfer of Defendant DuPont's liabilities for the claims brought in this Complaint and to hold Defendant DuPont jointly and severally liable for any damages or other remedies that may be awarded by this Court or a jury under this Complaint.

407.    Under Del. Code. Tit. 6 Sc. 1301 to 1312, and/or any other comparable state law, the Proposed Class Representatives, on behalf of themselves and the Class members, further reserve such other rights and remedies that may be available to them as may be necessary to fully compensate the Proposed Class Representatives and the Class members for the damages and injuries they have suffered as alleged in this Complaint.

## PRAYER FOR RELIEF

WHEREFORE, the Proposed Class Representatives, on behalf of themselves and the Class members, request that the Court enter an Order or judgment against Defendants, jointly and severally, as follows:

1.  Certification of the action as a Class Action pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure, and appointment of the Proposed Class Representatives as Class Representatives and the Proposed Counsel as Class Counsel;

2.  Compensatory and/or consequential damages according to proof including, but not limited to:

    a.  costs and expenses related to the past, present, and future investigation, sampling, testing, and assessment of the extent of Defendants' PFAS contamination on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Class members,

    b.  costs and expenses related to the past, present, and future treatment and remediation of Defendants' PFAS contamination of the drinking water wells and water supplies of the Proposed Class Representatives and the Class members, or, in the alternative, the costs and expenses associated with and related to the removal and disposal of such contamination; and

    c.  costs and expenses related to the past, present, and future installation and maintenance of monitoring mechanisms to assess and evaluate PFAS on and within the drinking water wells and water supplies of the Proposed Class Representatives and the Class members; and

3.  Exemplary and/or statutory damages;

4.  Punitive damages, where available;

5.  Costs, disbursements and attorneys' fees of this lawsuit;

6.  Pre-judgment and post-judgment interest on the monetary relief; and

7.  Any other and further relief as the Court deems just, proper, and equitable.

## DEMAND FOR JURY TRIAL

The Proposed Class Representatives demand a trial by jury.

Dated: July 6, 2023

Respectfully Submitted,

s/ Michael A. London
Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com

Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, Puerto Rico 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com

Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
312-741-1019
beth@feganscott.com

*Proposed Class Counsel*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing was electronically filed with this Court's CM/ECF on this 6th day of July, 2023 and was thus served electronically upon counsel of record.

/s/ Michael A. London
Michael A. London
Douglas and London PC
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com