**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF SOUTH CAROLINA**

| | | |
|---|---|---|
| IN RE: AQUEOUS FILM-FORMING FOAMS PRODUCTS LIABILITY LITIGATION | ) ) | Master Docket No.: 2:18-mn-2873-RMG |

| | | |
|---|---|---|
| | ) | |
| CITY OF CAMDEN, et al., | ) | Civil Action No.: |
| | ) | 2:23-cv-03230-RMG |
| *Plaintiffs,* | ) | |
| | ) | |
| *-vs-* | ) | |
| | ) | |
| E.I. DUPONT DE NEMOURS AND COMPANY (n/k/a EIDP, Inc.), et al., | ) | |
| | ) | |
| | ) | |
| *Defendants.* | ) | |

## CLASS COUNSEL'S MEMORANDUM IN SUPPORT OF THEIR MOTION FOR ATTORNEYS' FEES AND COSTS

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     THE DUPONT SETTLEMENT......................................................................... 6

  A.    PROCEDURAL BACKGROUND.................................................................. 6

  B.    MECHANISM OF PAYMENT....................................................................... 7

        1. Class Fee and Class Costs .................................................................... 7

        2. Class Fees and Costs are Appropriate for a Class Action Settlement............................. 8

        3. Class Fee and Class Costs Allocation and Administration ........................................... 13

III.    BACKGROUND AND OVERVIEW OF COMMON BENEFIT EFFORTS. ................. 16

  A.    A BRIEF HISTORY OF PRE-MDL LITIGATION AND EFFICIENCY OF THE MDL
        AND COUNSEL. ....................................................................................... 16

        1.  This Court Appointed Skilled Counsel with Institutional Knowledge of the Subject
            Matter that were Fully Capable of Performing their Legal Services
            Efficiently……………………………………………………………………17

        2. Plaintiffs' Counsel Conducted Discovery on a Massive Scale Efficiently Despite a
           Global Pandemic........................................................................... 19

  B.    THE COMMON BENEFIT WORK PERFORMED FROM THE ESTABLISHMENT OF
        THE AFFF MDL THROUGH AUGUST 22, 2023 SURMOUNTED A MYRIAD OF
        NOVEL AND DIFFICULT LEGAL QUESTIONS....................................... 20

IV.     LEGAL STANDARD AND ARGUMENT .................................................... 58

  A.    CLASS COUNSEL HAVE EARNED A PERCENTAGE FEE AWARD OF 8% OF THE
        COMMON FUND. ..................................................................................... 58

  B.    THE PRINCIPLES GOVERNING THE DETERMINATION OF AN APPROPRIATE
        FEE AWARD UNDER BARBER SUPPORT THE PROPOSED 8% AWARD PLUS OUT
        OF POCKET COSTS. ................................................................................ 60

        1. The Time and Labor Required ........................................................ 60

        2. The Novelty and Difficulty of the Questions Involved…………………………..61

        3. The Skill Requisite to Perform the Legal Service Properly…………………………64

        4. The Preclusion of Other Employment by the Attorneys Due to Acceptance of the
           Case………………………………………………………………….………65

5. The Customary Fee………………………………………..………………………….66

6.  Whether the Fee Is Fixed or Contingent…………………………………….…….…...66

7. Time Limitations Imposed by the Client or the Circumstances………….…….……...67

8. The Amount Involved and the Results Obtained……………………………...…....68

9. The Experience, Reputation, and Ability of the Attorneys…………………….…...…...69

10. The "Undesirability" of the Case…………………………………………………….70

11. The Nature and Length of the Professional Relationship with the Client………...…70

12. Awards in Similar Cases……………………………………………………….………71

C. THE LODESTAR CROSS-CHECK CONFIRMS THAT CLASS COUNSEL'S FEE REQUEST IS REASONABLE ............................................................................................ 74

D. PLAINTIFFS' COUNSEL ARE ENTITLED TO REIMBURSEMENT OF OUT-OF-POCKET COSTS ............................................................................................................. 77

V. CONCLUSION ............................................................................................................. 78

## **TABLE OF AUTHORITIES**

**Cases**

*Barber v. Kimbrell's Inc.,* 577 F.2d 216 (4th Cir. 1978) .................................................... 3, 59, 71

*Beesley v. Int'l Paper Co.,* No. 3:06-CV-703-DRH-CJP, 2014 WL 375432 (S.D. Ill. Jan. 31, 2014 .......................................................................................................................................... 77

*Berry v. Wells Fargo & Co.,* No. 3:17-CV-00304-JFA, 2020 WL 9311859 (D.S.C. July 29, 2020) ........................................................................................................................... 11, 58, 75

*Blum v. Stenson*, 465 U.S. 886 (1984) ........................................................................................ 58

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .................................................................. 13, 58

*Boyle v. v. United Technologies Corp.*, 487 U.S. 500 (1988) .................................................. 43, 61

*Brodziak v. Runyon*, 145 F.3d 194 (4th Cir. 1998) ...................................................................... 68

*Brundle ex rel. Conestellis Employee Stock Ownership Plan v. Wilmington Tr., N.*A., 919 F.3d 763 (4th Cir. 2019) .................................................................................................................. 58

*Bruner v. Sprint/United Mgmt. Co.*, Nos. 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762 (D. Kan. July 14, 2009). ................................................................................................................. 71

*Burford v. Cargill, Inc.,* No. 05-0283, 2012 WL 5471985 (W.D. La. Nov. 8, 2012).................. 70

*Cantu-Guerrero v. Lumber Liquidators,* 952 F.3d 471 (4th Cir. 2020)……………….....……….74

*Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622 (E.D. Pa. 1986) .......................................... 11

*Harman v. Lyphomed, Inc.,* 945 F.2d 969 (7th Cir. 1991).......................................................... 66

*Hensley v. Eckerhart*, 461 U.S. 424 (1983). ............................................................................... 68

*In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485 (W.D. La. 2017)................ 75

*In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006 (5th Cir. 1977)............................................................................................................................................ 9

*In re Allura Fiber Cement Siding Litig.*, No. 19-2886, 2021 WL 2043531 (D.S.C. May 21, 2021) ................................................................................................................ 58, 74

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2021 WL 5822993 (D.S.C. Aug. 4, 2021) ................................................................................................ 58, 59

*In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (U.S. Jud. Pan. Mult. Lit. 2018) ......................................................................................................... 67

*In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722 (3d Cir. 2001) ................................................. 59

*In re Cook Medical, Inc., Pelvic Repair Systems Prods. Liab. Litig.,* 365 F. Supp. 3d 685 (S.D. W.Va. 2019). ............................................................................................................... 75

*In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) .................................................................... 11, 59

*In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442 (E.D. Pa. 2008) ..................................................................................... 59

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732 (S.D. Tex. 2008) .. 59, 66, 67

*In re LandAmerica 1031 Exchange Svcs.*, No. 2054, 2012 WL 5430841 (D.S.C. Nov. 7, 2012). ................................................................................................................ 65, 66, 67

*In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 27 F.4th 291 (4th Cir. 2022) .......................................................... 58, 74

*In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246 (E.D. Va. 2009). .................................................... 66

*In re Vioxx*, 760 F.Supp.2d 640 (E.D. La. 2010) ........................................................................ 74

*In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974 (E.D. La. Oct. 25, 2016) .............................................. 68, 74

*Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974) .......................... 59, 71

*McAdams v. Robinson*, 26 F.4th 149 (4th Cir. 2022). .................................................................. 58

*Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) .................................................................... 9

*Morris v. Bland*, 2015 WL 12910631 (D.S.C. 2015) .................................................................. 76

*National Wildlife Federation v. Hanson*, 859 F.2d 313 (4th Cir.1988)........................................ 75

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545 (2014)............................... 60

*Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169 (4th Cir. 1994) ........................................ 76

*Savani v. URS Pro. Sols. LLC,* 121 F. Supp. 3d 564 (D.S.C. 2015)................................. 11, 67, 74

*Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939) ......................................................... 9, 11

*Torrisi v. Tucson Elec. Power Co.*, 83 F.3d 1370 (9th Cir.1993).................................................. 67

**Other Authorities**

Florida Standard Jury Instructions (Civil) 503.1 .......................................................................... 63

**Rules**

FED. R. CIV. P. 23(e) .................................................................................................................... 7

FED. R. CIV. P. 23(h) ............................................................................................................. 13, 58

FED. R. EVID. 602 ........................................................................................................................ 52

Local Rule 54.02(A) .................................................................................................................... 59

## I.   INTRODUCTION

Never before has litigation protected American drinking water on this scale. Plaintiffs' counsel secured historic settlement funds for Public Water Suppliers ("PWS") - $1.185 billion from DuPont[1] and between $10.5 and $12.5 billion from the 3M Company ("3M") – to aid PWS in their efforts to supply PFAS-free water both for their current constituents and for future generations. After years of intensely adversarial litigation, Class Counsel on behalf of all Plaintiffs' counsel now petition the Court for an award of attorneys' fees commensurate to the exceptional achievement they labored tirelessly for years to obtain. Class Counsel request an award of 8% of the DuPont settlement of $1,185,000,000 ("Settlement Amount")[2] or $94,800,000 ("Class Fee"), plus costs. Class Counsel's fee request represents an amount well below the approximate 25% benchmark permissible under Fourth Circuit precedent and is modest in contrast to the enormity of the work performed to obtain this result.[3]

Over the last four and a half years, Plaintiffs' counsel, including Lead Counsel, Class Counsel and the Plaintiffs' Executive Committee ("PEC"), spent 414,900.9 hours[4] working on herculean tasks that synergistically yielded the largest drinking water settlements in United States' history. This colossal achievement was the result of a sustained and concerted effort directed against all Defendants whose liability is undeniably intertwined and interrelated. Under the Court's watchful oversight and various scheduling orders, Plaintiffs conducted common discovery against all Defendants simultaneously, defeated common defenses (*e.g.,* government contractor defense),

---

[1] The Settling Defendants include: The Chemours Company, The Chemours Company FC, LLC, DuPont de Nemours, Inc., Corteva, Inc., and E. I. DuPont de Nemours and Company n/k/a EIDP, Inc. ("DuPont").

[2] With the exception of the terms "Class Fee" and "Class Costs," which are defined herein, all other capitalized terms have the same definition as in the Class Action Settlement Agreement (as amended) [ECF Nos. 3393-1, 3603 and 3684].

[3] *See* Diagram, *infra.*

[4] Declaration of John W. Perry, Jr. ("Perry Decl."), at ¶ 20, attached as Ex. A.

traced the exchange of research and knowledge as between and amongst the Defendants, and discovered the interplay among the various Defendants and the United States. These efforts were nothing short of exceptional. Every hour devoted to this litigation advanced the case against all Defendants, and the cumulative time expended by Plaintiffs' counsel was necessarily common to the cause and is indivisible as to the DuPont and 3M settlements. Class Counsel thus respectfully request that this Court view the DuPont and 3M settlements in the aggregate when analyzing the Class Fee – just as the Court approached the overall management of this case with all Defendants in concert, beginning with Science Day, through the government contractor defense briefing and argument, the bellwether process and right up until the eve of the first bellwether trial.

In super mega-fund cases like this one, courts regularly award percentage fees from a common fund in amounts greater than 8%, and a larger percentage would be appropriate with respect to the DuPont settlement if treated alone. Given this Court's intimate familiarity with how cohesively this litigation was conducted, Class Counsel ask the Court to review the current 8% fee request in the DuPont settlement, and the 8% fee request forthcoming in the 3M settlement, together.[5] This is justified given that the hours and work were equally important to achieving both settlements.

As discussed below, a thorough analysis of the *Barber* factors[6] illustrates that the requested Class Fee is reasonable given the daunting governmental contractor defense that loomed over this

---

[5] It is important to note that while Class Counsel believe an 8% Class Fee request is appropriate in both the 3M and DuPont settlements, and is consistent with legal precedent, any future settlements will need to be analyzed separately, if and when they occur.

[6] These factors include: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for legal work; (6) the attorney's expectations at the outset of litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation[,] and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship

litigation like the sword of Damocles. Thanks to this Court's oversight, Plaintiffs' counsel skillfully faced and surmounted well-heeled defense counsel who relentlessly pressed their novel and difficult governmental immunity arguments, and more – recall, a jury trial was imminent. With the situation piled high with adversity, Plaintiffs' counsel were obliged to rise to each occasion, sweating through thousands of hours over more than 4 ½ years of tedious tasks, contentious discovery, complex research, and evidentiary presentations, that may have appeared seamless to the unknowing, but happened only because of sleepless nights and exacting preparation by seasoned counsel whose ability matched their well-deserved reputations and judicial appointments. The result achieved for the Settlement Class Members -- considering all the significant litigation risks that were ever-present and only overcome on the eve of trial after grueling pre-trial toil by Plaintiffs' counsel who went uncompensated for years as they labored on a contingent basis -- is nothing short of remarkable. Where such extraordinary results are achieved courts in similar cases do not hesitate to justly compensate counsel for their contributions.

As the diagram below depicts, the 8% fee request represents a small portion of the total anticipated DuPont settlement payments and is likewise a much lower percentage-method award than is supported by Fourth Circuit precedent.[7]

---

between attorney and client; and (12) attorneys' fees awards in similar cases. *Barber v. Kimbrell's Inc.,* 577 F.2d 216, 226 n.28 (4th Cir. 1978)

[7] Declaration of Brian T. Fitzpatrick ("Fitzpatrick Decl."), at attached as Ex. B (opining that 8% is lower than the norm both overall and with respect to billion-dollar cases).



In addition to the request for 8% in attorneys' fees, Class Counsel likewise seek reimbursement of $2,136,213.21 in ("Class Costs"), or 10% of their total out-of-pocket costs, expended to fund the prosecution of this litigation.[8] No incentive awards are being sought for the class representative Plaintiffs.

A comprehensive description of the massive scope and nature of the work performed by PEC firms and other common benefit attorneys that led to what will be, if approved, a historic settlement by any measure, is provided below along with the supporting declarations of individuals with personal knowledge of that work, including the Declaration of Michael A. London ("London Decl."), which addresses the overall administration of this complex and multitrack MDL; the Declaration of Scott Summy ("Summy Decl."), which describes the settlement process, its complex details, and history of negotiations; the Declaration of Gary J. Douglas ("Douglas Decl."), which details the substantive litigation efforts undertaken from the inception of the MDL up though and including preparation for the first bellwether trial; and the Declaration of Paul J. Napoli ("Napoli Decl."), which describes the totality of discovery efforts undertaken as against the United

---

[8] Perry Decl., at ¶ 21 (reporting total costs submitted to date of $21,362,132.10, of which Class Counsel requests 10% – DuPont's approximate contribution to the combined settlement amount when totaled with the 3M PWS Settlement); *see also*, Fitzpatrick Decl., at ¶¶ 8, 27 (noting that Plaintiffs' $2.1 million reimbursement request is modest).

4

States, each of which is being filed concurrently herewith, and attached as Exs. C, D, E, and F, respectively.

To support this motion, additional evidence is being provided through declarations regarding: (1) document review management and electronically stored information;[9] (2) the development of experts;[10] and (3) the law and briefing efforts. These declarations are likewise being filed concurrently herewith in further support of Class Counsel's fee request.[11] All of the efforts described in the declarations combined to achieve these remarkable settlements that, if finally approved, will greatly benefit the Settlement Class.

Finally, Class Counsel provide input from leading professionals to assist the Court in evaluating the reasonableness of Class Counsel's fee request under the *Barber* standards, including the Fitzpatrick Decl., the Perry Decl. attesting to the number of hours of work performed and expenses submitted by PEC firms and other common benefit attorneys, and the Declaration of Steven J. Herman ("Herman Decl.") regarding an appropriate hourly rate for attorney time in this MDL (for the purpose of a Lodestar cross-check, in the event the Court choses to perform one), attached as Exs. B, A, and G, respectively.

The DuPont settlement was the result of a years-long, multitrack effort by Plaintiffs' counsel who expended hundreds of thousands of combined hours on multiple fronts, including settlement efforts, litigation efforts and MDL case administration, without any guarantee of a recovery. This three-pronged approach was necessary given the highly complex nature of this

---

[9] Declaration of Staci J. Olsen in Support of Class Counsel's Motion for Attorneys' Fees and Costs, ("Olsen Decl."), attached as Ex. H.
[10] Declaration of Wesley Bowden in Support of Class Counsel's Motion for Attorneys' Fees and Costs ("Bowden Decl."), attached as Ex. I.
[11] Declaration of Rebecca G. Newman In Support of Class Counsel's Motion for Attorneys' Fees and Costs ("Newman Decl."), attached as Ex. J.

MDL involving so many Defendants, and in order to meet the challenges and obstacles presented by this MDL, including, of course, litigating in the midst of a global pandemic.

All attorneys, working together towards the same goal, enhanced the efforts of the others, and their combined efforts, as described more fully below and in the supporting declarations, along with existing legal precedent, demonstrate that the requested 8% Class Fee ($94,800,000) and $2,136,213.21 in Class Costs is reasonable.

## II.    THE DUPONT SETTLEMENT

### A.    PROCEDURAL BACKGROUND

On June 1, 2023 a Memorandum of Understanding was executed[12] and thereafter a settlement with DuPont was announced. Four weeks later, on June 30, 2023, the Class Action Settlement Agreement was executed.[13] On August 22, 2023, the $1.185 billion proposed class settlement with DuPont was preliminarily approved.[14] The preliminarily approved settlement is for the Settlement Class consisting of:

> (a) All Public Water Systems in the United States of America that draw or otherwise collect from any Water Source that, on or before the Settlement Date, was tested or otherwise analyzed for PFAS and found to contain any PFAS at any level; and

> (b) All Public Water Systems in the United States of America that, as of the Settlement Date, are (i) subject to the monitoring rules set forth in UCMR 5 (*i.e.*, "large" systems serving more than 10,000 people and "small" systems serving between 3,300 and 10,000 people), or (ii) required under applicable state or federal law to test or otherwise analyze any of their Water Sources or the water they provide for PFAS before the UCMR 5 Deadline.[15]

In its Preliminary Approval Order, the Court noted "that it will likely be able to approve, under Rule 23(e)(2) of the Federal Rules of Civil Procedure, the proposed Settlement

---

[12] Summy Decl., at ¶ 30.
[13] ECF No. 3393-2
[14] Order regarding Motion of proposed Class Counsel for Preliminary Approval of Settlement Agreement ("Preliminary Approval Order") [ECF No. 3603].
[15] *Id*. at 3.

Agreement,"[16] which would necessarily include a finding that the proposed settlement is fair, reasonable and adequate. FED. R. CIV. P. 23(e). Moreover, pursuant to the Preliminary Approval Order, the Court likewise instructed Class Counsel to file a motion for attorneys' fees and costs,[17] which now occasions this request for a reasonable Class Fee and Class Costs in accordance with the methodology set forth below.[18]

## B.     MECHANISM OF PAYMENT

### 1.     Class Fee and Class Costs

Class Counsel respectfully request Class Fees and Class Costs, broken down as follows:

- <u>Class Fee</u>: 8% to be awarded for attorney fees (e.g., for the legal work performed for the common benefit of all litigants, all of which helped achieve this historic result); and

- <u>Class Costs</u>: $2,136,213.21 to be awarded for reimbursement of costs (e.g., for the DuPont PWS Settlement's share of costs and expenses incurred by the PEC and Class Counsel for the common benefit of all litigants).

A percentage award and reimbursement of expenses of this dimension are regularly allowed in litigation like this.[19]

As explained in detail by Mr. Summy, Co-Lead Counsel analyzed and determined that resolution of this matter on a class-wide basis was the superior way to ensure that all PWS had the opportunity to benefit from any proposed resolution.[20] Pursuant to Rule 23 and the principles of common benefit, counsel are entitled to seek a reasonable fee and out-of-pocket costs from the

---

[16] *Id*. at 7.

[17] *Id*. at 12.

[18] While this fee request is being made by Class Counsel, it is for the work performed over the course of the litigation by Lead Counsel, Class Counsel, PEC firms and other common benefit attorneys (collectively referred to as "Plaintiffs' counsel" or "counsel"), as set forth in II.B, *infra*.

[19] *See e.g.,* Fitzpatrick Decl., at Table 1 identifying percent fee method cases and exemplar expenses.

[20] Summy Decl., *supra*.

Settlement Amount. Of note, Class Counsel seek an 8% Class Fee here and will seek an 8% Class Fee from the pending 3M Settlement Amount, both of which were preliminarily approved during the same time period as a result of the indivisible work and efforts by Plaintiffs' counsel.

The present request is based on the cumulative number of reported hours worked by Plaintiffs' counsel from October 1, 2018[21] through August 22, 2023, the date of preliminary approval of the DuPont settlement,[22] for the work performed to achieve both the DuPont PWS Settlement and the 3M PWS Settlement. Class Counsel, supported by the PEC, will be filing a motion in the 3M PWS Settlement seeking the *same* percentage for Class Fees as in the DuPont PWS Settlement, and seeking Class Costs on the same proportionate basis as in the DuPont PWS Settlement. The PEC and Class Counsel are therefore optimistic that their cumulative lodestar and litigation costs will also be compensated from the 3M PWS Settlement funds. Thereafter, additional fees or costs would be compensated from future judgments or settlements.[23]

### 2.  Class Fees and Costs are Appropriate for a Class Action Settlement

CMO 3, which issued on April 26, 2019, contemplated a common benefit holdback for settlements in individual cases in the amount of 9% (6% for common benefit attorneys' fees and 3% for common benefit costs and expenses). Notably, CMO 3 contemplated that its application would be "subject to modification depending on the future course of litigation."[24] Due to the class action mechanism under which this resolution was reached, CMO 3's holdback should not apply

---

[21] Co-Lead Counsel recommended and agreed to waive all time submitted prior to this date with the exception of one firm that did not agree to waive a small amount of time that predates this date.

[22] The sole exception to this is with respect to the 5% holdback discussed below that is limited to fees associated with the administration of the DuPont PWS Settlement only through August 2030.

[23] Regarding private attorney-client agreements as to fees and costs, Class Counsel submits that those be paid in accordance with their private contract terms and will be deducted from the attorneys' portion of any settlement funds.

[24] CMO 3 at ¶ 21.

to this settlement. Instead, CMO 3 should continue to apply in the context for which it was originally designed – namely, for individual or private case settlements[25] – while here, Class Counsel's reasonable request for a Class Fee and Class Costs should be granted due to certain additional distinguishing factors which must be considered.

Rather than employ the MDL assessment applicable to individual case settlements under CMO 3, which is designed to prevent "free riders,"[26] the Class Fee and Class Costs requests spread the fee amongst *all* class members, *i.e.,* absent class members (some of whom are not represented by counsel) as well as the Class Representative Plaintiffs, as is appropriate in class action settlement under FED. R. CIV. P. 23. In addition, the current motion requests *less than* CMO 3's 9% holdback, since the Class Fee request is only 8% and Class Counsel only seek reimbursement of proportional costs of $2,136,213.21, which costs were calculated as the approximate percent share of the total common (shared and held) costs incurred through August 22, 2023 that resulted in the total recovery achieved in the DuPont and the 3M PWS Settlements.[27] Stated differently, of the $21,362,132.10 in total costs certified by Special Master John Perry's office, only one-tenth (1/10th) of the costs to date are ascribed to the DuPont PWS Settlement since that approximates its proportionate share when compared to the 3M settlement.[28]

---

[25] Plaintiffs recognize that CMO 3 will likely apply in future individual or private case settlements. For example, if a cluster of personal injury or property damage cases were to settle with one lawyer (or small group of lawyers), as occurred in *Campbell v. Tyco Fire Prods., et al.,* 19-cv-00422 or *City of Stuart v. 3M, et al.,* 18-cv-3487, then the requirements of CMO 3 would likely apply.

[26] *See Sprague v. Ticonic National Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *In re Air Crash Disaster at Florida Everglades on December 29, 1972*, 549 F.2d 1006, 1019-21 (5th Cir. 1977).

[27] Plaintiffs' Motion for Preliminary Approval of Class Settlement, for Certification of Settlement Class and for Permission to Disseminate Class Notice (hereinafter, "Plaintiffs' Motion for Preliminary Approval") [ECF 4].

[28] Given that expenses are also inextricably interwoven, the PEC in consultation with class fairness experts, determined that rather than seek reimbursement of all expenses at the present time, which would amount to less than 2.5% of the settlement (still under the 3% approved under CMO 3), they are seeking to have the expenses reimbursed based upon a pro-rata share of the 3M and the

Class Counsel intend to allocate the Class Fee just as if the funds were received pursuant to CMO 3. Thus, for present purposes, the concept of "common benefit attorneys' fees" is synonymous with the concept of the requested "Class Fee." The Class Fee here will be allocated to those whose work was performed for the common benefit of all litigants from October 1, 2018 up through to August 22, 2023.[29] Similarly, as used herein the concepts of "common benefit expenses and costs" and "Class Costs" are synonymous. The Class Costs here will be allocated to reimburse counsel whose expenses and costs were incurred for the common benefit of the litigation through to August 22, 2023.

At present, the PEC has spent $21,362,132.10 for all litigation expenses from October 1, 2018 through August 22, 2023. Time and expense reports were required to be submitted to the Court-appointed CPA, Mr. Jeremy Betsill.[30] Special Master John Perry and his office, with his partner Mr. Dan Balhoff, review the submissions to ensure they comply with CMO 3. These professionals categorize the expenses as either Held Expenses or Shared Expenses.[31] Mr. Perry

---

DuPont PWS Settlements combined. To this end, the combined base settlements equal $11,685,000,000.00 ($10,500,000,000.00 + $1,185,000,000.00). DuPont's percent of $11,685,000,000.00 is 10.14%. Class Counsel seek $2,136,213.21, or approximately 10.14% of the total common costs, to be reimbursed from the DuPont PWS Settlement. Notably, if the three 3% assessment for costs under CMO 3 was applied, it would have amounted to $35,550,000.00 – more than tenfold the present request. Class Counsel's request for costs from the DuPont PWS in the amount of $2,136,213.21 represents a significant and appropriate savings to the Class.

[29] Just before the *Stuart* bellwether trial was to begin, the Kidde Defendants filed for bankruptcy. The effect of the automatic stay in bankruptcy had profound effects on the *Stuart* trial. Principally, it resulted in the severance of all telomer Defendants from the trial, including DuPont. But the pressures of the trial still were integral to the DuPont settlement just before jury selection. Until that moment, Plaintiffs were prosecuting Stuart's claims under the impression that all the Defendants were jointly and severally liable, and thus Plaintiffs' litigation efforts were focused on all Defendants collectively. This collective focus explains why it is simply impossible to disaggregate time Defendant-by-Defendant. The case was never prosecuted in that manner – and indeed, neither CMO 3 nor any other governing guidance contemplated such disaggregation, instead implicitly recognizing the interconnectedness of work performed as against all Defendants.
[30] CMO 3 at ¶ 12.d.
[31] CMO 3 at ¶ 14; *see also*, Perry Decl. at ¶ 21.

confirmed that Plaintiffs' expenses have been properly received in accordance with CMO 3.[32] Because the PEC is treating the DuPont and 3M PWS Settlements as presenting a virtually unified common fund due to how the cases were jointly prosecuted against all Defendants and how the work was inextricably intertwined, Class Counsel seek reimbursement of costs from the DuPont Settlement in the amount of $2,136,213.21, which represents DuPont's approximate proportionate contribution of one-tenth (1/10[th]) to the combined settlement proceeds.[33] In addition to litigation costs, certain costs of providing notice to the class, and the currently invoiced costs of the Notice Administrator, Escrow Agent and Special Master are to be taken from the QSF even before the Effective Date in accordance with the Settlement Agreement.[34] Should final approval be granted, future costs of the Notice Administrator, Escrow Agent and Special Master shall be paid directly from the QSF in accordance with the Settlement Agreement.[35] The following chart denotes the calculations discussed above, incorporating the 3M PWS Settlement for the purpose of illustrating

---

[32] Perry Decl., at ¶ 9.

[33] Courts are authorized to award payment of out-of-pocket costs expended to achieve a common benefit recovery or to advance the common goals of plaintiffs in MDL litigation. *See Sprague*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Savani v. URS Pro. Sols. LLC*, 121 F. Supp. 3d 564, 576 (D.S.C. 2015) ("Reimbursement of reasonable costs and expenses to counsel who create a common fund is both necessary and routine"). "The prevailing view is that expenses are awarded in addition to the fee percentage." *Berry v. Wells Fargo & Co.*, No. 3:17-CV-00304-JFA, 2020 WL 9311859, at *15 (D.S.C. July 29, 2020) (citations omitted). Notably, CMO 3's holdback assessment serves the underlying purpose of the common fund doctrine: "avoid[ing] the unjust enrichment of those who would otherwise benefit from the fund without paying the litigation costs necessary to produce the fund." *Fickinger v. C.I. Planning Corp.*, 646 F. Supp. 622, 632 (E.D. Pa. 1986); *see also In re Diet Drugs*, 582 F.3d 524, 550 n.52 (3rd Cir. 2009) (noting that fee awards in common fund cases include "[b]asic concerns for fairness and due process"). Coinciding with this principle, the equitable considerations addressing reimbursement of costs from a common fund created by virtue of a class action apply to ensure that all class members, whether or not represented by counsel, contribute to pay for the recovery.

[34] DuPont Settlement Agreement ¶ 6.2.

[35] DuPont Settlement Agreement ¶¶ 6.3 & 11.2.

the basis for Class Counsel's request – namely, that the costs incurred to achieve both the DuPont

and the 3M PWS Settlements were wholly intertwined:

| | BASIS FOR CALCULATION | AMOUNT |
|---|---|---|
| A | DuPont PWS Settlement Amount | $1,185,000,000.00 |
| B | 3M PWS Settlement Amount minimum | $10,500,000,000.00 |
| C | Aggregate minimum of PWS Settlement Amounts (A + B) | $11,685,000,000.00 |
| D | Total costs to date across both PWS Settlements | $21,362,132.10 |
| E | DuPont share of aggregate costs (A ÷ C) | 10.14%[36] |
| F | DuPont approximate share of total costs (D * E) | $2,136,213.21 |
| G | DuPont Class Fee request (8% of A) | $94,800,000.00 |
| H | Total DuPont Class Fee and Class Costs request (F + G) | $96,936,213.21 |
| I | Remaining DuPont funds after deduction of requested Class Fee and Class Costs (A – H) | $1,088,063,786.79* |

*Not inclusive of any interest earned.

Based on their experience, consultation with experts, and analysis of legal precedent, Class

Counsel request a Class Fee of 8% percent or $94,800,000.00.[37] In addition, also in consultation

with Plaintiffs' expert, Class Counsel request that the Class Fee be treated like a common benefit

assessment, such that for represented Plaintiffs, it shall be deducted from the total amount of

counsel fees payable under individual Plaintiffs' counsel's retainer agreements.[38] Previously, there

was unanimous support amongst the PEC when the 9% assessment in CMO 3 was proffered to

the Court and approved. Notably, when the MDL assessment under CMO 3 was agreed to, all

counsel understood that the fee portion of that assessment would be deducted from counsel's

retainer fee. Given the circumstances presented by this class settlement (and motion related to 3M

in the near future), it is proposed that this procedure should apply. In other words, for class

---

[36] For purposes of the calculations herein, the 10.14% has been rounded down to 10%.

[37] Fitzpatrick Decl. at ¶ 3 (noting that the 8% fee request is below the norm and reasonable).

[38] Fitzpatrick Decl., at ¶ 8, n.2.

settlements, the 8% Class Fee will be credited against any individual counsel's retainer fee such that any private contract will be reduced by 8%. For example, a class member who has hired a private lawyer at a 25% contingency agreement, will have its contingency agreement reduced to 18% because the Class Fee will have already come off the top.

### 3.    Class Fee and Class Costs Allocation and Administration

Pursuant to CMO 3 and in accordance with the Settlement Agreement, common benefit awards are to be deducted from any settlement monies paid by Defendants.[39] As noted above, the proposed Class Fee and Class Costs would be deducted the same way; namely, taken from the settlement fund itself. *See Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980). *See also* FED. R. CIV. P. 23(h).

The following chart delineates the calculation and transfer destinations of the funds to be paid from the Settlement Amount for the Class Fee Award:

|   | BASIS FOR CALCULATION | AMOUNT | TRANSFERRED TO |
|---|---|---|---|
| A | Settlement Amount | $1,185,000,000.00 | DuPont Qualified Settlement Fund |
| B | Class Fee (8% of Settlement Amount) | $94,800,000.00 | Class Counsel fee account |
| C | Class Costs requested (10% of total costs to date, $21,362,132.10) | $2,136,213.21 | Class expense account |

Pursuant to the Settlement Agreement with DuPont, upon Preliminary Approval, the DuPont Defendants were required to tender the entirety of the Settlement Amount, $1,185,000,000.00, within 10 business days.[40] Further, in accordance with the settlement and Plaintiffs' Motion for Preliminary Approval, Co-Lead Counsel moved for the establishment of a

---

[39] CMO 3; *see also*, DuPont Settlement Agreement at Sections 6.2 and 6.3.
[40] Settlement Agreement at 6.1; *see also*, Order Granting Motion for Preliminary Approval [ECF 33].

Qualified Settlement Fund ("QSF") as defined in the DuPont MSA.[41] Such Motion was granted by the Court and the QSF was established.[42] In accordance with the Preliminary Approval Order, DuPont tendered the Settlement Amount into the QSF, titled the DuPont PFAS Water Provider Settlement Trust Fund (hereinafter, "DuPont QSF"). These funds are being maintained in the DuPont QSF.[43] In accordance with the DuPont MSA, future costs incurred by the Court-approved Claims Administrator, Notice Administrator and Settlement Special Master are to be taken or billed directly to the QSF and paid throughout the course of the litigation.

Class Counsel propose to administer the Class Fee and Class Costs as follows. First, upon entry of the Court's Order Granting Final Approval of the DuPont PWS Settlement (including the Class Fee  as respectfully requested herein), and thereafter following the Effective Date, 8% ($94,800,000.00) of the Settlement Amount would be taken from the DuPont QSF for the Class Fee, and another $2,136,213.21 would be taken from the DuPont QSF for Class Costs, totaling $96,963,213.21. As illustrated in the chart above, this $96,963,213.21 would be allocated and transferred as follows:

- <u>Class Fee</u>: $94,800,000.00 (8% of the gross settlement amount of $1.185 billion) would be wired to the Class Fee account/common benefit fee account: MDL 2873 COMMON BENEFIT FEE – FEE FUND Huntington Bank (Acc#: …9885)).

- <u>Class Costs</u>: $2,136,213.21 (10% of the total reimbursable MDL costs incurred to date) would be wired to the Class Expense account/common benefit expense account: MDL 2783 COMMON BENEFIT FEE – EXPENSE FUND (Huntington Bank (Acc#: …9872)).

---

[41] Settlement Agreement at 2.41, 6.2, 7.
[42] Order Granting Motion for Preliminary Approval [ECF 33].
[43] *See* Huntington Private Bank Account State, attached as Ex. K.

The remaining money, which would be in excess of $1,088,063,786.79 (because interest is already and will continue accruing), shall remain in the DuPont QSF until its allocation and distribution in accordance with the Settlement Agreement.

However, because the settlement will require ongoing administration, and in order to ensure that Class Counsel remain fully committed to this administration, 5% percent of the Class Fee award should be held back from immediate distribution so that fees incurred in the post-settlement administration are compensated.[44] Class Counsel has consulted with their expert, Steven J. Herman, who opines that a 5% holdback is appropriate.[45] Mr. Perry concurs and is prepared to administer fee applications related to these funds over the course of the next six years.[46]

Allocation of any award of Class Fees that are available now would be the subject of a recommendation by a Fee Committee, a report and recommendation by Special Master John Perry (to include documentation of the work that he and Mr. Balhoff have engaged in), and ultimately the review and approval of this Court. This Class Fee would be paid from the $94,800,000.00 requested, less a 5% holdback for legal fees that will be incurred in the course of future settlement administration. As such, $90,060,000.00 would be immediately available for attorneys' fees, while $4,740,000.00 would be held back and available for legal fees incurred by Class Counsel or their designees for the remainder of the DuPont settlement's administration.[47] It is contemplated that claims for legal fees incurred by Class Counsel in the ongoing administration of the settlement would be made by Class Counsel one time per year with the first request due November 7, 2024

---

[44] *See, e.g., In re: NFL Players' Concussion Inj. Litig.*, MDL No. 2323, Explanation and Order [ECF 10019] at 4, n. 2 (approving a 5% holdback for additional "implementation fees" to class counsel to be paid at a later date).
[45] Herman Decl., at ¶ 90-93; *see also*, Perry Decl., at ¶ 24.
[46] Perry Decl., at ¶¶ 22-24.
[47] Herman Decl., at ¶ 93; *see also*, Perry Decl., at ¶ 24.

and then all future requests for attorney fees (for settlement administration) due on the first Thursday of November for each year thereafter through 2030.

Similarly, any award of Class Costs would be subject to the same process: a Fee Committee recommendation, a report and recommendation by Special Master John Perry, and ultimately, the review and approval of this Court.

### III.    BACKGROUND AND OVERVIEW OF COMMON BENEFIT EFFORTS.

#### A.    A BRIEF HISTORY OF PRE-MDL LITIGATION AND EFFICIENCY OF THE MDL AND COUNSEL.

Plaintiffs' counsel's work in this MDL should be commended and compensated for their extraordinary skill and efficiency made possible by both counsel's institutional knowledge with respect to PFAS litigation specifically and their vast decades of experience in water contamination cases generally, as well as their ability to adapt to the challenging circumstances presented by a global pandemic, including carrying out discovery of a complex subject matter despite a nationwide lockdown. As the history below recounts, all of the *Barber* factors support Class Counsel's fee request. Counsel's expertise and commitment to the litigation allowed them to overcome a myriad of complex and novel questions of law and difficulties in proving factual culpability. The government contractor defense, which loomed as an existential threat at the inception of the litigation, tampered counsel's expectations, and made the case undesirable to many, was defeated through hard work and careful attention to details by insightful, high-caliber lawyers who had the gumption and know-how to accomplish their mission. Plaintiffs' counsel's work was never made easy given the incredibly talented and resourced opposition who regularly presented strong defenses and challenged virtually all of Plaintiffs' efforts given the magnitude of liability their clients had at stake.  All these factors justify the award sought.

16

       1.    **This Court Appointed Skilled Counsel with Institutional Knowledge of the Subject Matter that were Fully Capable of Performing their <u>Legal Services Efficiently</u>.**

Litigation involving per- and polyfluoroalkyl substances ("PFAS") has been ongoing for nearly 25 years. This extensive history is part of what makes PFAS litigation unique. Early litigations acted as the catalyst[48] that led to the 2009 provisional Health Advisory Levels for PFOA and PFOS,[49] the 2016 Lifetime Health Advisory Level for PFOA and PFOS of 70 ppt (parts per trillion) combined,[50] the 2022 Interim Health Advisories,[51] and, finally, the enforceable National Primary Drinking Water Regulations (NPDWRs) that were proposed by EPA in March 2023 of 4 ppt for each PFOA and PFOS.[52] The EPA has concluded that these regulatory actions, "will prevent thousands of deaths and reduce tens of thousands of serious PFAS-attributable illnesses."[53]

Driven by a growing public awareness of PFAS contamination, brought to light, in part, as a result of high profile PFAS verdicts[54] and settlements,[55] public water systems and other entities

---

[48] Letter from Robert A. Bilott, Esq. to the United States Environmental Protection Agency, dated March 6, 2001, EPA01-00171880-172830 (informing government officials including EPA that DuPont was emitting PFOA which "may pose an imminent and substantial threat to health or the environment"), attached as Ex. L.

[49] EPA's website, Health Advisories for Perfluorooctanoic Acid (PFOA) and Perfluorooctane Sulfonate (PFOS), *available at*: https://www.epa.gov/sites/default/files/2015-09/documents/pfoa-pfos-provisional.pdf.

[50] EPA's website, FACT SHEET, PFOA & PFOS Drinking Water Health Advisories, *available at*: https://www.epa.gov/sites/default/files/2016-05/documents/drinkingwaterhealthadvisories_pfoa_pfos_5_19_16.final_.1.pdf.

[51] EPA's website, Drinking Water Health Advisories for PFOA and PFOS, 2022 Interim Updated PFOS and PFOS Health Advisories, *available at*: https://www.epa.gov/sdwa/drinking-water-health-advisories-pfoa-and-pfos.

[52] EPA's website, Per- and Polyfluoroalkyl Substances (PFAS), Proposed PFAS National Primary Drinking Water Regulation, *available at*: https://www.epa.gov/sdwa/and-polyfluoroalkyl-substances-pfas.

[53] *Id.*

[54] *See e.g., Vigneron v. E. I. DuPont de Nemours & Co*., 13-cv-136 (S.D.O.H.)(plaintiff's verdict in 2017 of $2 million in compensatory damages and $10.5 million in punitive damages).

[55] *See e.g*., approximately $671 million dollar settlement with DuPont in 2017 in the *In re E. I. DuPont de Nemours and Co. C8 Personal Injury Litig*., (S.D.O.H.)("C8 MDL")(global resolution

began filing cases against a variety of PFAS and AFFF manufacturers.[56] As the number of AFFF-specific PFAS cases piled up in federal courts, a growing chorus for consolidating these disparate cases before the Judicial Panel on Multidistrict Litigation ("JPML") ensued.[57] Consolidation served the best interests of individual clients, but also established a pathway to advance the prosecution of PFAS-related claims nationwide.

Discovery and expert efforts in this MDL benefitted from work conducted in PFAS litigation prior to the formation of the MDL.[58] Rather than duplicate existing discovery efforts that had previously been undertaken in PFAS cases outside of the AFFF MDL, Plaintiffs' counsel devised novel ways to accommodate this discovery in this AFFF MDL. For example, deposition transcripts of DuPont witnesses taken in the C8 MDL were reproduced and made available for use in this MDL. Access to these deposition transcripts allowed for a more efficient and streamlined approach to deposing the DuPont witnesses in this MDL, because counsel knew what testimony already existed, and thus could focus on eliciting testimony related to undiscovered areas of inquiry only, such as, DuPont's role in the AFFF market specifically rather than PFAS more broadly.

Similarly, legacy expert discovery from the C8 MDL benefitted this MDL. This is because many of the experts who provided testimony in that litigation likewise proffered expert opinions in this MDL and brought their prior PFAS knowledge to bear in this MDL.[59] Of course, the same is true for counsel in the C8 MDL who are also counsel in this case. Not surprisingly, much of that prior litigation was conducted by counsel who attained leadership positions in this MDL as well

---

of approximately 3500 cases alleging harm from PFOA exposure emitted from DuPont's Washington Works plant).

[56] London Decl., at ¶ 14.

[57] London Decl., at ¶ 15.

[58] London Decl., at ¶¶ 8-9, 15-16, 36, 39.

[59] The following disclosed Plaintiffs' experts likewise served as experts in the C8 MDL: Dr. Michael Siegel, Dr. Barry Levy, Dr. David MacIntosh, Mr. Robert Johnson and Mr. Stephen Petty.

as lead critical committee and other litigation roles. The cumulative effect of this prior PFAS litigation, and the institutional knowledge garnered from it, was to make the prosecution of this case more efficient than otherwise could have been, which undoubtedly saved thousands of hours of additional attorney time that would have been necessary had these prior efforts not been undertaken.

Other counsel also brought invaluable depth of experience in environmental litigation. For almost three decades, some of these counsel have represented public water providers in cases against the manufacturers of chemical products whose release contaminated water supplies. These lawyers' fluency in the language of water system operation, contaminant treatment, and complex products liability litigation efficiently gave the PEC an appreciation of the claims and context that would otherwise take years to acquire. They also shared established relationships with leading environmental experts, who are well-versed in designing treatment systems for public water providers. And, critically, they contributed to the PEC an advanced understanding of water provider Plaintiffs, their damages, and how to structure a settlement that reflects these Plaintiffs' needs.

In sum, having knowledgeable and experienced counsel appointed by the Court to leadership roles clearly benefited the overall conduct of this litigation and accelerated its successful resolution.

### 2.    Plaintiffs' Counsel Conducted Discovery on a Massive Scale Efficiently Despite a Global Pandemic.

Surprisingly, the global COVID-19 pandemic, horrific and life-altering in so many ways, created an opportunity for efficiency in time spent conducting common benefit work, and resulted in significant cost savings for the PEC and all Plaintiffs. Specifically, shortly after the pandemic and ensuing lockdown began, this Court issued one of the nation's first protocols for remote

19

depositions without which this litigation might have to come to a complete halt.[60] Although navigating largely uncharted waters in this regard, and as is described more fully below and in supporting declarations, pursuant to CMO 11, the PEC demonstrated an exceptional ability to effectively and efficiently conduct dozens of complex depositions, which required the review of millions of pages of documents. CMO 11 provided a protocol that largely avoided any undue delays and enabled the PEC to prosecute the case expeditiously on behalf of the entire MDL despite the pandemic. It is indisputable that the remote format saved countless of hours of attorney time and extraordinary expense.[61]

**B.     THE COMMON BENEFIT WORK PERFORMED FROM THE ESTABLISHMENT OF THE AFFF MDL THROUGH AUGUST 22, 2023 SURMOUNTED A MYRIAD OF NOVEL AND DIFFICULT LEGAL QUESTIONS.**

On December 7, 2018, the JPML transferred the AFFF MDL to the District of South Carolina.[62] The first Status Conference in the AFFF MDL was held on February 25, 2019,[63] after which this Court entered two Orders appointing Plaintiffs' Co-Lead Counsel, Liaison Counsel, the first slate of Plaintiffs' Executive Committee members and Advisory Counsel to the PEC ("Leadership Counsel").[64, 65]

---

[60] CMO 11, as amended by CMOs 11A-B, ("Remote Deposition Protocol")[ECF Nos. 680, 1173 and 1778]; *see also*, London Decl., at ¶¶ 45-48.

[61] London Decl., at ¶ 47.

[62] MDL Transfer Order No. 2873 [ECF No. 1].

[63] Case Management Order ("CMO") No. 1 [ECF No. 3].

[64] CMO Nos. 2 and 3 [ECF Nos. 28 & 72]. CMO 3 added four (4) additional firms to the initial slate of PEC firms.

[65] London Decl., at ¶¶ 3, 9, 13, 24-33.

Plaintiffs' Leadership Counsel initially included twenty-five (25) Leadership firms.[66] As the MDL went on, while some lawyers resigned, the total number of PEC firms for the 2022-2023 Term expanded to include twenty-eight (28) firms.[67]

Leadership Counsel were collectively charged with prosecuting the litigation for the common benefit by conducting all pretrial discovery on behalf of Plaintiffs in the MDL, organizing regular meetings of Plaintiffs' counsel and representing their interests as spokespersons at all pretrial proceedings, and finally, engaging in a multitude of actions, such as the submission of motions, stipulations, development of settlements and every other task necessary and proper to accomplish these responsibilities.[68]

To carry out these duties and responsibilities, Leadership Counsel enlisted various PEC firms and other common benefit attorneys to assist.[69] To effectively manage this massive workload

---

[66] *Id.*
[67] CMO 24 [ECF No 2259].
[68] CMO 2 [ECF No. 48], 6-8 (setting forth the specific responsibilities assigned by the Court); *see also*, London Decl. at ¶¶ 29-33, 107-113, 117.
[69] London Decl. at ¶ 30.

of prosecuting this sprawling litigation, the PEC and other common benefit attorneys were

subdivided into committees with discrete responsibilities:[70, 71]

---

[70] These Committees included:

    (1)    Law & Briefing Committee
    (2)    Science Committee
    (3)    Public Water Provider Committee
    (4)    Private Water Provider Committee
    (5)    Medical Monitoring Committee
    (6)    Property Damage Committee
    (7)    State/Sovereign Claims Committee
    (8)    Personal Injury Committee
    (9)    Discovery Committee
    (10)    Privilege Challenge Committee
    (11)    Redactions/De-Designations Committee
    (12)    Fact Sheet Committee
    (13)    Third-Party Discovery Committee
    (14)    Defendant Identification/Dossier Committee
    (15)    Government Contractor Committee
    (16)    Document Review Management Committee ("DRMT")
    (17)    DuPont Fraudulent Conveyance Committee, and
    (18)    Legislative Committee.

Over the course of the MDL, these original committees were supplemented with the

following additional committees:

    (19)    Market Share
    (20)    Personal Injury Bellwether Trial Team Committee (*Leach* injuries)
    (21)    Turn Out Gear Plaintiff Injury Committee
    (22)    DOJ Immunity Motions Committee
    (23)    Communications Committee
    (24)    Kidde Bankruptcy Committee
    (25)    Water Provider Bellwether Selection Committee
    (26)    Tier One Water Provider Bellwether Team
    (27)    Tier Two Water Provider Bellwether Team
    (28)    *City of Stuart* Trial Team
    (29)    Telomer Water Provider Trial Team
    (30)    Telomer Water Provider Bellwether Team
    (31)    Settlement Team

[71] London Decl., at ¶¶ 20-33.

Each committee was either chaired co-chaired by multiple common benefit attorneys whose responsibilities include coordinating the committee's internal efforts as well as liaising with Co-Lead Counsel regarding the status of tasks assigned to the respective committees. Throughout the course of the MDL, these committees' collective efforts constituted essential common benefit work without which the litigation would not have been successfully prosecuted with such alacrity.[72] Perhaps no committee was more important than an *ad hoc* committee comprised of key members selected from the various committees. Established prior to the Court's Science Day, the "Strike Force," its colloquial moniker, was established for the purpose of coordinating the efforts of all committees, with a singularity of purpose, to allow for the nimble prosecution of the litigation, efficient coordination and effective communication as across all aspects of the MDL.[73]

Given the tremendous work performed by these committees over the course of this MDL through August 22, 2023, it would be impossible to delineate every item of common benefit work. Below, however, Class Counsel have sought to identify highlights of these collective efforts.

For proper context, it is imperative to underscore that the liability efforts with respect to each Defendant helped make the liability case as against *the other* Defendants. There is such inextricable interplay between each Defendants' liability that it would be impossible to parse specific efforts that relate only to one Defendant and played no role in the larger overall liability picture. In fact, documents and other evidence produced by one Defendant often helped buttress the liability case as against another Defendant.

For example, in one email correspondence between DuPont witness, Dr. Stephen Korzeniowski and his DuPont colleague, Charles K. Taylor, they discussed their perspective that

---

[72] *Id*. at ¶¶ 34, 52, 90-93.
[73] Douglas Decl., at ¶¶ 6-7.

3M's market withdrawal from C8-chemistries was not voluntary, but rather, "staged."[74] This correspondence between Dr. Korzeniowski and Mr. Taylor provided a liability theme that the PEC fully discovered and prosecuted, that is, that 3M's withdrawal from the C8-chemsitry market was not as voluntary as 3M suggested. This allowed Plaintiffs to undercut 3M's argument that it had acted as an exemplary environmental steward in phasing out of C8 chemistries. Similarly, congressional testimony from DuPont witness, Daryl Roberts, solidified the PEC's general understanding that "PFAS chemicals used in firefighting foams… particularly PFOS-based firefighting foams, are the main cause of drinking water contamination with PFAS…"[75] Testimony from 3M's long-time chief toxicologist, John Butenhoff, Ph.D., helped  shore up the liability case against DuPont by making clear that 3M always shared its historic toxicology data regarding PFOS and PFOA with DuPont.[76]

Similarly, Anne Regina testifying on behalf of Defendants Kidde-Fenwal, Inc. ("Kidde") and National Foam, Inc. ("National Foam"), acknowledged that, as of the year 2000, she had access to 3M's toxicology data as well.[77] This arguably put Kidde on notice of the totality of toxicology data concerning the potential harms of both PFOA and its precursor products, including C8-based fluorosurfactants, which were often incorporated into both Kidde and National Foam's AFFFs.

Liability with respect to AFFF concentrate manufacturers, like Kidde, National Foam, Tyco/Chemguard and Buckeye, was also clearly intertwined with the liability of fluorosurfactant suppliers, such as DuPont, Dynax, Chemguard, and BASF as successor-in-interest to Ciba-Geigy, among others, who manufactured the C8-based fluorosurfactants that were incorporated into these

---

[74] Deposition of Stephen Korzeniowski, at 341:18-348:10, (discussing exhibit DL262 and how 3M played the EPA so that their C8 market withdrawal would look voluntary), relevant pages attached as Ex. M.
[75] Congressional Testimony of Daryl Roberts, attached as Ex. N
[76] Deposition of John Butenhoff, at 155:2-156:2 [ECF No. 2597-6].
[77] Deposition of Anne Regina, at 191:11-193:9 [ECF No. 2597-17].

companies' respective AFFFs. Adding even more layers to this complicated amalgam, the liability of every AFFF fluorosurfactant manufacturer who purchased PFOA precursor intermediates from companies such as Daikin, Clariant Corporation, AGC Chemicals and Archroma was likewise inextricably interlinked. In fact, even toll manufacturers' liability was s similarly immersed with the Defendants at every other level of the AFFF market channels.

Finally, the AFFF-industry group, the Fire Fighting Foam Coalition ("FFFC"), acted as a collaborative mouthpiece and combined knowledge center for all Telomer-Defendants, which further intertwined the Telomer-Defendants' liability with one another, illustrating how these Defendants' liabilities were not separate and distinct but rather had to be considered collectively. In short, the development of both the science and liability evidence as it pertains to each of the various Defendants cannot reasonably be separated.[78]

***Exemplar Case Management/Leadership-Related Efforts That Helped Resolve this Massive Case and the Difficult and Novel Questions Presented Therein.***

Throughout the pendency of this MDL, Co-Lead Counsel organized, coordinated, and oversaw the various committees, advocated on behalf of the PEC at each CMC, liaised with defense counsel to negotiate CMOs, advised all PEC and other counsel of litigation developments, and worked to establish the administrative protocols and foundational frameworks for the litigation.[79]

As part of these efforts, Co-Lead Counsel oversaw the entry of sixty-six (66) CMOs, many of which were heavily negotiated with opposing counsel over months-long periods of time.[80] Take for example CMO 5, which governs the procedure, form and schedule for the completion of Fact

---

[78] Douglas Decl., at ¶¶ 11-15.
[79] London Decl., at ¶¶ 107-112.
[80] *Id*. at ¶¶ 3, 34-37, 56-63, 111.

Sheets.[81] The draft of this CMO was so contested the Parties had to submit to the Court lengthy memoranda to justify their interpretation of the proper fact sheets, a crucial foundational discovery device needed for individual case-specific facts.[82]

A sampling of other critical CMOs that governed both administrative protocols and foundational discovery issues, which Co-Lead Counsel negotiated and/or oversaw the implementation of, include, *inter alia*:[83]

| Case Management Order | Description |
|---|---|
| CMO 3 | The Common Benefit Order[84] |
| CMO 4 | The Protective Order & ESI Order governing confidentiality and electronically stored information[85] |
| CMO 5 | The order governing the procedure, form and schedule for the completion of Plaintiff and Defense Fact Sheets[86] |
| CMO 6 | The order governing alternative service of process[87] |
| CMO 8 | The protocol for privileged information[88] |
| CMO 9 | The procedure for the exchange of documents received by a party pursuant to a subpoena[89] |
| CMO 11 | The Remote Deposition Protocol[90] |
| CMO 13 | The bellwether selection process for the Water Provider Plaintiffs[91] |
| CMO 19 | The pretrial schedule of first water provider bellwether: *City of Stuart v. 3M Company*[92] |
| CMO 22 | The protocol for expert witness depositions[93] |
| CMO 26 | The Order governing a second class of bellwether cases (alleging personal injuries)[94] |

---

[81] CMO 5 [ECF No. 205].
[82] London Decl., at ¶ 37.
[83] *Id*. at ¶¶ 3, 34, 35-37, 58-63, 111.
[84] CMO 3 [ECF No. 72].
[85] CMO 4 [ECF No. 99].
[86] CMO 5 [ECF No. 205].
[87] CMO 6 [ECF No. 355].
[88] CMO 8 [ECF No. 392].
[89] CMO 9 [ ECF No. 524].
[90] CMO 11 [ECF No. 680].
[91] CMO 13 [ECF No. 1049].
[92] CMO 19 [ECF No. 1844].
[93] CMO 22 [ECF No. 2170].
[94] CMO 26 [ECF No. 3080].

While certain of these CMOs are routine in nature and commonplace in most MDLs, others required innovative thinking to meet the unique and emergent challenges of the day.[95] For example, CMO 11, the Remote Deposition Protocol, was entered by the Court in April 2020 in the height of the COVID-19 pandemic. This CMO was entered "…to enable the parties to proceed with discovery efficiently and with due regard for the health and safety of witnesses, court reporters/videographers, counsel, and parties during the ongoing COVID-19 pandemic…"[96] CMO 11 allowed the Parties to conduct depositions remotely though the Zoom platform,[97] share deposition exhibits in advance of depositions to allow the witness to have hard copies of potential deposition exhibits,[98] and required that deponents and attorneys be trained on the Zoom platform to ensure a seamless transition from in-person depositions to a remote protocol.[99, 100] As set forth in greater detail below, the PEC and other common benefit attorneys conducted all but five (5) of the non-bellwether case-specific depositions remotely rather than in-person.[101] This not only resulted in a pioneering solution to a unique litigation obstacle, but also had the added benefit of saving thousands of dollars in travel costs, lodging expenses, and attorney time.[102]

To assist the Court in administering this MDL, Co-Lead Counsel advocated on behalf of the PEC at forty-five (45) CMCs, and prepared Joint Status Reports ("JSRs") in advance of each conference.[103] The monthly JSRs provided the Court and every litigant a detailed analysis of the discovery status of each Defendant, including the United States, an update on the total number of

---

[95] London Decl., at ¶ 45.
[96] CMO 11, at ¶ 1.
[97] *Id*. at ¶ 5.
[98] *Id*. at ¶ 8.
[99] *Id*. at ¶ 10.
[100] London Decl., at ¶¶ 45-47.
[101] *Id*.
[102] *Id*. at ¶ 47.
[103] *Id*. at ¶¶ 107, 117.

documents produced in the litigation with respect to Defendants and third-parties, the total number of depositions taken (expert and fact), a report on both related and unrelated PFAS cases pending outside of the MDL, a status of bellwether efforts, an outline of any arising disputes between the Parties, and a status of Fact Sheet production.[104] More recently, the JSRs included the status of settlement efforts, as well as an update on the Kidde-Fenwal, Inc.'s ("Kidde") bankruptcy proceedings. The benefits of preparing and presenting a JSR were plentiful. Not only did the regular gathering and reporting of information require Co-Lead Counsel to maintain open channels of communication on all fronts, but it also provided an efficient mechanism to keep the Court apprised of all litigation matters both historically and in real-time as they developed.[105] Lastly, it provided the Parties with a consistent mechanism to raise disputes related discovery, bellwethers, case management or anything litigation related. The JSR process was terrific tool to aid in the efficient management and advancement of this MDL

Co-Lead Counsel also spearheaded additional efforts in prosecuting the litigation, including an analysis of DuPont's liability share in the AFFF marketplace[106] as well as leading the charge with respect to the coordination of DOJ's forthcoming jurisdictional motions.[107]

Finally, prior to and after the COVID-19 lockdown, Co-Lead Counsel organized in-person PEC meetings around the scheduled CMCs. While during the COVID-19 lockdown, CMCs were held telephonically. Co-Lead held monthly PEC calls on the first Tuesday of every month to ensure that all PEC counsel was kept apprised of the litigation.[108] The sum total of these efforts allowed Plaintiffs' counsel to maintain collegiality and momentum, and to run the litigation smoothly and

---

[104] *Id*. at ¶¶ 43, 107-109.
[105] *Id*. at ¶ 107.
[106] Napoli Decl., at ¶¶ 53-57; *see also*, Summy Decl., at ¶¶ 10, 24-25.
[107] Napoli Decl., at ¶¶ 45-52.
[108] London Decl., at ¶¶ 34, 48.

efficiently despite a demanding deposition and bellwether schedule, a fast-paced trial schedule, and a voluminous discovery record, in the midst of a raging global pandemic.[109]

***Exemplar Strike Force-Related Efforts That Assisted in the Resolution of Novel and Difficult Questions Raised in this MDL and Greatly Impacted the Results Obtained.***

The Strike Force,[110] co-chaired by Gary Douglas of Douglas & London, P.C., Scott Summy of Baron & Budd, and Phillip Cossich of Cossich, Sumich, Parsiola & Taylor,  created in advance of the Court's Science Day, has been central and critical to the prosecution of this MDL because it was formed to oversee nearly all aspects of this MDL, including coordinating across all committees with respect to the overall liability picture, the briefing efforts, the efforts to overcome the government contractor defense, and trial preparation efforts.[111]

The Strike Force worked in tandem with the Science Committee to develop the science necessary to prosecute the case, and with the Discovery Committee to establish liability with respect to each Defendant.[112] In so doing, the Strike Force and its members fully handled, participated in and/or oversaw the coordination of 82 depositions of corporate witnesses, 7 government witness depositions, and 12 defense expert witness depositions, and defended 14 Plaintiff expert witnesses in their depositions and 56 depositions of bellwether Plaintiff witnesses.[113] The importance of having the Strike Force integrally involved in each of these

---

[109] London Decl., at ¶¶ 45-65.

[110] The members of this core team, a/k/a the Strike Force, are also members of other PEC-appointed committees such as the Science Committee, Law & Briefing Committee, and Discovery Committee and included (and continue to include), Gary Douglas, Rebecca Newman, Lara Say, Tate Kunkle and Anne Accetella of Douglas & London; Neil McWilliams and Wesley Bowden of Levin Papantonio;  Christina Cossich, Brandon Taylor and Phillip Cossich of Cossich, Sumich, Parsiola & Taylor, LLC; Scott Summy, Carla Burke Pickrel, Celeste Evangelisti, of Baron & Budd; and Frederick Longer of Levin, Sedran & Berman, among others at different times.  Douglas Decl., at 3 n.2.

[111] Douglas Decl., at ¶ 6-7.

[112] Douglas Decl., at ¶ 6.

[113] Douglas Decl., at ¶ 16.

depositions, along with other common benefit attorneys, cannot be overemphasized because it ensured that no committee was ever working in a silo, at cross purposes with any another committee and/or undermining any other MDL efforts. In short, it allowed for consistency of message and narrative with respect to both overall liability and regarding each individual Defendant liability.

Similarly, the Strike Force worked cohesively with the Science Committee to participate and coordinate in the initial service of nine (9) general expert reports and twelve (12) case-specific expert reports, and one (1) expert report with a general sub-part and three (3) case-specific sub-parts, as well as multiple supplemental reports[114] as the regulatory landscape changed and trial approached. Moreover, Defendants identified 50 experts, for which the Strike Force was responsible for reviewing, summarizing, and creating defense expert dossiers.[115] Again, the Strike Force was then able to share this knowledge with other relevant committees as different issues arose over the course of the MDL.

Many of the members of the Strike Force were also members of both the Government Contractor Committee and the *Stuart* Trial Team, those exemplary efforts are both set forth below and in the annexed Douglas Declaration but include, *inter alia*, with respect to the government contractor defense: reviewing thousands of pages of documents pertaining to what the Government and Defendants knew (and when) with respect to the harms posed by PFAS, eliciting deposition testimony necessary to overcome the government contractor defense and developing necessary subject-matter themes that later became the backbone of Plaintiffs' briefing.[116] With respect to *Stuart* Trial Team efforts, the Strike Force, along with trial counsel, was responsible for the

---

[114] Douglas Decl., at ¶ 21.
[115] *Id.*
[116] Douglas Decl., at ¶¶ 22-30.

drafting and/or coordination of direct witness examinations, dispositive motion practice, exhibit lists, deposition designations, jury questionnaires, exhibit objections, evidentiary motions, opening statements, among other trial-related efforts.[117]

The Strike Force's efforts cross-pollinated every aspect of this case to make for a cohesive prosecution along with common benefit attorneys working on this MDL from across the nation. Its management, participation and oversight allowed for a highly streamlined and singularly honed approach, a unique function that critically served the needs of the case.

### Exemplar Science Committee-Related Efforts that Developed the Complex Scientific Support to Prove Defendants' Culpability.

Considering the breadth of PFAS's impact, the Science Committee, Co-Chaired by Scott Summy of Baron & Budd, Gary Douglas of Douglas & London, Christina Cossich of Cossich Sumich, Parsiola & Taylor, LLC, and Robert Bilott of Taft, Stettinius & Hollister, LLP, faced great challenges. By necessity, it had to develop experts across a wide range of scientific disciplines: epidemiology, hydrology, fate and transport, risk assessment, analytical chemistry, public health, PFAS health effects, industrial hygiene, toxicology, environmental engineering and PFAS treatment and remediation. Thanks to the able work of its committed members an assemblage of world-class experts was identified, vetted and retained.[118]

When the Court wisely decided to order there to be a Science Day in October 2019, the Science Committee, in concert with the Strike Force, was ready and able to demonstrate the type of evidence available to support Plaintiffs' claims. To do so, the PEC presented three (3) experts

---

[117] Douglas Decl., at ¶¶ 37-50.
[118] With respect to expert retention, the PEC and the Science Committee collectively have forged a multi-layer tactical approach, which has kept consistent pressure on all Defendants, and thereby allowed every aspect of the case to advance despite the bellwether efforts specifically targeting water provider Plaintiffs.

on the following topic areas:[119]

-   **Dr. David MacIntosh** presented on the scientific basis for drinking water advisories; and explained why the existing standards vary by jurisdiction. Dr. MacIntosh also presented on the scientific processes for assessing potential toxic effects on humans including toxicological and epidemiological studies, exposure assessments, risk assessments and medical monitoring.

-   **Dr. Christopher Higgins** presented on the scope of PFAS contamination of drinking water; the methods, costs and effectiveness of remediation technology; and the availability of products alternative to AFFF that could effectively extinguish liquid hydrocarbon fires without PFOS or PFOA as ingredients.

-   **Dr. Robert Bahnson** presented data relating to the diseases or conditions caused uniquely or primarily by exposure to PFOS and PFOA.

The process of preparing these experts to testify before the Court began in May 2019. Many trips to Boston, MA, Golden, CO, and Columbus, OH, for meetings with these experts occurred over the course of approximately five months.[120] This gargantuan effort culminated in the Court's Science Day of October 4, 2019, after the original hearing was postponed due to Hurricane Dorian. Of course, counsel had prepared and met with experts for weeks in advance of the originally scheduled Science Day as well.

Beyond these three (3) highly regarded experts, the Science Committee met with and retained the well-known and highly-esteemed scientist, Linda Birnbaum, PhD, a board-certified toxicologist, microbiologist, and former federal scientist for over forty (40) years with both the EPA and the National Institutes of Environmental Health Sciences ("NIEHS").[121] Dr. Birnbaum has nearly twenty (20) publications on PFAS, and has been conducting PFAS studies herself since the 1980s.[122] She offered the opinions in this MDL that PFOA and PFOS are toxic to humans, that all reasonable efforts to reduce exposure should be employed, and that EPA's actions with respect

---

[119] Bowden Decl., at ¶¶ 7, 10-14.
[120] Douglas Decl., at ¶ 8.
[121] Bowden Decl., at ¶ 18(a).
[122] Curriculum Vitae of Linda S. Birnbaum, Ph.D., D.A.B.T., A.T.S., attached as Ex. O.

to PFAS regulatory standards are appropriate.[123] Few in the world are as highly regarded when it comes to PFAS as Dr. Birnbaum. Obtaining her agreement to testify on behalf of the Plaintiffs early on in the MDL's history is a little noted but major accomplishment achieved by the Science Committee.[124]

Other world-renowned PFAS experts, like Jonathan W. Martin, PhD, were also retained.[125] Dr. Martin is a professor at Stockholm University and an expert in environmental analytical chemistry with a long-standing PFAS history.[126] He has been conducting research on various aspects of PFAS for over twenty years,[127] and has published on the subject over 180 times.[128] In addition to supporting core liability theories, Dr. Martin proffered case-specific opinions in each of the Tier Two bellwether cases.

Adjunct to the Science Committee's work with Dr. Martin to develop his testimony was extensive environmental sampling efforts at all ten (10) of the Tier One Water Provider bellwether sites.[129] This began in June 2021. An independent laboratory, Eurofins Laboratory ("Eurofins"), was contracted to analyze PFAS water samples collected at each bellwether location. This testing enabled Dr. Martin to opine as to the relative contribution of PFOA contamination at each bellwether site as between 3M and the Telomer Defendants. Dr. Martin used the samples to differentiate other Defendants' PFOA isomer profile from 3M's "off-the-shelf" PFOA,[130] which the Science Committee obtained from 3M.

In total, the Science Committee, along with the Strike Force, worked-up fourteen (14)

---

[123] Bowden Decl., at ¶ 18(a).
[124] London Decl., at ¶ 42.
[125] Bowden Decl., at ¶ 18(b).
[126] Curriculum Vitae of Professor Jonathan W. Martin, Ph.D., attached as Ex. P.
[127] *Id.*
[128] Bowden Decl. at ¶ 18(b).
[129] Douglas Decl., at ¶ 32.
[130] *Id.*

experts who, in March 2022, produced twenty-two (22) expert reports on numerous subject matters, as below.[131]

    (1)    Greg Walton (Chemical Engineering)
    (2)    Dr. Michael Siegel (Public Health / Standard of Care / Epidemiology)
    (3)    Dr. Linda Birnbaum (Toxicologist / Regulatory)
    (4)    Three (3) case-specific expert reports from Dr. Christopher Higgins (Analytical Chemistry)
    (5)    Dr. Ronald Kendall (Toxicology)
    (6)    Dr. David MacIntosh (Toxicology)
    (7)    Steven Petty (Industrial Hygiene)
    (8)    Three (3) case-specific expert reports from Anthony Brown (Hydrology)
    (9)    Three (3) case-specific expert reports from Kevin Berryhill (Treatment and Remediation)
    (10)   Robert Johnson (Forensic Economist)
    (11)   Dr. Barry Levy (Public Health / Standard of Care)
    (12)   Dr. Patrick Lowder (Patent and Chemistry)
    (13)   Dr. Anthony Travis (Analytical Methods of PFAS Detection)
    (14)   Dr. Jonathan Martin (PFAS isomer profiling and detection of PFAS in blood)[132]

Each expert was deposed by defense counsel. The Science Committee, in concert with the Strike Force, defended all fourteen (14) of its experts, which spanned twenty-one (21) days of testimony, and also conducted the depositions of twelve (12) defense experts.[133]

Apart from the publicly disclosed experts, the PEC also retained consulting experts to advise on other matters.[134] In total, over thirty (30) experts were retained in both consulting and testifying capacities on topics relating to the DuPont and 3M settlements, the Kidde bankruptcy, various personal injury health effects experts, and in connection with the DuPont fraudulent transfer claims.[135]

Finally, throughout the pendency of the litigation, the Science Committee regularly kept

---

[131] Subsequent to the original expert report deadline, Plaintiffs supplemented their expert opinions with additional expert reports from Mr. Berryhill, Mr. Johnson, Dr. Birnbaum and Dr. MacIntosh.
[132] Bowden Decl., at ¶¶ 8, 15-18.
[133] Douglas Decl., at ¶ 35.
[134] Bowden Decl., at ¶ 8.
[135] *Id.*

the Court apprised of scientific developments related to PFOA and PFOS. To this end, the Science Committee submitted nine (9) update letters to the Court as part of these ongoing efforts.[136] In an environmental contamination case of worldwide dimension, it was obvious that the backbone of the prosecution of this case would be supported by the Science Committee. Their work assuredly conferred substantial common benefit to every litigant and responded swiftly to novel and difficult scientific questions.

***Exemplar Discovery Committee-Related Efforts that Greatly Impacted the Labor and Time Expended in this MDL Especially Given the Novel and Complex Nature of Such Discovery***

Since the inception of this MDL, the PEC knew that discovery would be voluminous. Many factors contributed to this: (a) the sixty-plus year history of evidence to review; (b) the vast number of Defendants named in Plaintiffs' various lawsuits; (c) the involvement of the United States and various of its agencies, including the Department of Defense ("DoD"), and the armed forces; and (d) the significant number of third parties whose evidence would be needed.[137]

I.     *The Complexity of the MDL Required a Massive Amount of Discovery.*

The discovery undertaken by the PEC in the four-plus years of this MDL, three of which occurred during the lock-down period of the Covid-19 pandemic, is nothing short of incredible. Within six months of the creation of the MDL, the PEC carefully drafted and served sixty-one (61) interrogatories and one hundred four (104) requests for production of documents (collectively "Master Set") on eighteen (18) of the predominant Defendants and the United States. In 2020, the PEC served six (6) new Defendants with Master Sets of discovery demands. In 2021, the PEC served an additional four (4) new Defendants with Master Sets of discovery demands. Throughout 2020-2021, the PEC served dozens more second and third sets of interrogatories, document

---

[136] London Decl., at ¶ 52, n. 26.
[137] *Id*. at ¶ 32.

demands and requests for admissions, to leave no stone unturned.[138]

Notably, many of the Defendants are unique in what they manufactured, when they manufactured their respective products, and how they manufactured them. Given this complexity, attorneys working on discovery demands were often required to do significant research to obtain enough knowledge of a Defendants' history to craft discovery that would adduce useful information. To complete discovery, PEC attorneys routinely engaged with Defendants' counsel regarding search terms, custodians and privilege issues. Each discovery response was reviewed for deficiencies and where they existed a Discovery Committee member challenged them.

Because of the Defendants' early reliance on the government contractor defense, a tremendous amount of discovery had to be obtained from the United States.[139] Setting aside issues of national security and coordinating the staging of discovery with Defendants, the number of federal agencies involved in discovery was remarkable. Examples include the DoD, the Air Force, the Navy, the Naval Research Laboratory ("NRL"), Naval Facilities Engineering Systems Command ("NAVFAC"), the EPA, and the Food and Drug Administration.[140]

In addition to Defendant and United States discovery, the PEC devoted an entire team of attorneys, headed by Andrew Cvitanovic, Esq. of Cossich, Sumich, Parsiola & Taylor, LLC, for the collection of third-party discovery. The third-party discovery team served over one hundred-seventy (170) subpoenas. Many of these required extensive follow-up and negotiations with counsel to obtain the sought-after productions.[141] Third-party subpoenas served on FluoroCouncil, National Fire Protection Association, Cottrell Associates, Inc., Elkhart Brass, Inc, Aqueous Foam Technology, Inc. and the FFFC resulted in vital evidence for the PEC and for bellwether Plaintiffs.

---

[138] London Decl., at ¶ 67.
[139] Napoli Decl. at ¶¶ 25-19, 35-37, 40.
[140] Napoli Decl., at ¶¶ 25, 35-36.
[141] London Decl., at ¶¶ 41, 48.

Many of the subpoenas targeted and obtained critical information from distributors related to product identification, product warnings, and intended use of AFFF. Documents from distributors showed what products were being used and where, what warnings were conveyed to end users, and how distributors directly informed purchasers to use AFFF.

An additional extensive project undertaken by Plaintiffs' counsel was the maintenance and collection of Plaintiff Fact Sheets ("PFS") and Defendant Fact Sheets ("DFS") through a Fact Sheet Committee ("FSC"). In July 2019, the FSC provided a list of all sites then at issue in the MDL to the Defendants as part of a proposed DFS process.[142] With the entry of CMO 5 on August 7, 2019, the FSC began providing monthly site lists to Defendants, triggering a DFS response from each Defendant for each site. The first DFSs were served in November 2019 and at that time the FSC began reviewing and analyzing the responses. This analysis included reviewing the DFSs for deficiencies, identifying third-parties such as distributors from which to seek further discovery, and identifying certain products used at a site and locating the referenced records.[143]

In December 2019, the FSC (Frederick Longer and Charles Schaffer of Levin, Sedran & Berman and Christiaan Marcum of Rogers, Patrick, Westbrook and Brickman and Lisa Greenberg of Douglas & London) had already amassed 255 DFSs before recognizing that consolidating them into a master spreadsheet would better benefit all Plaintiffs. The PEC then created and maintained a portal where Plaintiffs' counsel could access the master spreadsheet and DFSs for the sites applicable to their case.[144] In April 2020, the FSC presented a tutorial on the DFS process to all Plaintiffs' counsel and presented their analysis of the DFS productions. Every month the FSC compiled site lists from Plaintiff's counsel (sometimes including hundreds of sites), notified the

---

[142] London Decl., at ¶ 37, n. 17.
[143] *Id.*
[144] *Id.*

Defendants of new Plaintiff sites, and analyzed DFSs as they are received. The FSC brought, and continues to bring, great value to all Plaintiffs' case by helping to make case-specific evidence accessible to all Plaintiffs.

II.     *Document Review and Coding*

Shortly after the creation of the MDL, in early 2019, the Document Review Management Team ("DRMT"), a committee headed by Staci Olsen of Baron & Budd, Stephanie Biehl of Sher Edling, and Tate J. Kunkle of Douglas & London, formed to lead document review and document database management, researched and interviewed ESI specialists to assist with the coordination and review of document productions.[145] Ultimately, the DRMT selected Everlaw as the document review platform to be used by the PEC for the hosting of various document productions as well as to review and code these productions.[146]

After Everlaw was selected as the e-discovery platform, the DRMT set up the coding for numerous Defendants and issues, trained document reviewers, assembled reviewer teams, and instituted standard procedures for upload and management of documents, which included Defendants' document productions, third-party documents, Plaintiff bellwether documents, deposition transcripts and exhibits, and PEC work-product.[147] Further, the DMRT drafted and organized a coding manual and background materials on AFFF and PFAS to train each reviewer to properly code documents.[148]

Once the Defendants' documents were produced, the DRMT hosted an in-person training session which over fifty (50) attorneys attended in Dallas, Texas in the Fall of 2019. Additional

---

[145] Olsen Decl. at ¶ 8.
[146] Olsen Decl. at ¶ 9.
[147] Olsen Decl. at ¶ 10.
[148] Olsen Decl. at ¶ 11.

in-person and remote training sessions continued into 2020.[149] To maintain comradery and synergy in the Covid era, the DRMT hosted weekly Zoom calls with the reviewers to answer questions, discuss the coding of documents, present new information on key topics, and to further educate and assist the reviewers.[150] More recently, as more focused needs arose, the DRMT hosted weekly and monthly small group calls for Tier 2 document reviewers, Defendant-specific teams, deponent-specific teams, and issue-specific review teams.[151] These meetings, whether in-person or over Zoom, yielded better insight and strategies and thus more accurate document review coding, promoted the exchange of ideas among the group, and enabled the reviewers to maintain the pace required by the rigorous deposition and briefing schedules.

The DRMT not only maintained documents produced by Defendants, but also maintained and assigned reviewers for documents produced by over 170 third-party subpoena recipients. The DRMT also coordinated the service of subpoenaed third-party documents on Defendants.[152]

In over four years of litigation, the DRMT and over 150 document reviewers effectively and efficiently coded over 4.65 million documents (totaling over 37 million pages).[153] These document reviewers, employees of twenty-one (21) PEC firms, worked tirelessly together on various projects (e.g., custodian review projects for depositions and liability-themed reviews) to support Co-Lead Counsel, the PEC and its various committees.[154]

III.    *Depositions*

Beginning in the Summer of 2020, because of COVID-19, PEC counsel began remote depositions. Despite being among the first MDLs to prosecute their claims during a historic global

---

[149] Olsen Decl. at ¶ 12.
[150] Olsen Decl. at ¶ 13.
[151] Olsen Decl. at ¶ 14.
[152] Olsen Decl. at ¶ 15.
[153] Olsen Decl. at ¶ 18.
[154] Olsen Decl. at ¶ 20.

pandemic, the PEC, nonetheless, set an aggressive deposition schedule, sometimes conducting multiple depositions simultaneously.

Over the course of this litigation, the PEC, largely at the direction and with coordination of the Strike Force, conducted 82 depositions of corporate witnesses, seven (7) depositions of United States' witnesses, twelve (12) defense expert witness depositions, defended fourteen (14) Plaintiff expert witnesses in their depositions and defended fifty-six (56) depositions of bellwether Plaintiff witnesses.[155] Many of these depositions were conducted in a very compressed timeframe. Preparation for the depositions required thousands of hours from members of the respective deposition teams. For those depositions conducted by the PEC, Discovery Committee teams would gather all relevant information and documents for the pertinent witness, at times formulate themes and lines of questioning, and organize potential exhibits into themes and subthemes. There were often hundreds of documents coded as "hot" by first round document reviewers from the millions of pages produced, which then necessitated further detailed Tier Two review and would often spur even further searches in the database to flesh out a certain theme.[156]

Deposition teams took on the laborious task of marshalling those documents into streamlined, comprehensive themes and sub-themes that pertained to general liability, Defendant-specific liability, underlying science issues, affirmative defenses (*e.g.*, government contractor, as discussed further below), specific witnesses, specific bellwether sites and/or damages. From there, the primary depositions examiners, with assistance from members of the deposition teams, would create outlines for witnesses and topics based on strategy discussed with the larger deposition teams to elicit powerful admissible testimony to establish liability.[157] The Discovery Committee

---

[155] Douglas Decl., at ¶ 16.
[156] Douglas Decl., at ¶ 19.
[157] Douglas Decl., at ¶ 20.

has been a consistent presence throughout the litigation. It managed an overwhelming amount of material, made it accessible to all Plaintiffs' counsel, and created an evidentiary tableau par excellence. The arsenal created by the Discovery Committee proved to be an overwhelming factor that drove two Defendants to settle before any disclosure of the trove of material was disclosed at trial.

***Exemplar Law & Briefing Committee-Related Efforts that Required a High Level of Attorney Skill to Advocate Effectively and Persuasively and Impacted the Results Obtained.***

The Law and Briefing Committee's extensive efforts in this MDL have proven to be reliably supported, amply persuasive, and crucial to the prosecution of this matter. The Law and Briefing Committee, co-chaired by Rebecca Newman of Douglas & London, Carla Burke Pickrel of Baron & Budd, Kevin Madonna of Kennedy Madonna, and Frederick Longer of Levin Sedran & Berman, routinely drafted internal memoranda at the request of Co-Lead Counsel regarding various legal research issues, letters to the Court, CMOs, motions, responses to motions and pleadings, appellate motions and briefs, and were regularly consulted on other strategic plans or documents.

From the outset of this litigation, Defendants touted their government contractor defense as the "kill shot" to Plaintiffs' claims. To meet this existential threat, as early as the Spring of 2019, the Law and Briefing Committee carefully analyzed the case law and creatively identified distinguishing features from the facts in the AFFF MDL record.[158] These insights were spread amongst the PEC and in particular, the attorneys reviewing documents, to enable them to recognize the potential for any particular document to help Plaintiffs overcome the defense. The Law and Briefing Committee's efforts, in parallel with the Discovery Committee and Strike Force, assisted document reviewers with an understanding of the government contractor defense constituted a

---

[158] Newman Decl., at ¶ 15.

significant part of the Law and Briefing Committee's early efforts, including through in-person training sessions in the Fall of 2019.[159]

The MDL docket reveals the Law and Briefing Committee's public filings, but the committee's work extended far beyond the Court docket.[160] The committee's work was far-reaching into strategies, correspondence between counsel, pleadings and other papers. The charts identified in the attached Newman Dec.[161] outline each briefing effort for which a Court ruling was sought.[162] The first chart identifies the totality of the affirmative motions made both by members of the Law and Briefing Committee and the *City of Stuart* Trial Team ("Trial Team"), while the second chart identifies Defendants' motions for which members of the Law and Briefing Committee and/or the Trial Team were tasked with responding to or opposing.[163]

While the annexed charts simply catalogue the many papers prepared by the committee, each document required significant effort on the part of the Law and Briefing Committee, and other common benefit attorneys, and routinely also included administrative support with respect to exhibit annexation, redactions and/or filings under seal. Moreover, given the highly complex nature of the subject matter involved in the AFFF MDL, in order to be effective brief writers, the Law and Briefing Committee had to understand all aspects of the overall litigation, including the complicated scientific, regulatory, and discovery matters.

In this MDL, the Law and Briefing Committee never conducted its work in its own silo, but rather successfully intermingled with each of the other working committee groups in order to be effective written advocates for every committee. Perhaps the best example of this, was the

---

[159] *Id.*
[160] *Id.* at ¶ 7.
[161] Ex. J.
[162] Newman Decl., at ¶ 10.
[163] *Id.*

interplay between the Law and Briefing Committee, the Strike Force and the Government Contractor Committees who cohesively teamed-up to successfully overcome the novel and complex questions posed by the government contractor defense. Without the skill and ability of the lawyers on these Committees, Plaintiffs may not have overcome the government contractor defense, which was a landmark result for all Plaintiffs in this MDL.

### *Exemplar Government Contractor Committee-Related Efforts that Dealt with Unique Legal Issues and Greatly Impacted the Results Obtained.*

From the outset of this MDL, Defendants repeatedly underscored that government contractor immunity was the linchpin of their defense. This defense required that Defendants prove three elements: (1) the United States approved reasonably precise specifications; (2) the equipment conformed to those specifications; and (3) the supplier warned the United States about the dangers in the use of the equipment that were known to the supplier but not to the United States. *Boyle v. United Techs. Corp.*, 487 U.S. 500, 512 (1988).

Given the centrality of the defense and pervasiveness for virtually all the Defendants, discovery efforts to overcome it began as early as December 2019, during which time the Discovery and Government Contractor Committees undertook two projects specifically designed to help Plaintiffs fully appreciate the United States' knowledge over time concerning the harms posed by PFAS. These early efforts resulted in the creation of both a timeline regarding government knowledge and a full government dossier, which were modified and updated as discovery proceeded against the United States.[164]

By January 2021, the Government Contractor Committee along with the Strike Force turned its attention to identifying specific United States witnesses to be deposed and reviewing the

---

[164] Napoli Decl., at ¶ 33.

documents produced related to the identified witnesses.[165] In this regard, the first United States

witness deposition was Robert Darwin, the former Director of the Fire Protections Division of the

Naval Seas Systems Command ("NAVSEA"), who was also considered the original custodian of

the AFFF military specification ("MIL-F-24385" or "MIL-Spec"). Mr. Darwin's deposition was

conducted over the course of three (3) days, April 28-30, 2021. His testimony was critical evidence

needed to disprove the defense.[166]

Whether the AFFF MIL-Spec was "reasonably precise" or whether AFFF manufacturers

had discretion in manufacturing their own unique AFFF formulations had to be addressed

factually. Mr. Darwin's testimony was unequivocal in responding to this inquiry. He testified: "I

think the way we've always looked at it is it was up to each manufacturer to come up with his own

*magic witch's brew* to meet the performance requirements."[167] With this testimony, it became clear

that, at a minimum, it would be an uphill battle for Defendants to prove that the United States'

AFFF MIL-Spec dictated specific AFFF formulations.

During the Spring-Fall 2021, an additional six (6) United States witnesses were deposed,[168]

including, the deposition of United States' witness, John Farley, Director of Test Operations and

lead qualifier for AFFF at the Naval Research Lab ("NRL"). Mr. Farley testified that *prior* to the

year 2000, he had *never even heard of PFOS*.[169] Given that Mr. Farley was personally responsible

for determining which AFFF agents the United States could purchase during his tenure, his

complete ignorance of the compound prior to 2000 lent significant credence to Plaintiffs' position

that the government could not possibly have historically known of the dangers of PFOA and PFOS.

---

[165] Douglas Decl., at ¶¶ 22-24.
[166] Douglas Decl., at ¶ 24.
[167] Darwin Dep. Tr. Vol I., Ex. 2, at 46:17-47:2 [ECF No. 2063-3] (emphasis added).
[168] Douglas Decl., at ¶¶ 16, 18.
[169] Farley Dep. Tr. Vol. I, at 89:15-24 [ECF No. 2597-8](confirming he learned that PFOS was in 3M's MIL-Spec AFFF in approx. May 2000)(emphasis added).

Similarly, Mr. Darwin testified that even as of 2004, he was unaware that C8-based telomer AFFFs degrade to PFOA.[170] Of course, National Foam, Inc.'s witness, Anne Regina, also made unequivocally clear in her deposition testimony, by 2001, it was well understood by industry that AFFF could create PFOA in the environment.[171] The carefully elicited testimony from both Mr. Farley and Ms. Regina were crucial to controvert the third element of *Boyle* as it proved that industry had superior knowledge of the dangers posed by PFOA and PFOS, which was not shared with the United States government.

Once discovery related to the government contractor defense was sufficiently complete, after input from the parties, the Court set a briefing schedule. CMO 16 issued on April 15, 2021.[172] It and CMO16A governed the initial briefing deadlines, while CMOs 16B and 16C modified the government contractor briefing protocols whereby the Court ordered that the Parties' initial briefing be limited to the first element of *Boyle*.[173]  At the time, the Defendants insisted that the question of whether MIL-F-24385 was "reasonably precise" would be a cross-cutting issue for the MDL.

The first element of *Boyle* was briefed by the Government Contractor and Law and Briefing Committees between Defendants' omnibus opening brief filed on November 5, 2021,[174] and their Reply briefs which were filed on January 28, 2022. The Plaintiffs' responsive brief was 50 -pages long and annexed 127 exhibits, including three (3) Declarations from Plaintiff's experts, specifically, Dr. Birnbaum, Dr. Lowder and Mr. Walton.[175]

---

[170] Darwin Dep. Tr. Vol. I, at 190:6-22 and 199:1-15 [ECF No. 2063-3](Objs. omitted) (emphasis added).
[171] Regina Dep. at 232:15-21 [ECF No. 2597-17].
[172] London Decl., at ¶ 70.
[173] London Decl., at ¶ 70-71.
[174] Douglas Decl., at ¶ 25.
[175] Newman Decl., at ¶ 16.

Oral argument on the first element of *Boyle* was scheduled for March 2022. The Government Contractor Committee and the Strike Force intensely prepared for this hearing by reviewing case law, preparing visual aids, and prepping argument outlines.[176] Unfortunately, oral argument was canceled after a member of the defense team was diagnosed with COVID-19.[177] Even at that time, the Court recognized that the government contractor briefs were "excellent," and that "[b]oth sides have just done first-rate briefs."[178]

While unfortunate, the cancelation had its benefits. The Court recognized an interconnection between the first and third elements of *Boyle*, and that it would be difficult to rule on the defense with briefing limited to only the first element. The Court therefore issued CMO 16D, which expanded the briefing to include the second and third elements of *Boyle*.[179] Once again, the Law and Briefing Committee, Strike Force and Government Contractor Committees returned to work to prepare oppositions with respect to the second and third elements of *Boyle*. Briefing occurred between May 13, 2022 and July 1, 2022.

In this second round of briefing the Plaintiffs submitted a 92-page brief annexed with 128 exhibits.[180] As before, the Law and Briefing,  Government Contractor Committees and the Strike Force intensely prepared for the August 19, 2022 oral argument.[181] The Court opened the August 19, 2022 hearing by again noting that "…the briefing on all of these issues is the best briefing that I've seen in my dozen years on the bench. All of y'all have just done an outstanding job of marshalling what is incredible complicated information in a way that is digestible and

---

[176] Douglas Decl., at ¶ 26.
[177] London Decl., at ¶ 73.
[178] March 25, 2022, H'ring Tr., at 2:22
[179] London Decl., at ¶ 73.
[180] Newman Decl., at ¶ 17.
[181] Douglas Decl., at ¶ 28.

understandable."[182]  In fact, after the argument, the Court requested that Plaintiffs submit a number of their visual aids.[183]

On September 16, 2022, the Court issued an Order denying Defendants' motion for summary judgment on the government immunity defense in every major respect.[184] Plaintiffs defeated the Defendants' Goliath after well over two years of steadfast effort. Without the successful result of these efforts, today, the AFFF MDL would likely be in a very different place. There can be no doubt that these committees' work conferred an unparalleled common benefit for all Plaintiffs in this litigation.

***Exemplar Bellwether Discovery Efforts That Added Enormously to the Time and Labor Expended in this MDL on Complex and Novel Issues and to the Results Obtained.***

In mid-2020, the PEC initiated efforts to identify potential public water provider Plaintiffs to serve as bellwether cases.[185] These efforts included a thorough investigation of all eligible pending cases in order to find those water provider cases the PEC was satisfied were sufficiently representative of the overall docket to be appropriate bellwether selections.[186] This process of identifying initial bellwethers concluded in February 2021, when the PEC, through Co-Lead Counsel, submitted to the Court the Joint Submission Regarding Water Provider Bellwether Discovery Pool Cases.[187]

This submission identified the following ten (10) initial Tier One Water Provider bellwether cases:

    (1)    *Bakman Water Company v. 3M Company, et al.*, 2:19-cv-02784-RMG;
    (2)    *City of Dayton v. 3M Company, et al.*, 2:18-cv-03496-RMG;
    (3)    *City of Sioux Falls v. 3M Company, et al.*, 2:19-cv-1806-RMG;

---

[182] August 19, 2022, CMC, at 57:2-14.
[183] Order [ECF Nos. 2560-10-13].
[184] Order and Opinion [ECF No. 2601].
[185] London Decl., at ¶¶ 54-63.
[186] Douglas Decl., at ¶ 31.
[187] Joint Submission Regarding Water Provider Bellwether Discovery Pool Cases [ECF No. 1222].

(4)    *City of Stuart, Florida v. 3M Company, et al.*, 2:18-cv-03487-RMG;

(5)    *Emerald Coast Utilities Authority v. 3M Company, et al.*, 2:18-cv-03488-RMG;

(6)    *Hampton Bays Water District v. 3M Company et al.*, 2:18-cv-03339-RMG;

(7)    *Town of Ayer v. 3M Company, et al.*, 2:19-cv-03120-RMG;

(8)    *Town of Maysville v. 3M Company, et al.*, 2:19-cv-03434-RMG;

(9)    *Warminster Township Municipal Authority v. 3M Company et al.*, 2:19-cv-02472; and

(10)   *Warrington Township v. 3M Company et al.*, 2:19-cv-02473.

Once these Tier One bellwethers were selected, the Tier One Water Provider Bellwether Team began weekly calls to manage the work-up and prosecution of these bellwether cases. Initially, during the Spring of 2021, the team addressed written discovery propounded by Defendants, as well as collaborating on noticing and taking FED. R. CIV. 30(b)(6) depositions[188] related to product identification and sales. Bellwether counsel also drafted and served their own written discovery, *i.e.*, interrogatories and requests for production. Then, in the Fall 2021, case-specific depositions began in the Tier One Water Provider bellwether cases. In September 2021 alone, sixteen 30(b)(6) depositions were defended by Plaintiffs' counsel in the Tier One Water Provider bellwether cases.[189]

Once Tier One bellwether discovery largely concluded, the Water Provider Bellwether Selection Committee, with input from the Strike Force, began its work of reviewing and assessing the status and discovery of the Tier One Water Provider Bellwether Cases to ascertain the most appropriate bellwether trial selections for the three Tier Two Water Provider bellwether cases.[190] On October 13, 2021, following a joint submission by the Parties, the Court entered an Order Selecting Tier Two Water Provider Bellwether Trial Pool Cases.[191]

The following three (3) cases thereafter became the Tier Two Water Providers cases from

---

[188] London Decl., at ¶¶ 66-67, 76.

[189] London Decl., at ¶ 76.

[190] Douglas Decl., at ¶ 33.

[191] Order Selecting Tier Two Water Provider Bellwether Trial Pool Cases [ECF No. 1931].

which the first trial case would be selected:

- *City of Sioux Falls v. 3M Company, et al.*, 2:19-cv-1806-RMG;
- *City of Stuart Florida v. 3M Company, et al.*, 2:18-cv-03487-RMG; and
- *Town of Ayer v. 3M Company*, et al., 2:19-cv-0312-RMG.[192]

Once the Tier Two Water Provider bellwether cases were selected, the Tier Two Bellwether Committee self-organized to engage in weekly calls to coordinate their continued work-up and prosecution. For example, each of the three (3) bellwether cases had site visits that included Plaintiffs' counsel in addition to multiple Plaintiffs' experts.[193] Subsequently, each Tier Two Water Provider bellwether had a second site visit wherein Plaintiffs' counsel along with defense counsel and their experts again visited each bellwether site. Also, between November 2021-April 2022, forty (40) case-specific Tier Two depositions were defended by Plaintiffs' counsel and four (4) FED. CIV. R. P. 30(b)(6) case-specific depositions were conducted.[194, 195]

Once fact discovery closed in the Tier Two Water Provider bellwether cases, the Court set a deadline for expert discovery and disclosures for all three (3) cases with Plaintiffs' disclosures being due on March 18, 2022, Defendants disclosures on April 29, 2022, and rebuttal reports, if any, on May 13, 2022, with expert discovery requiring completion by August 16, 2022.[196] Given this schedule, bellwether efforts pivoted towards working in connection with the Science Committee and the Strike Force to develop case-specific expert reports relating to each of three (3) bellwether cases. These case-specific expert reports initially included three (3) expert reports from Dr. Higgins (hydrology), three (3) expert reports for Dr. Martin (isomer profiling), three (3)

---

[192] London Decl., at ¶ 82.
[193] Douglas Decl., at ¶ 36.
[194] All these activities were occurring during the same time frame that counsel was briefing the first round of opposition to the government contractor defense and preparing for the initial oral argument in March 2022.
[195] Douglas Decl., at ¶ 34.
[196] Douglas Decl., at ¶ 35.

expert reports for Mr. Berryhill (fate and transport), one (1) three-part case-specific expert report from Mr. Johnson and three (3) expert reports for Mr. Brown on the case-specific topics of damages.[197] The Tier Two Bellwether Committee was likewise heavily involved in preparing each of these expert witnesses for their respective depositions.

When the Court directed the Parties to identify their preferred trial sequencing as between the three (3) Tier Two Water Provider bellwether cases,[198] the Water Provider Bellwether Committee was prepared with all the datapoints available from the discovery of our experts. Pursuant to letter-briefing undertaken by the Water Provider Bellwether Committee, through Co-Lead and Liaison Counsel, Plaintiffs recommended that the *City of Stuart* be set as the initial trial case, followed by *City of Sioux Falls* and, lastly, the *Town of Ayer*.[199] Defendants agreed that the *City of Stuart* case should be the initial trial selection, but requested it be followed by *Town of Ayer* and, lastly, *City of Sioux Falls*. Given the Parties' agreement that the *City of Stuart* case be the first trial case, it was so selected.

***Exemplar Stuart Trial Team-Related Efforts That Involved Significant Litigation Risk, Attorney Skill, Required Resolution of a Multitude of Complex Issues and Greatly Impacted the Results Obtained:***

On September 23, 2022, the *City of Stuart* case was selected as the first bellwether trial case with an anticipated June 5, 2023, trial date.[200] Immediately after its selection, a Trial Team was assembled comprised of many Strike Force members, other committee members, and counsel for *Stuart*, all of whom began to prepare the *Stuart* case for trial.[201] Early efforts in this regard

---

[197] *Id.*

[198] Fifth Amended Scheduling Order Governing First Water Provider Bellwether Trial [ECF No. 2548].

[199] Letter from Plaintiffs' Liaison Counsel to the Court, dated September 9, 2022 [ECF No. 2592].

[200] Order Designating the First Bellwether Water Provider Trial and Regarding Submissions to the Court [ECF No. 2613].

[201] Douglas Decl., at ¶ 37.

included identifying both potential expert and fact witnesses, meeting with these potential witnesses and beginning to prepare them for their anticipated trial testimony.

On December 2, 2022, Defendants filed their dispositive motion briefing, including both summary judgment and *Daubert* motions. As such, during the month of December 2022 and into early January 2023, the Trial Team's efforts turned towards briefing oppositions to Defendants' dispositive motions. As part of these efforts, the Trial Team opposed an omnibus *Daubert* motion attacking eleven (11) of Plaintiff's fourteen (14) experts.[202] With respect to *Daubert*, all but one of Plaintiff's experts were permitted to proffer opinions at the *Stuart* trial.[203]

The Trial Team likewise opposed an omnibus summary judgment motion seeking to dismiss Plaintiff's damages theories, its nuisance cause of action and arguing failure to prove specific causation.[204] Except for Plaintiff's nuisance claim, Defendants' omnibus motion for summary judgment was denied in its entirety.[205] In addition to the omnibus summary judgment motions, the Trial Team opposed six (6) Defendant-specific summary judgment motions that raised various arguments, *inter alia*, a lack of product identification and failure to prove specific causation.[206]

After dispositive motions were addressed, the team had to confront trial motions. The Trial Team prepared seven (7) motions in *limine* and opposed a nine-part omnibus motion *in limine*, a five-part 3M-specific motion *in limine*, a four-part DuPont-specific motion *in limin*e and an

---

[202] Newman Decl., at ¶ 19.

[203] Order regarding Defendants' Co-Lead Counsel's omnibus motion to exclude [ECF No. 3059].

[204] Newman Decl. at ¶ 18.

[205] Order and Opinion regarding Defendants' Co-Lead Counsel's omnibus motion for summary judgment [*Stuart* ECF No. 291].

[206] Eight (8) Defendants made Defendant-specific summary judgment motions but two, namely, Defendants Buckeye Fire Equipment Company ("Buckeye") and BASF as a successor in interest to Ciba, Inc., were dismissed prior to the filing of Plaintiff's oppositions. [ECF No. 2885].

omnibus Telomer-Defendant motion *in limine*.[207]

In the legal profession, preparing for trial is akin to preparing for war. Much treasure is expended. Logistics, strategy, equipment acquisitions, personnel, witnesses' schedules, and more, are all in play. As the June 5 trial date approached, to comply with the Court's pretrial procedures, the Trial Team compiled a trial exhibit list, which included approximately 7,000 Plaintiff trial exhibits, which was later winnowed down to approximately 500 likely to be used trial exhibits.[208] The Trial Team was forced to lodge objections to hundreds of trial exhibits listed on Defendants' exhibit list without justification.[209] The exhibit objection process resulted in a game-changing evidentiary order whereby nearly all of Defendants' authenticity objections were dropped as were their improper FED. R. EVID. 602 objections.[210] The Court's ruling cleared a path for *Stuart* to proffer its evidence without needless delay from improper objections. Any remaining objections were argued by trial counsel during both the May 12th and June 2nd evidentiary hearings.[211]

Simultaneously, the Trial Team prepared deposition designations serving affirmative deposition designations with respect to thirty-five (35) days of deposition testimony.[212] The Trial Team likewise lodged objections to Defendants' affirmative deposition designations and prepared counter designations to Defendants' affirmative deposition designations. Finally, among other efforts, the Trial Team met and conferred with defense counsel in order to ready proposed jury instructions, jury questionnaires and a *voir dire*.[213] It also prepared opening statements, a pretrial brief, trial demonstratives, witness lists, and ultimately reviewed over 200 prospective juror

---

[207] Newman Decl., at ¶ 20.
[208] Douglas Decl., at ¶ 40.
[209] Douglas Decl., at ¶¶ 42-43.
[210] Order regarding exhibit objections [*Stuart* ECF No. 285](holding that FED. R. EVID. 602 does not address the admissibility of documentary evidence).
[211] Douglas Decl., at ¶ 43.
[212] Douglas Decl., at ¶ 41.
[213] Douglas Decl., at ¶ 46.

questionnaires.[214]

In mid-May 2023, Kidde filed for Chapter 11 bankruptcy, which caused a colossal shift in the Trial Team's preparation given that the trial was being prepared as against both Defendants Kidde and National Foam in addition to Defendants 3M and DuPont.[215] Additionally, these bankruptcy proceedings required significant PEC efforts, including to retain bankruptcy counsel and create a PEC committee tasked with keeping the MDL apprised of the bankruptcy proceedings to ensure Plaintiffs' interests are protected there.[216]

In late May 2023, in anticipation of selecting a jury on June 5, 2023, the entire Trial Team moved to Charleston, South Carolina.[217] The Trial Team on the ground in Charleston, South Carolina, included seventeen (17) lawyers, four (4) support staff and a trial technician.[218]

On June 5, 2023, the *Stuart* trial was continued upon joint motion by the Parties given the Parties' intent, with the Court-appointed mediator Judge Layn Phillips (ret), to devote all efforts to try to achieve a settlement with 3M in the three weeks the Court afforded in its Order.[219]

***DuPont Specific Settlement Negotiation Details that Required Implementation of Novel Settlement Concepts and Greatly Impacted the Results Obtained.***

In the Spring of 2020, when leadership was first hopeful that settlement discussions would eventually ensue, Scott Summy enlisted the assistance of PEC member Christina Cossich and her partner Phil Cossich to create the Resolution Team.[220] Over the ensuing years the Resolution Team, utilizing its vast experience in complex environmental negotiations, and working on

---

[214] Douglas Decl., at ¶¶ 46-48.
[215] Douglas Decl., ¶ 21, n.8; *see also*, London Decl., at ¶¶ 114-116.
[216] London Decl., at ¶¶ 115.
[217] Douglas Decl., at ¶ 49.
[218] Douglas Decl., at ¶¶ 37, 49.
[219] ECF No. 3256.
[220] Summy Decl., at ¶ 9.

separate but inexorably related tracks with the Strike Force, developed the foundation for the settlement that is now before the Court.

While the Strike Force forged ahead developing the liability case against each of the Defendants, the Resolution Team started the arduous legwork of data gathering and scientific analysis required in preparation for anticipated settlement negotiations.[221] Plaintiffs agreed that the actual negotiations would be conducted by Scott Summy along with Co-Lead Counsel, Michael London and Paul Napoli (the "Negotiation Team"),[222] which began preliminary settlement discussions with DuPont representatives in the Spring of 2020.[223] Later in 2020 and at the beginning of 2021, the Negotiating Team began meeting with DuPont's national settlement counsel, who made clear that the DuPont wanted to focus settlement discussions on resolving only the PWS, and that a class resolution would be needed to provide as much finality as possible. [224]

To that end, the Resolution Team set about gathering all obtainable information about public water systems that would help inform settlement efforts, establish a Damages Model to be used in negotiations, define the Class that would likely be required by a settling Defendant(s), identify Class Members, and assist with an eventual allocation of settlement funds.[225] This work eventually culminated in a Master PFAS Detection Dataset (the "Master Dataset") – the most robust collection of PFAS detections in PWS in existence, and a tool that would prove critical to the negotiations that resulted in these resolutions.[226]

---

[221] *Id.* at ¶¶ 9-10.
[222] *Id.* at ¶ 9.
[223] *Id.* at ¶¶ 21.
[224] *Id.* at ¶¶ 21-22
[225] *Id.* at ¶ 11.
[226] *Id.* at ¶ 12.

The Resolution Team held numerous in-person and remote meetings.[227] Through these sessions and using the Master Dataset, the Resolution Team determined the likely extent of PFAS in PWS across the country, estimated the likely rate of PFAS detections in states that did not yet require testing, and estimated the total costs to treat these identified and estimated Impacted Water Sources.[228] These calculations were crucial in creating an extensive, credible, and objective damage model for use in the initial settlement discussions with DuPont ; moreover, they helped the Resolution team craft the elegant concept of Baseline Testing – particularly significant as it allows Class Members to maintain their future claims for water sources that currently do not currently have a PFAS detection.[229] The Master Dataset was also used to create presentations for the Negotiation Team.[230] These presentations were particularly effective because they contained real statistics of likely numbers of PFAS-impacted PWS and the populations and classifications of each PFAS Impacted PWS.[231]

As the Master Dataset was being developed, the Resolution Team also took on the task of developing the Allocation Procedures as a means, if a settlement could be achieved, to equitably divide potential settlement funds among claimants.[232] The Resolution Team began drafting Allocation Procedures in 2021, which were final in July 2023.[233]

In the Spring of 2022, DuPont expanded their negotiation team to officially include national settlement counsel for both Chemours and Corteva.[234] Over the next year, the Negotiating Team had continuous calls and a number of in-person meetings in New York with the DuPont's

---

[227] *Id.* at ¶¶ 12-14
[228] *Id.* at ¶ 13.
[229] *Id.* at ¶ 14, 18-19.
[230] *Id.* at ¶ 14, 20-22.
[231] *Id.* at ¶ 14.
[232] *Id.* at ¶ 16.
[233] *Id.* at ¶ 17.
[234] *Id.* at ¶ 22.

counsel,[235] although the negotiations were contentious, and at times, broke down for several months.[236] Despite these intense negotiations spanning over two years, the Negotiation Team was unable to reach a comprehensive settlement with DuPont.[237]

Two events increased the pressure on the negotiations with DuPont. The first was strategically initiated by this Court, when, on October 26, 2022, it appointed Judge Layn Phillips (ret) as Mediator to oversee the settlement discussions.[238] Second, preparations began in earnest for the start of the first PWS bellwether trial involving the *City of Stuart*, scheduled to start on June 5, 2023.[239] Under the oversight of Judge Phillips and his staff, the parties met extensively from March through May of 2023, with numerous and ongoing sessions occupying substantial time.[240]

The parties worked incredibly hard to agree on a structure that would compensate not only those PWS that had already detected PFAS but also those that had not detected it yet but were required to test under either federal or state law.[241] The Negotiating Team also spent significant time protecting claims that would be carved out of the Release.[242] Many PWS are facing or will face damages associated with airports, wastewater, and stormwater.[243] These claims that are unrelated to drinking water are preserved.[244]

On June 1, 2023, the parties signed a Memorandum of Understanding that included certain material terms of the proposed Settlement, though other issues remained unresolved.[245] Thereafter,

---

[235] *Id.*
[236] *Id.*
[237] *Id.*
[238] *Id.* at ¶ 27.
[239] *Id.*
[240] *Id.*
[241] *Id.* at ¶ 28.
[242] *Id.*
[243] *Id.*
[244] *Id.*
[245] *Id.* at ¶ 30.

Judge Phillips and his team continued to moderate multiple discussions with Counsel for the Parties to resolve the outstanding issues.[246] With the help of Judge Phillips, the Parties reached agreement on the remaining issues and executed the Settlement Agreement on June 30, 2023.[247]

Shortly after the Motion for Preliminary Approval was filed, a group of more than 20 States filed formal objections to various provisions of the settlement.[248] In July and August, 2023, the Negotiating Team spent hours nearly every day negotiating with the States and DuPont to reconcile the States' objections.[249] After intense negotiations, the parties agreed to make several changes to the Master Settlement Agreement to satisfy the States' collective concerns.[250] Shortly after filing a Joint Consent Motion outlining the changes and signifying the States withdrawal of their objections, the MDL Court granted Preliminary Approval.[251]

Over the last six to nine months, the Negotiating Team/Co-Leads have worked arduously to prepare for filing the instant motion. The current fee proposal was developed only after many hours of consultation with the experts,[252] and other counsel. In particular, on September 21, 2023, the PEC convened in-person in Miami to consider the matters *sub judice*.[253] After a comprehensive discussion, the PEC members unanimously supported the fee structure being proposed to the Court,[254] which enabled Class Counsel to present this motion.

---

[246] *Id.*

[247] *Id.*

[248] *Id.* at ¶ 33.

[249] *Id.*

[250] *Id.*

[251] *Id.*

[252] *Id.* at ¶ 35

[253] *Id.* at ¶ 36.

[254] *Id.*

## IV.     LEGAL STANDARD AND ARGUMENT

### A.     CLASS COUNSEL HAVE EARNED A PERCENTAGE FEE AWARD OF 8% OF THE COMMON FUND.

Class Counsel who create a common fund are entitled to receive from it a reasonable fee. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, No. 18-2873, 2021 WL 5822993, at *2 (D.S.C. Aug. 4, 2021) ["Campbell"]; *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); FED. R. CIV. 23(h). The Fourth Circuit authorizes "two main methods for calculating the reasonableness of attorneys' fees—the lodestar method and the percentage-of-recovery method." *McAdams v. Robinson*, 26 F.4th 149, 162 (4th Cir. 2022). District courts have discretion to choose between the two methods based on their "judgment and the facts of the case." *Id.* "The vast majority of courts use the percentage of recovery method, which is advantageous because it ties the attorneys' award to the overall result achieved rather than the number of hours worked.*" In re Allura Fiber Cement Siding Litig.*, No. 19-2886, 2021 WL 2043531, at *4 (D.S.C. May 21, 2021).[255] This is especially true where, as here, Plaintiffs' counsel prosecuted the case on a contingency fee basis with the risk of non-payment. *See e.g., Brundle ex rel. Conestellis Employee Stock Ownership Plan v. Wilmington Tr., N.*A., 919 F.3d 763, 785-86 (4th Cir. 2019)(noting that fees based on a percentage of the common fund "hold[s] beneficiaries of judgment responsible for compensating the counsel who obtained the judgment or settlement for them").

---

[255] *See also Berry v. Wells Fargo & Co.*, No. 17-304, 2020 WL 9311859, at *12 (D.S.C. July 29, 2020) ("Within the Fourth Circuit, district courts prefer the percentage method in common fund cases."); *Blum v. Stenson*, 465 U.S. 886, 900 n.16 (1984) ("a reasonable fee is based on a percentage of the fund bestowed on the class."). *See generally In re Lumbar Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 952 F.3d 471, 491 (4th Cir. 2020) (vacating fee award because it failed to apply CAFA's coupon settlement provisions, 28 U.S.C. §1712).

To assess the reasonableness of a class fee, this Court employs the guiding principles announced in *Barber v. Kimbrell's Inc.*, 577 F.2d 216, 226 n.28 (4th Cir. 1978), which reprise the factors announced by the Fifth Circuit in *Johnson v. Georgia Highway Express, Inc.*, 488 F. 2d 714 (5th Cir. 1974). *See Campbell*, 2021 WL 5822993, at *2. The District of South Carolina Local Rule 54.02(A) mandates the application of *Barber*'s principles to the percentage-fee method. These twelve guiding principles include: "(1) the time and labor expended; (2) the novelty and difficulty of the questions raised; (3) the skill required to properly perform the legal services rendered; (4) the attorney's opportunity costs in pressing the instant litigation; (5) the customary fee for like work; (6) the attorney's expectations at the outset of the litigation; (7) the time limitations imposed by the client or circumstances; (8) the amount in controversy and the results obtained; (9) the experience, reputation and ability of the attorney; (10) the undesirability of the case within the legal community in which the suit arose; (11) the nature and length of the professional relationship between attorney and client; and (12) attorneys' fees awards in similar cases." *Campbell*, 2021 WL 5822993, at *2, citing *Barber, supra*.

Even in megafund level (> $100 million) and super-megafund level (> $1 billion)[256] cases, basic fee award principles still apply. *See, e.g., In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 586 F. Supp. 2d 732, 754 (S.D. Tex. 2008) ("the megafund rule is contrary to the Fifth Circuit's approach that the district court scrutinize each case for the particular facts that will determine what constitutes a reasonable fee award."). Each case must be evaluated pursuant to uniform standards to determine what constitutes a reasonable fee award.

---

[256] *See In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 737 (3d Cir. 2001) (referring to "large settlement cases" as "cases in which the common fund exceeded $100 million."); *In re Diet Drugs (Phentermine, Fenfluramine, Dexfenfluramine) Prods. Liab. Litig.*, 553 F. Supp. 2d 442, 480 (E.D. Pa. 2008), as corrected (Apr. 9, 2008), judgment entered, No. 99-20593, 2008 WL 2890878 (E.D. Pa. July 21, 2008), and aff'd sub nom. *In re Diet Drugs*, 582 F.3d 524 (3d Cir. 2009) (defining "super-mega-fund settlements," as "settlements of one billion dollars or more.").

As demonstrated both above and below, and through the various declarations being filed concurrently herewith, the work performed by counsel to obtain this landmark settlement is, by definition, exceptional. The Supreme Court has defined "exceptional" in the patent realm as "simply one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case)." *Octane Fitness, LLC v. ICON Health & Fitness, Inc*., 572 U.S. 545, 554 (2014). Class Counsel's work truly "stands out" under the *Barber* standards, which fully justify the requested 8% award.

**B.    THE PRINCIPLES GOVERNING THE DETERMINATION OF AN APPROPRIATE FEE AWARD UNDER *BARBER* SUPPORT THE PROPOSED 8% AWARD PLUS OUT OF POCKET COSTS.**

**1.    The Time and Labor Required**

All told, so far, the PEC expended a collective 414,900.9 hours by approximately 40 law firms and 650 timekeepers (including partners/members, senior associates, associates, paralegals, and law clerks) from the beginning of this MDL.[257] This is an impressive number of hours, which would have been even larger, but much time was saved as the efficiencies of telephonic conferences and Zoom depositions, mediations and meetings proved to be effective virtual substitutes for actual in-person events.[258] Both the hours spent and the work performed over the course of those many hundreds of thousands of hours ensured an excellent result for the Settlement Class. This enormous collective effort of time and labor, as outlined above and detailed in the Declarations of Perry, Douglas, Summy, London, Napoli, Newman, Bowden and Olsen, supports the requested 8% fee award.

---

[257] Perry Decl., at ¶¶ 10, 20.
[258] London Decl., at ¶ 47.

These PEC efforts culminated in the announcement of the landmark settlements on the eve of the bellwether trial.

### 2.    The Novelty and Difficulty of the Questions Involved

Throughout this litigation, the Court has repeatedly been reminded of the complex nature and uniqueness of this multidistrict, multi-party litigation.[259] This MDL was particularly difficult given the number of Defendants which the PEC was required to litigate against.[260] As part of its efforts, from the outset, the PEC sought to establish liability stories with respect to each Defendant. This approach was critical because the liability with respect to each Defendant in this case is inextricably intertwined with each of the other Defendants.[261] Moreover, many of the Defendants have unique positions in the AFFF market, which required the PEC to understand the varying AFFF market channels, including the relationships between the Defendants. This litigation has also been difficult given the complex science involved. Given the complexity, and as noted in the Douglas Decl., the Strike Force routinely engaged in hours long phone conferences with their experts to understand the totality of the implicated science.[262]

At the outset of the MDL, the Defendants insisted that the government contractor defense announced in *Boyle v. v. United Technologies Corp.*, 487 U.S. 500 (1988), would prove to be a cross-cutting issue that would preclusively limit the capacity of Plaintiffs to prosecute their claims.[263] Those predictions proved themselves fallible. The issue was originally scheduled to be resolved on just the first *Boyle* element -- whether the MIL-Spec was "reasonably precise" -- but after extensive briefing over the course of several months (November 2021 to January 2022), the

---

[259] London Decl., at ¶¶ 11-13, 25, 32, 52.
[260] *Id*. at ¶ 52.
[261] Douglas Decl., at ¶¶ 11-15, 18; *see also*, London Decl., at ¶¶ 90-93.
[262] *Id*. at ¶ 8.
[263] *Id*. at ¶ 22.

Court determined that supplemental briefing covering the entire controversy was necessary to resolve the matter.[264] Over the next four months (April to June 2022) Plaintiffs responded to all of Defendants' arguments with excellent briefing that established the fallacy of Defendants' defense.[265] Plaintiffs proved that the Defendants' novel application of the doctrine to this situation --where the government's continued use of the product occurred notwithstanding its fundamental ignorance of the environmental defect presented by AFFF – was flawed. And the Court routinely noted the excellence of the arguments presented by the Plaintiffs to counter Defendants' elaborate efforts.[266]

The challenges to Plaintiffs never ceased as Defendants continued to defend against the bellwether trial by asserting *Daubert* motion practice on Plaintiffs' experts and summary judgment motions.[267] These motions presented a variety of complex issues that again required assembling a top-notch briefing team, in conjunction with the Strike Force, capable of addressing the many detailed factual issues as well as the capacity to fend off the difficult legal questions presented.[268] These efforts successfully moved the case forward to trial and, ultimately, towards resolution.

At trial, significant litigation risks also likely would have presented themselves, which Plaintiff would have had to overcome. These include, *inter alia*, establishing that:

- The PFOA and/or PFOS in Plaintiff's drinking water wells emanated from Defendants' AFFF products, a process that requires the application of complex principles of environmental science, including a fate and transport analysis and chemical fingerprinting;

---

[264] London Decl., at ¶¶ 70-71; *see also*, Douglas Decl., at ¶¶ 25-26.
[265] London Decl., at ¶ 73; see also, Douglas Decl., at ¶¶ 27-30.
[266] *See e.g.*, March 25, 2022, H'ring Tr., at 2:22-24 (noting "first-rate briefs"); *see also*, July 8, 2022, H'ring Tr., at 11:8-10 (noting that briefing was "excellent.")
[267] Douglas Decl., at ¶ 38; *see also*, Newman Decl., at ¶¶ 18-19.
[268] Newman Decl., at ¶¶ 18-19.

- It was foreseeable to each of the Defendants that the chemicals in their products would contaminate drinking water generally and more specifically the Plaintiff's public drinking wells;

- PFOA and PFOS are toxic to humans and that same was either known and or foreseeable to the Defendants;

- That the levels of PFOA/PFOS in Plaintiff's drinking water and wells exceeded the EPA's Health Advisory Limit of 70 ppt and that, therefore, under Florida state law [*Stuart* bellwether case], and as a reasonably prudent water utility, Plaintiff was required to and did expend capital costs to construct treatment facilities to remove PFAS from its wells;

- That the warnings and/or instructions affixed to Defendants' AFFF concentrates and/or fluorosurfactants failed to adequately warn and/or instruct firefighters on how to properly use, train with and/or dispose of AFFF;

- That despite knowledge of health risks associated with use, disposal and bioaccumulation of AFFF concentrates and/or fluorosurfactants, Defendants did not warn Plaintiff of same;

- That Defendants' AFFF concentrates and/or fluorosurfactants were defectively designed, and more specifically, that a safer alternative design existed that could have been utilized to make AFFF, which included the use of shorter chain fluorocarbons that do not contain nor degrade to PFOA or PFOS;

- That Plaintiff, as a user of AFFF, was not contributorily negligent with respect to the contamination of Plaintiff's drinking water wells with PFOA and/or PFOS;

- That the preponderance of the evidence established that Defendants conduct was unreasonable given their knowledge over time of the harms posed by PFOS and PFOA; and

- That Plaintiff established by clear and convincing evidence that Defendants acted with *intentional misconduct* and had actual knowledge of the wrongfulness of their conduct, or that there was a high probability of injury to the Plaintiff; and/or *gross negligence* in that Defendants acted with a conscious disregard and/or indifference to the life, safety, or rights of others entitling it to punitive damages.[269]

---

[269] Florida Standard Jury Instructions (Civil) 503.1 [*Stuart* case].

Even the settlement with DuPont and calculation of the company's share of liability was fraught with complex legal and factual questions.[270] Because DuPont made only a component part of AFFF, and its telomer-based PFOA could not easily be distinguished in the environment from that made by others, the company would argue its production and sales could be linked only to a small amount of PFAS contamination.[271] Finally, of course, there are general risks of jury trials, re-litigating of issues before the transferor court and various state law arguments and defenses such as statutes of limitations and the like.

As these complexities for Plaintiffs were ever present, this factor favors a substantial fee award in this case.

### 3.        The Skill Requisite to Perform the Legal Service Properly

The Court regularly witnessed the high quality of Plaintiffs' counsel's legal work, which conferred an exceptional benefit on the clients in the face of daunting litigation obstacles and highly sophisticated defense counsel. As the Court is aware, it is a formidable and complicated challenge to successfully prosecute a case like this. Moreover, the orderly and effective management of this massive MDL, with claims against numerous Defendants on behalf of thousands of claimants, presented challenges that many law firms and lawyers simply would not be able to meet. Indeed, litigation of a case like this requires counsel highly trained in class action law and procedure, as well as in the specialized subject matters these cases present. Those lawyers, whom the MDL Court appointed to represent Plaintiffs, possess these attributes, and their participation as Plaintiffs' counsel added significant value to the representation of the clients. The record before the Court establishes that the litigation involved a wide array of complex and novel challenges, which Plaintiffs' counsel met at every juncture based on their collective, extensive

---

[270] Summy Decl., at ¶¶ 10, 24-25.
[271] *Id.*

experience in complex litigation and class action litigation. Both trial preparation and settlement negotiations required a thorough understanding of the scientific, legal, and factual issues as well as a sophisticated familiarity with how PWS operate and how to compensate them for their PFAS contamination. As such, the skill and diligence demonstrated by Plaintiffs' Counsel in this litigation supports the requested fee.

### 4. The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case

Many members of the firms leading the common benefit effort on Plaintiffs' behalf, by necessity, had to forego other cases and potential fees. Many lawyers involved in the common benefit effort expended the vast majority, if not all, of their available time to the pursuit of this litigation for a period of more than four years. Almost all Plaintiffs prosecuted this litigation entirely on a contingent fee basis and self-funded the litigation through assessments on the PEC. Meeting the immense time and expense demands of the case limited the ability of Class Counsel to work on numerous other matters, all without any guarantee that such a substantial investment of the many years' worth of time and effort would ever be reimbursed. This significant risk of nonpayment or underpayment warrants the requested fee.

Numerous cases recognize that contingent-fee risk is an important factor in determining the fee award. "In complex, multi-year class actions, the risks inherent in the litigation are immense and the risk of receiving little or no recovery is a major factor in awarding attorney fees." *In re LandAmerica 1031 Exchange Svcs.*, No. 2054, 2012 WL 5430841, at *4 (D.S.C. Nov. 7, 2012); *see also In re Continental Ill. Sec. Litig.*, 962 F.2d 566 (7th Cir. 1992) (holding that when a common fund case has been prosecuted on a contingent basis, plaintiffs' counsel must be compensated adequately for the risk of non-payment). Therefore, this factor favors the fee award requested in this case.

### 5. The Customary Fee

Class action percentage fee recoveries in the amount of 30% are typical. *Campbell, supra.* In *LandAmerica*, Judge Anderson relied on a survey of common fund fees in the Fourth Circuit and elsewhere approving "percentage awards that ranged from 18% to 30%, inclusive of mega-fund recoveries that reached into the nine figure range." *LandAmerica 1031 Exchange Svcs.*, 2012 WL 5430841, at *4, citing *In re Mills Corp. Sec. Litig.*, 265 F.R.D. 246, 264 (E.D. Va. 2009). As Professor Fitzpatrick's Declaration makes clear, a review of every billion-dollar class action settlement demonstrates the average and median percentages for attorneys' fees awards were 12.1% and 9.52%, respectively.[272] Given these ranges in value, the amount requested in this water contamination case – 8% - is eminently reasonable and well-supported.[273] Arguably, an even greater percentage fee is warranted,[274] but Class Counsel recognize that their efforts to resolve these claims against DuPont parallel the claims being resolved against 3M. To request a different percentage of the fund simply because of the size of the fund was not deemed justified. This factor supports the percentage fee requested.

### 6. Whether the Fee Is Fixed or Contingent

Virtually all Plaintiffs' counsel undertook this litigation on a contingent fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See, e.g., LandAmerica, supra; Enron,* 586 F. Supp. 2d at 791. The time in which to evaluate the risk is *ex ante, i.e.*, as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991). Where

---

[272] Fitzpatrick Decl., at ¶ 17.
[273] *Id.* at ¶¶ 3, 8.
[274] *Id.* at ¶¶ 14-17 (opining that the instant fee request is below the norm).

counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See LandAmerica*, 2012 WL 5430841, at \*4; *Enron*, 586 F. Supp. 2d at 796. "Class Counsel has worked for years with no payment, undertaking the risk of walking away with no fee at all. Such 'burdens are relevant circumstances' that support the requested award." *Savani v. URS Pro. Sols. LLC*, No. 06-02805, 2014 WL 172503, at \*5 (D.S.C. Jan. 15, 2014), quoting *Torrisi v. Tucson Elec. Power Co.*, 83 F.3d 1370, 1377 (9th Cir.1993).

### 7.    Time Limitations Imposed by the Client or the Circumstances

This MDL was conducted during the height of the world-wide pandemic caused by COVID-19. In the face of logistical difficulties that COVID restrictions imposed on the parties, counsel and the Court, Class Counsel persevered and conducted enormous amounts of discovery, including document review and a multitude of significant depositions.[275] Under the aegis of this Court who regularly held monthly status conferences and employed "hands-on" management to see that discovery was being conducted promptly and that the litigation was progressing at an appropriate rate, time was efficiently used, not squandered. Notwithstanding the impediments presented by the pandemic, the first bellwether trial was ready to present to a jury on June 5, 2023, within 4 ½ years of the Transfer Order that initiated this MDL. *See In re Aqueous Film-Forming Foams Prods. Liab. Litig.*, 357 F. Supp. 3d 1391 (U.S. Jud. Pan. Mult. Lit. 2018). At the same time, settlement negotiations had taken place over the course of two years, and those efforts were proceeding efficiently using the totality of time before trial to explore resolution.

The fact that all these enormous efforts were performed during these challenging times speaks volumes of the pace of this litigation and dedication of counsel to fulfilling their obligations to their clients and to the Court. This "time" factor deserves weight in the Court's analysis.

---

[275] *See* § I.A.2, *supra.*

### 8.      The Amount Involved and the Results Obtained

The eighth *Barber* factor – the amount involved and the results achieved – is entitled to arguably the most significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the Plaintiffs. Indeed, the Supreme Court and the Fourth Circuit have observed that "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). *See also Brodziak v. Runyon*, 145 F.3d 194, 196 (4th Cir. 1998) (recognizing the degree of overall success must be considered for all claims raised by the plaintiff). An approximately $1.2 billion settlement against a manufacturer with a limited liability/market share is clearly an outstanding result obtained for Plaintiffs. If outcome weighs as "the most critical" consideration, then surely the requested fee award should be deemed fair and appropriate.

As described above, the DuPont settlement provides significant economic value to Public Water Systems that have been damaged by Defendants' products. This settlement not only benefits class members, but also the customers/ratepayers of these water authorities who need and depend upon clean water in their daily lives. In *Deepwater Horizon*, Judge Barbier noted that "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large." *In Re: Oil Spill by the Oil Rig "Deepwater Horizon" in the Gulf of Mexico, on Apr. 20, 2010*, No. 2179, 2016 WL 6215974, at *18 (E.D. La. Oct. 25, 2016). Here, thousands of public water systems benefit from this settlement. Moreover, their customers are derivatively benefitted because the settlement funding will be available to ensure that these customers are drinking PFAS-free drinking water. In fact, the settlement benefits over 100 million Americans by providing resources to the Public

Water Systems that supply them with drinking water so they can remediate PFAS contamination, currently found in 45% of America's drinking water.[276] As such, there can be no question that due to the common benefit work of Class Counsel over the course of this litigation, there was a tremendous result.

The complexity of the settlement, too, underscores the analysis and inquiry involved in resolution. The parties did not merely agree to a dollar figure to be doled out to each PWS with a PFAS detection. The parties structured a system that identifies each contaminated water source, applies engineering factors to that source, and calculates compensation. The system recognizes, too, that some PWS have not yet tested their sources and allows a testing period and claim period to compensate for those sources as well.  By any measure, the settlement is an outstanding result. Given such a result, this factor supports the requested fee award.

## 9.     The Experience, Reputation, and Ability of the Attorneys

When this MDL litigation began, the Court underwent an arduous vetting and selection process to appoint experienced, reputable and able counsel to serve on the PEC.[277] Since then, because of the exceptional work-product performed, the Court has reappointed the PEC Members with twenty-eight (28) PEC firms being appointed for the 2022-2023 Term.[278] On August 22, 2023, the Court agreed to add a fourth Co-Lead Counsel to aid in the future prosecution of this MDL. Moreover, this Court-appointed Class Counsel, which included both Co-Lead Counsel and additional counsel with specific class experience and Phase 2 class member dedication. This factor supports the requested percentage here.

---

[276] Smalling et al., Per- and polyfluoroalkyl substances (PFAS) in United States tapwater: Comparison of underserved private-well and public-supply exposures and associated health implications, Environment International, Volume 178, August 2023, 108033, *available at*: https://www.sciencedirect.com/science/article/pii/S0160412023003069?via%3Dihub.

[277] *See generally*, CMO No. 2.

[278] ECF No. 2259.

The PEC and common benefit attorneys prosecuting this MDL have far more experience both in PFAS litigation and in environmental law, by far, than any other law firms in the country, and the results and efficiency here demonstrate the impact of this prior experience.[279] This factor clearly supports the fee request.

### 10.    The "Undesirability" of the Case

The risks presented by taking on such a massive case with so many Defendants were daunting at the inception of this litigation. "Cases may be deemed 'undesirable' when the defendant is a large corporation with substantial resources, financial and otherwise, for a vigorous defense; and the legal and factual issues presented risks to recovery absent settlement. Where class counsel is a relatively small group of attorneys with limited resources pitted against … [a larger entity] with access to enormous legal resources, the tenth factor weighs in favor of a substantial fee." *Burford v. Cargill, Inc.,* No. 05-0283, 2012 WL 5471985, at *5 (W.D. La. Nov. 8, 2012) (citations omitted). Considering the expense and time involved in prosecuting this case against well-resourced defense counsel on a purely contingent basis, with no guarantee of a positive result and ever-mounting litigation costs in excess of $21 million, risky cases such as this are not for the faint of heart. Whereas many shied away from this litigation, the Court-appointed counsel poured their heart and soul into this litigation and should be rewarded accordingly. This factor also supports the requested percentage.

### 11.    The Nature and Length of the Professional Relationship with the Client.

This *Barber* factor was designed to consider those instances when "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson*, 488 F.2d at 719. "The meaning of this factor, however, and its effect on

---

[279] Herman Decl., at ¶¶ 8, 16 Fitzpatrick Decl., at ¶ 26.

the calculation of a reasonable fee has always been unclear…Courts applying the [Barber] factors typically state this particular standard is irrelevant or immaterial. *Bruner v. Sprint/United Mgmt. Co.*, Nos. 08-2133-KHV, 08-2149-KHV, 2009 WL 2058762, at *9 (D. Kan. July 14, 2009).

Here, many counsel have longstanding client relations with their PWS clients having represented them other contamination cases. If this factor is to be given weight, then it should weigh in favor of Counsel' fee request because the long-standing relationships that certain counsel have with established clients motivates them to conduct high-quality work to maintain these ongoing client relationships.

### 12. Awards in Similar Cases

All but two of the *Barber* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate percentage award. The final *Barber* factor provides guidance as to how to concretize abstract consideration of the other factors into a definitive percentage fee award. This factor prescribes consideration of "awards in similar cases." *Barber*, 577 F.2d at 226 n.28. Such consideration is a dominant feature of contemporary Percentage of Funds fee adjudication.[280]

To aid the Court in making this evaluation, as noted above, Plaintiffs retained Mr. Fitzpatrick, a renowned academician in this area of the law, to review the *Barber* factors to opine on the reasonableness of Class Counsel's fee request. He determined with respect to the factors relating to fee awards in other cases, that is, factors five (the customary fee) and twelve (awards in similar cases), counsel's fee request here is below the norm.[281] In fact, in this Circuit, Plaintiff's expert's empirical study found that the mean and median percentage-method awards were 25.2%

---

[280] *See generally,* Fitzpatrick Decl.
[281] Fitzpatrick Decl., at ¶¶ 14-17.

and 28%.[282] Far greater than what is being requested here.  Moreover, this same study found that across all percentage method fee awards considered, the fee request herein is at very low end of the spectrum, as depicted below (the red arrow depicts the fee request here):[283]



Figure 1: Percentage-method fee awards among all federal courts, 2006-2007

Of course, as a super mega fund settlement, this settlement is far larger than most. However, notwithstanding this size of the settlement, even among other billion-dollar-plus settlements, this fee request still remains below the norm[284] and thus these factors clearly support the fee request.

With respect to those factors that address the results obtained in the litigation, namely, factors:  two (the novelty and difficulty of the questions raised); three (skill required to properly perform the legal services rendered); four (the quality of representation); six (the attorney's

---

[282] *Id.* at 14.
[283] *Id.* at ¶15.
[284] *Id.* at ¶ 17.

expectorations at the outset of the litigation) eight (results obtained) and ten (the undesirability of the case), as set forth above, given the extensive risks in pursuing this litigation, and the settlements obtained, there can be little doubt that this is a formidable outcome for the Class.[285]

With respect to factor one (time and labor required), this factor supports the fee request. This litigation has been ongoing for over 4.5 years, and as set forth in the Perry Decl., Douglas Decl., Napoli Decl., London Decl., Summy Decl., Newman Decl., Olsen Decl. and Bowden Decl., counsel have expended 414,900.9 hours in attorney time and conducted massive common benefit work on behalf of the Class.

Finally, with respect to the *Barber* factors that go to the skills of class counsel and their relationship to the plaintiffs, these factors likewise support Class Counsel's requested fee.[286] These factors include: three (Skill Requisite to Perform the Legal Service Properly); four (The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case); seven (Time Limitations Imposed by the Client or the Circumstances); nine (The Experience, Reputation, and Ability of the Attorneys) and eleven (The Nature and Length of the Professional Relationship with the Client). As set forth the Fitzpatrick Decl., with respect to skill of counsel specifically, the result speaks for itself.[287] As such, these factors likewise support the fee request.

As demonstrated above, the requested fee percentage is well within the range of percentages that have been awarded in super-megafund cases and by courts in this Circuit. Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the 8% fee requested. As the other *Barber* factors fully endorse the requested fee, the fee requested should be awarded.

---

[285] Fitzpatrick Decl., at ¶¶ 18-20.
[286] *Id*. at ¶¶ 18, 26.
[287] *Id*. at ¶ 26.

### C.    THE LODESTAR CROSS-CHECK CONFIRMS THAT CLASS COUNSEL'S FEE REQUEST IS REASONABLE

Although optional, a lodestar cross-check is often employed to ensure that the percentage awarded describes a reasonable attorney's fee.[288] Indeed, the first *Barber* principle (the time and labor expended) encourages this consideration. *See Allura*, 2021 WL 2043531, at \*4. When undertaken as a "cross-check on the reasonableness of a percentage fee request," the Court need not "exhaustively scrutinize the hours documented by counsel and the reasonableness of the claimed lodestar can be tested by the court's familiarity with the case." *Savani v. URS Professional Solutions LLC*, 121 F. Supp. 3d 564, 575–76 (D.S.C. 2015). Indeed, the cross-check is applied in a "broad," "rough," "abbreviated," "streamlined," and "imprecise" way.[289]

To conduct the lodestar cross check, the Court multiplies the number of hours reasonably spent by a reasonable hourly rate. A "reasonable hourly rate" is determined by the "customary fee for services by experienced counsel in a case like this," *Savani*, 121 F. Supp. 3d at 576, and "should be in line with the market rate for 'similar services by lawyers of reasonably comparable skill, experience, and reputation,'" *Berry v. Wells Fargo & Company*, 2020 WL 9311859, at \*14 (D.S.C. 2020).

---

[288] However, when the lodestar method is employed, because it is deemed "presumptively reasonable," a percentage of fund crosscheck is contraindicated. *See In re Lumber Liquidators Chinese-Manufactured Flooring Prods. Mktg., Sales Pracs. & Prods. Liab. Litig.*, 27 F.4th 291, 307 (4th Cir. 2022).

[289] Herman Decl. at ¶¶ 22, 71 (citing *Cantu-Guerrero v. Lumber Liquidators*, 952 F.3d 471, 482 n.7 (4th Cir. 2020) (a so-called "lodestar cross-check" is the comparison of a calculation of attorney's fees using the percentage-of-recovery method to a "rough" or "imprecise" lodestar calculation); *In re Deepwater Horizon*, MDL No. 2179, Rec. Doc. 21849 [2016 U.S. Dist. LEXIS 147378] (E.D. La. Oct. 25, 2016) at p.30 ("the Court will perform an abbreviated lodestar analysis as a broad cross-check on the on the reasonableness of the fee arrived at by the percentage method") and at p.39 ("the loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination"); *In re Vioxx*, 760 F.Supp.2d 640, 652 (E.D. La. 2010) ("The lodestar analysis is not undertaken to calculate a specific fee, but only to provide a broad cross check on the reasonableness of the fee arrived at by the percentage method")).

Because the MDL procedure consolidates cases filed by lawyers who typically practice in varied and disparate jurisdictions, district courts often look to a "national rate" rather than the market rate of the locality where the MDL happens to be. In the *Transvaginal Mesh Litigation*, Judge Goodwin, sitting in the Southern District of West Virginia, observed that "these MDLs encompass law firms from across the country and are national in scope" and therefore: "When selecting an hourly rate for determining legal fees the court cannot consider just one market because 'the relevant legal community' is one national in nature."[290]

Although some MDL litigation may involve more localized parties, justifying giving great weight to the local "market," MDL 2873 reaches a national and international scope of Plaintiffs and Defendants and involves legal issues that turn on national security policy, national environmental regulations, nationwide contamination, nationwide and international product distribution, and universal health concerns. *See In re Actos (Pioglitazone) Prods. Liab. Litig.*, 274 F. Supp. 3d 485, 520 (W.D. La. 2017) (where "plaintiffs and plaintiffs' counsel span the entire United States of America; the venue proper as to each individual claim spans the entire United States, and the PSC, PEC, and Participating Counsel comprise attorneys whose practices span the entire United States," the "relevant legal community," " is national in nature.").

The Fourth Circuit agrees with this approach. Although "[t]he relevant market for determining the prevailing rate is ordinarily the community in which the court where the action is prosecuted sits," *National Wildlife Federation v. Hanson*, 859 F.2d 313, 317 (4th Cir.1988), "[i]n circumstances where it is reasonable to retain attorneys from other communities, however, the rates in those communities may also be considered." *Rum Creek Coal Sales, Inc v. Caperton*, 31 F.3d 169, 175 (4th Cir. 1994); *Morris v. Bland*, 2015 WL 12910631, at *3 (D.S.C. 2015)

---

[290] Herman Decl. at ¶¶ 26, 36-37 (*citing In re Cook Medical, Inc., Pelvic Repair Systems Prods. Liab. Litig.*, 365 F. Supp. 3d 685, 701 (S.D. W.Va. 2019)).

("Charleston is ordinarily the community that the Court would consider. However, because Plaintiff is a resident of York County, it was reasonable for her to obtain local counsel there, and the Court will consider the rates where counsel is located as well.").[291]

In this case, a lodestar crosscheck confirms the reasonableness of the fee request.[292] The lodestar calculated here ranges between $300,803,152.50 and $342,293,242.50 based on the 414,900.9 hours that were submitted to Mr. Perry[293] and the blended hourly rates of $725-$825 approved by Mr. Herman.[294] Viewed in insolation, counsel's lodestar vastly exceeds the $94,800,000 fee requested from the DuPont Settlement. Indeed, a negative multiplier would have to be applied to arrive at the fee requested from the DuPont Settlement alone. This cross-check resoundingly proves that even a greater fee is in order here. However, because Class Counsel submit that the DuPont Settlement should be considered in tandem with the 3M Settlement for purposes of fee calculations a different math applies. If the aggregate minimum of both Settlements are considered, the requested 8% fee equals $ 934,800,000 (($1,185,000,000 + $10,500,000,000.00) x .08). This combined fee is fully justified as it merely requires a lodestar multiplier ranging between 2.8 and 3.12, depending on the blended rate employed. Either multiplier is well within the range of permissible multipliers, and thus the lodestar cross check fully supports the fee request.[295]

In fact, a higher multiplier is likely warranted as this is on the lower end of the range of multipliers seen in billion-dollar cases, which is between 1.0 and 6.2.[296] The fact that the range of multipliers here (2.8-3.12) is within the appropriate range (1.0 to 6.2), supports the appropriateness

---

[291] Herman Decl. ¶ 38.
[292] Fitzpatrick Decl., at ¶¶ 21-25.
[293] Perry Decl., at ¶ 20.
[294] Herman Decl., at ¶¶ 11, 56-83.
[295] Fitzpatrick Decl., at ¶¶ 24-25.
[296] *Id*. at 24.

of the already lower than norm fee request. Moreover, even if additional settlements occur in this, the Court can continue to do Lodestar analyses should it so choose in order to confirm that the multiplier remains within this appropriate range.[297]

### D. PLAINTIFFS' COUNSEL ARE ENTITLED TO REIMBURSEMENT OF OUT-OF-POCKET COSTS

Class Counsel also request that the Court grant Plaintiffs' application for reimbursement of their out-of-pocket costs incurred in prosecuting and resolving this litigation for Class Members. As discussed above, Plaintiffs have incurred $21,362,132.10 in total costs.[298] At present, Plaintiffs seek 10% of those incurred costs, or $2,136,213.21,[299] which approximates DuPont's proportionate share of the aggregate Settlement Amounts of the DuPont and 3M PWS Settlements.[300]

As courts have recognized, "Class Counsel had a strong incentive to keep expenses at a reasonable level due to the high risk of no recovery when the fee is contingent." *Beesley v. Int'l Paper Co.*, No. 3:06-CV-703-DRH-CJP, 2014 WL 375432, at *3 (S.D. Ill. Jan. 31, 2014).This is certainly true, here, where Plaintiffs' counsel only expended what was reasonably necessary to prosecute and resolve the case for the Class Members, and, as discussed above, with the remote protocols that were put in place in this MDL, significant expenses were saved. As such, Plaintiffs respectfully submit that the cost reimbursement here is reasonable and appropriate and should be reimbursed.[301]

---

[297] Fitzpatrick Decl., at ¶ 23.
[298] Perry Decl., at ¶ 21.
[299] Fitzpatrick, at ¶ 27.
[300] *See* § II.B, *supra*.
[301] Fitzpatrick, at ¶ 28.

## V.     CONCLUSION

For the reasons set forth above, Class Counsel respectfully request that this Court recognize the exceptional work performed to achieve this historic settlement with DuPont by awarding them:

> 8% in fees of the DuPont settlement in the amount of $94,800,000, with 5% of that amount, or $4,740,000.00, held back for legal fees to administer the DuPont PWS settlement through 2030; and

> Reimbursement of costs in the amount of $2,136,213.21.

Further, for this class settlement, Class Counsel request that the Court direct the 8% fee award to be credited against any individual counsel's retainer fee such that any private contract will be reduced by 8%.

Dated: October 15, 2023

Respectfully submitted,

/s/ Michael A. London
Michael A. London
Douglas and London P.C.
59 Maiden Lane, 6th Floor
New York, NY 10038
212-566-7500
212-566-7501 (fax)
mlondon@douglasandlondon.com


Paul J. Napoli
Napoli Shkolnik
1302 Avenida Ponce de León
San Juan, Puerto Rico 00907
Tel: (833) 271-4502
Fax: (646) 843-7603
pnapoli@nsprlaw.com

Scott Summy
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, TX 75219
214-521-3605
ssummy@baronbudd.com


Elizabeth A. Fegan
Fegan Scott LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
312-741-1019
beth@feganscott.com


Joseph Rice
Motley Rice LLC
28 Bridgeside Blvd.,
Mt. Pleasant, SC 29464
jrice@motleyrice.com

*Class Counsel*